UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JONATHAN "JAY" SOLOMON                          :
1640 Florida Avenue, NW                         :
Washington, DC 20009                            :
                                                :
                Plaintiff                       :
                                                :
        v.                                      :
                                                :
DECHERT LLP                                     :       Civil Action No.
1900 K Street, NW                               :       1:22-cv-03137-JEB
Washington, DC 20036                            :
                                                :
and                                             :
                                                :
DAVID NEIL GERRARD                              :
Hunters Farm, Courtlands                        :
Nutley, Uckfield                                :
TN22 3LS                                        :
East Sussex, United Kingdom                     :
                                                :
and                                             :
                                                :
DAVID GRAHAM HUGHES                             :
59 Canons Drive, Edgware                        :
HA8 7RG, United Kingdom                         :
                                                :
and                                             :
                                                :
NICHOLAS DEL ROSSO                              :
1909 Maryland Ave.                              :
Charlotte, NC 28209                             :
                                                :
and                                             :
                                                :
VITAL MANAGEMENT SERVICES, INC.                 :
1340 Environ Way                                :
Chapel Hill, NC 27517                           :
                                                :
and                                             :

1

```
                                         :
                                         :
AMIT FORLIT                              :
5-A Habarzel Street                      :
Tel Aviv, 69710-02                       :
Israel                                   :
                                         :
and                                      :
                                         :
ISRAEL INSIGHT ANALYSIS                  :
AND RESEARCH, LLC                        :
13727 SW 152 St., # 715,                 :
Miami, Florida 33177                     :
                                         :
and                                      :
                                         :
SDC-GADOT LLC                            :
W 210 89th Street, Apt 1K                :
New York, NY 10024                       :
                                         :
and                                      :
                                         :
AMIR HANDJANI                            :
290 West Street, Apt 6A                  :
New York, NY 10013                       :
                                         :
and                                      :
                                         :
ANDREW FRANK                             :
370 Lexington Ave., Suite 2001           :
New York, NY 10017                       :
                                         :
and                                      :
                                         :
KARV COMMUNICATIONS, INC.                :
370 Lexington Ave., Suite 2001           :
New York, NY 10017                       :
                                         :
                   Defendants.           :
_____ :
```

## AMENDED COMPLAINT

1.      Plaintiff, by counsel, respectfully brings this action against Defendants Dechert LLP, David Neil Gerrard, David Graham Hughes, Nicholas Del Rosso, Vital Management Services, Inc., Amit Forlit, Insight Analysis and Research LLC, SDC-Gadot LLC, Amir Handjani, Andrew Frank, and KARV Communications, for the damages the Plaintiff has suffered as a result of the Defendants' conspiracy, racketeering, mail and wire fraud, personal injury, tortious interference with Plaintiff's business relationships, entitlements and resultant damages and related torts, which includes Defendants conspiring with others, illegal hacking, kidnapping, perjury, witness tampering, obstruction of justice, extortion, money laundering and theft of highly confidential information, documents, and materials.

## JURISDICTION, VENUE, AND CHOICE OF LAW

2.      This Court exercises subject matter jurisdiction in accordance with the provisions of 18 U.S.C. §§ 1962, 1964(c).

3.      Defendant Dechert LLP ("Dechert") is a global law firm with, upon information and belief, approximately 1000 lawyers worldwide of which approximately 600 practice out of one or more offices in the United States.  Exercise of jurisdiction over Defendant Dechert is proper pursuant to 18 U.S.C. § 1965(b) and DC Code § 13–423(a)(3). Of the 22 offices listed on its website, ten are located in the United States: Washington, DC, Austin, Boston, Charlotte, Chicago, Los Angeles, New York, Philadelphia, San Francisco, and Silicon Valley.  Dechert employees nearly 100 lawyers, as well as related support staff, in its Washington DC office located at 1900 K Street NW.  As the firm has acknowledged in connection with a federal court proceeding, Dechert operates as a single firm and its offices are effectively a single entity.

3

4.      Defendant David Neil Gerrard ("Mr. Gerrard") at all times relevant hereto was the co-head of Dechert's White Collar Compliance and Investigations practice ("White Collar Practice") and in that role maintained an office in Dechert's New York location in the United States from which he regularly transacted business.  Exercise of jurisdiction over Defendant Mr. Gerrard is proper pursuant to 18 U.S.C. § 1965(b) and DC Code § 13–423(a)(3). Mr. Gerrard has transacted business and engaged in conduct in the United States which gives rise in part to the damages that Plaintiff Jay Solomon suffered in Washington DC. Dechert's page for its White Collar Practice touts that "Clients seek out our white collar lawyers in Washington, D.C., London, and other global hubs for good reason . . . Our global presence enables us to represent clients both in single and multi-jurisdictional matters – criminal cases, internal investigations, enforcement matters – worldwide."  Regarding internal investigations, Dechert states that "Dechert has represented clients in all phases of internal investigations, and we have extensive experience in the full range of matters that often parallel or derive from them. Our familiarity and frequent interactions with regulators and enforcement agencies enhance our ability to protect our clients' interests." Accordingly, Mr. Gerrard as a partner of Dechert and as a leader of Dechert's White Collar Practice availed himself and benefited from Dechert's global reach, particularly including its presence in Washington D.C., and including in the context of this specific matter. Upon information and belief, at all times relevant hereto, Mr. Gerrard as part of the acts complained of, and in furtherance thereof, regularly communicated to and/from as well as was located in the District of Columbia including interfering directly or indirectly with Mr. Solomon's employment in Washington, DC. Mr. Gerrard has transacted business and engaged in conduct in the United States which gives rise to the damages Plaintiff Jay Solomon suffered in Washington DC. As

detailed further below, Defendant Mr. Gerrard engaged in conduct in the United States and directed toward the United States related to the scheme and directed at the United States proceedings. For the same reasons, Mr. Gerrard has engaged in intentional, wrongful, illegal, and/or acts the effects of which Mr. Gerrard knew and intended would be felt in the United States and Washington, DC. Also, as set forth more fully herein, Mr. Gerrard's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or acts in the United States and Washington DC. Mr. Gerrard was aware of the effects in the United States and Washington DC of those acts. The activities of Mr. Gerrard's co-conspirators and agents were to the benefit of Mr. Gerrard and the enterprise, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Mr. Gerrard in committing those acts.

5.     Defendant David Graham Hughes ("Mr. Hughes") is a lawyer and former Dechert partner who served as a high-level deputy of Mr. Gerrard in the enterprise. Exercise of jurisdiction over Defendant Mr. Hughes is proper pursuant to 18 U.S.C. § 1965(b) and DC Code § 13–423(a)(3). Mr. Hughes has transacted business and engaged in conduct in the United States which gives rise in part to the damages that Plaintiff Jay Solomon suffered in Washington DC. As detailed further below, Defendant Mr. Hughes engaged in conduct in the United States and directed toward the United States related to the scheme and directed at the United States proceedings. For the same reasons, Mr. Hughes has engaged in intentional, wrongful, illegal, and/or acts the effects of which Mr. Hughes knew and intended would be felt in the United States and Washington, DC. Also, as set forth more fully herein, Mr. Hughes' co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or acts in the United States and Washington DC. Mr. Hughes was aware of the effects in the United States and Washington DC of those acts. The activities of Mr. Hughes'

5

co-conspirators and agents were to the benefit of Mr. Hughes and the enterprise, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Mr. Hughes in committing those acts.

6.     Defendant Amir Handjani ("Mr. Handjani") is a U.S. citizen who lives in New York, New York, and currently serves as a "Senior Advisor" with Defendant KARV Communications Inc. ("KARV").   Defendant Andrew Frank ("Mr. Frank") is a U.S. citizen who lives in New York, New York, and is the founder and current President of Defendant KARV. Exercise of jurisdiction over Defendants Mr. Handjani, Mr. Frank, and KARV is reasonable and proper in this District pursuant to 18 U.S.C. § 1965(a) and DC Code § 13–423(a)(4) because Mr. Handjani, Mr. Frank, and KARV all transacted business and engaged in conduct which give rise to the damages that Plaintiff Jay Solomon suffered in Washington DC. Mr. Frank is the Founder and President of KARV and Mr. Handjani is employed by KARV, which does business in Washington, DC. KARV touts on its website that it "has a number of key relationships across the political spectrum in Washington, DC, where we partner to deliver all aspects of lobbying and public affairs services on a federal level." Frank and KARV indeed provide such lobbying and public affairs services to non-Defendant co-conspirator the Emirate of Ras Al Khaimah ("RAK"). According to Foreign Agents Registration Act ("FARA") filings with the US Department of Justice in Washington, DC, KARV has served as a registered foreign agent of RAK since 2013. Mr. Handjani worked directly with RAK in his capacity as an employee at KARV.   KARV, Mr. Frank and Mr. Handjani's involvement in the enterprise include the receiving materials unlawfully obtained by the enterprise through hacking and then disseminating those materials to the press, including members of the press in Washington DC, for the purpose of attacking the credibility of

Mr. Solomon and others associated with him.  According to his own website, Mr. Handjani is a Non-Resident Fellow at the Quincy Institute for Responsible Statecraft, a Security Fellow with the Truman National Security Project and a member of the Executive Committee of the Board of Directors, at the Atlantic Council, all three of which are think tank organizations headquartered in Washington, DC.

7.      Defendant Nicholas Del Rosso ("Mr. Del Rosso") lives and resides in Charlotte, North Carolina, and is the owner of Defendant Vital Management Services, Inc. ("Vital"), a company organized and based in North Carolina.  Exercise of jurisdiction over Defendants Mr. Del Rosso and Vital is proper pursuant to 18 U.S.C. § 1965(b) and DC Code § 13–423(a)(3). Mr. Del Rosso and Vital have transacted business and engaged in conduct in the United States which gives rise to the damages that Plaintiff Jay Solomon suffered in Washington DC. As detailed further below, Defendants Mr. Del Rosso and Vital engaged in conduct in the United States and directed toward the United States related to the scheme and directed at the United States proceedings. For the same reasons, Mr. Del Rosso and Vital have engaged in intentional, wrongful, illegal, and/or acts the effects of which Mr. Del Rosso and Vital knew and intended would be felt in the United States and Washington, DC. Also, as set forth more fully herein, Mr. Del Rosso and Vital's coconspirators and agents have engaged in intentional, wrongful, illegal, and/or acts in the United States and Washington DC. Mr. Del Rosso and Vital were aware of the effects in the United States and Washington DC of those acts. The activities of Mr. Del Rosso and Vital's co-conspirators and agents were to the benefit of Mr. Del Rosso, Vital and the enterprise, and their co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Mr. Del Rosso and Vital in committing those acts.

8.      Defendant Amit Forlit ("Mr. Forlit") is a resident of Israel and the owner of U.S. companies Defendants Insight Analysis and Research LLC ("Insight") and SDC-Gadot LLC ("SDC" or "SDC-Gadot"). Defendants Insight and SDC are alter egos of Defendant Mr. Forlit as he is the sole member of same and exercises full and complete control over said entities. Exercise of jurisdiction over Defendants Mr. Forlit, Insight, and SDC-Gadot is proper pursuant to 18 U.S.C. § 1965(b) and DC Code § 13–423(a)(3). Mr. Forlit, Insight and SDC have transacted business and engaged in conduct in the United States, which give rise to the damages that Plaintiff Jay Solomon suffered in Washington DC, Defendants Mr. Forlit, Insight and SDC engaged in conduct in the United States and directed toward the United States related to the scheme and directed at the United States proceedings. For the same reasons, Mr. Forlit, Insight and SDC have engaged in intentional, wrongful, illegal, and/or acts the effects of which Mr. Forlit, Insight and SDC knew and intended would be felt in the United States and Washington, DC. Also, as set forth more fully herein, Mr. Forlit, Insight and SDC's coconspirators and agents have engaged in intentional, wrongful, illegal, and/or acts in the United States and Washington DC. Mr. Forlit, Insight and SDC were aware of the effects in the United States and Washington DC of those acts. The activities of Mr. Forlit, Insight and SDC's co-conspirators and agents were to the benefit of Mr. Forlit, Insight and SDC and the enterprise, and their co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Mr. Forlit, Insight and SDC in committing those acts. The Defendants are subject to suit in the courts of the United States pursuant to FCRP Rules 4(k)(1)(A) and 17(b)(2).

9.      Venue lies in this Court pursuant to 28 U.S.C. § 1965, which provides, *inter alia*, that any civil action or proceeding arising under 28 U.S.C. § 1964 against any person may be

instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

10.     Actions for receiving income, derived directly or indirectly from a pattern of racketeering activity are unlawful under 28 U.S.C. § 1962, and any person injured in his business by reason of under 28 U.S.C. § 1962 may sue in any appropriate U.S. district court and shall recover threefold the damages he sustains and the costs of the suit, including reasonable attorney's fees under 28 U.S.C. § 1964(c).  Any acts involving kidnapping and extortion which is chargeable under State law and punishable by imprisonment for more than one year constitutes racketeering activity under 28 U.S.C. § 1961(1)(A) and are unique causes of actions arising out of federal racketeering statute(s) and are controlled by applicable federal law.

## THE PARTIES

### A.  The Plaintiff

11.     Plaintiff Jonathan "Jay" Solomon ("Mr. Solomon") is and, at all times relevant hereto, a resident and domiciled in the District of Columbia.  At all times relevant hereto, Mr. Solomon was a chief foreign affairs correspondent for the *Wall Street Journal* ("WSJ"), based out of the *Wall Street Journal*'s Washington, D.C. bureau where over the span of nearly 20 years he covered national security and U.S. foreign policy. Mr. Solomon was an award-winning world-wide renowned reporter that investigated, wrote and/or broke many stories about United States national security and foreign policy, with postings in East Asia, South Asia, and the Middle East, in addition to Washington. He broke news on a money laundering scheme designed to help Iran evade U.S. sanctions and was the first journalist to report on secret meetings in Oman between American and Iranian officials, which were the precursor to the formal negotiations for the Joint

Comprehensive Plan of Action. The *Wall Street Journal* nominated him for multiple Pulitzer Prizes during his nearly two-decade career with the paper. Notwithstanding Mr. Solomon's stellar career, on June 21, 2017, Mr. Solomon was fired from his job by the *Wall Street Journal* because of the malicious and illegal acts of the Defendants.

12.     Because of Mr. Solomon's pedigree as a journalist and his relationship with key witnesses to relevant illegal activity, he became a target of a racketeering enterprise, directed, operated and/or participated in by Defendants, to the benefit of each in the form of fees received under a lucrative legal services engagement with the Ras Al Khaimah Investment Authority, an instrumentality of the Ras Al Khaimah sheikhdom of the United Arab Emirates.  In performance of their duties to and in concert with RAK, the Defendants engaged in racketeering enterprise and other illegal activities, including serious human rights abuses, all with the goals of, *inter alia*, (a) helping the Ruler of RAK entrench himself in power and eliminate the threats posed by his adversaries, (b) expanding the scope of services that Dechert would perform and (c) ultimately enhancing income that Defendants would receive. The Defendants, their co-conspirators and their fellow participants in the racketeering enterprise came to view Mr. Solomon as a threat to their illegal operations and engaged in further racketeering and other illegal activities as part of a specific effort to, *inter alia*, de-platform Mr. Solomon.

13.     Indeed, on June 21, 2017, Mr. Solomon's employment with the *Wall Street Journal* was terminated in response to the publishing as facilitated by Dechert, Mr. Gerrard and/or their co-conspirators and fellow participants in a racketeering enterprise ("Cohorts")—of confidential communications between Mr. Solomon and his source Farhad Azima ("Mr. Azima"), which were illegally obtained by the hacking of Mr. Azima's email account—as directed and orchestrated by

the Defendants and/or their Cohorts — and which presented suggestive language creating a wrongful appearance of alleged improper, unethical and/or fraudulent dealings between Mr. Solomon and Mr. Azima that never occurred.

14.     The use and dissemination of these communications, directly or indirectly —by Defendants and/or their Cohorts— to various third parties who were not otherwise entitled to know of Mr. Solomon's private communications with his news source, have caused irreparable harm and damage to Mr. Solomon.

15.     These communications had been used by the Defendants and/or their Cohorts and provided to Mr. Solomon's employer, the *Wall Street Journal*, some months earlier but did not result in Mr. Solomon's immediate firing as Mr. Solomon was able to establish to the satisfaction of his employer that he did not engage in the business or the other improper, unethical and/or fraudulent activities suggested by the illegally obtained emails.  However, once these illegally obtained emails were published by the Associated Press, the wide-spread dissemination of the suggestive language had the foreseeable effect of wrongly impugning Mr. Solomon's long-standing reputation as an ethical journalist and resulted in his employer terminating Mr. Solomon's employment relationship.

16.     Mr. Solomon was unaware that he had been the target of the Defendants' racketeering enterprise and that his termination was facilitated by illegal and malicious activity of the Defendants and/or their Cohorts.  Mr. Solomon was unaware of this because the Defendants and/or Cohorts, intentionally and fraudulently concealed their role in the hacking of Mr. Azima's emails by committing and conspiring with others to commit perjury, including by developing and

presenting in court a fabricated story about how the Defendants came into possession of the stolen documents, upon all of which Mr. Solomon relied.

17.     Although Mr. Solomon has come to discover, by way of a series of filings and other developments in lawsuits in the United Kingdom and the United States, that Defendants played a principal role in the hacking of Mr. Azima's emails and using and disseminating the suggestive emails first to Mr. Solomon's employer and later to members of the press, he still does not know the full nature of the Defendants' activities and role in the conspiracy and enterprise.  This hack-and-smear operation by the Defendants and/or their Cohorts caused significant damages to Mr. Solomon's business and property including, but not limited to, causing him to lose his job, and suffer serious embarrassment and damage to his reputation, thereby preventing him from securing future employment in his chosen field of being an investigative reporter and inflicting upon him significant economic loss. In addition, this criminal and racketeering activity effectively caused Mr. Solomon to be blackballed by the journalistic and publishing community in Washington, New York and elsewhere and further caused damage to his business and property by devaluing Mr. Solomon's existing book publishing contracts as the market value of the books he publishes are inextricabilty intertwined with his employment status and reputation as a journalist.

**B.  The Defendants**

18.     Defendant Dechert is a global law firm with, upon information and belief, more than 900 lawyers worldwide of which approximately 600 practice out of one or more offices in the United States. Of the 22 offices listed on its website, ten are located in the United States: Washington, D.C., Austin, Boston, Charlotte, Chicago, Los Angeles, New York, Philadelphia, San Francisco and Silicon Valley.  Dechert employees nearly 100 lawyers, as well as related support

staff, in its Washington DC office located at 1900 K Street NW.  As the firm has acknowledged in connection with a federal court proceeding, Dechert operates as a single firm and its offices are effectively a single entity.

19.     Dechert served as counsel to the Ras Al Khaimah Investment Authority ("RAKIA"), an instrumentality of the Ras Al Khaimah sheikhdom of the United Arab Emirates and works at the direction of Sheikh Saud bin Saqr Al Qasimi—the ruler of RAK ("Sheikh Saud" or "Ruler").  Recently, it has come to light that allegedly illegal and unethical services were provided to RAKIA and RAK by Dechert through current and former partners of Dechert, including *inter alia,* Defendant Neil Gerrard—who for some time served on Dechert's Management Committee— David Hughes ("Mr. Hughes"), Caroline Black ("Ms. Black") and Linda Goldstein ("Ms. Goldstein"), with knowledge, consent, agency, and to the economic benefit of Defendant Dechert.

20.     Dechert played a central role in the enterprise's affairs and criminal activity. To carry out its scheme, Mr. Gerrard and the enterprise relied upon Dechert's infrastructure, partners, employees, financial resources, and reputation. Dechert received millions of dollars in fees as a direct result of the enterprise's continuing campaign of criminal conduct. Dechert and its leadership were at least willfully blind or recklessly indifferent to Mr. Gerrard's misconduct. Dechert ignored "red flags" regarding Mr. Gerrard beginning when it first hired him as a partner in 2010 and turned a blind eye to increasingly clear evidence that emerged over the following decade showing that Mr. Gerrard was involved in serious ethical violations, human rights abuses, and criminal activity, including hacking. Mr. Gerrard and others carried on the affairs of the enterprise out of one or more of Dechert's U.S. based offices.

13

21.     Defendant Mr. Gerrard is one of the leaders of the enterprise. Mr. Gerrard joined Dechert in 2011, retired from Dechert at the end of 2020 and as recent as April 4, 2022 was listed on Dechert's website as a "Retired Partner".  Prior to his retirement, Mr. Gerrard served as Dechert's co-head of its White-Collar Practice, which consists of over one hundred attorneys who primarily work out of Dechert's offices in London, New York and Washington DC, and a member of Dechert's Policy Committee. In those roles, and using the substantial resources provided to him and the enterprise by Dechert, Gerrard directed and oversaw the enterprise's scheme to defraud and harm the Plaintiff and others and the years-long cover up of the enterprise's crimes. Upon information and belief, at all times relevant hereto, Mr. Gerrard as part of the acts complained of, and in furtherance thereof, regularly communicated to and/from as well as was located in the District of Columbia including interfering directly or indirectly with Mr. Solomon's employment in Washington DC.

22.     Defendants Dechert and Mr. Gerrard through their actions, and/or the actions of their Cohorts, which include, but are not limited to, Defendants Vital, Insight and SDC-Gadot, and non-defendants RAKIA, RAK, BellTroX InfoTech Services ("BellTroX") and CyberRoot Risk Advisory ("CyberRoot"), caused and is fully liable and responsible for the injuries described herein, including many predicate offenses under Federal RICO law within the meaning of 28 U.S.C. § 1964(c).

23.     Defendant Mr. Hughes is a lawyer and former Dechert partner who served as a high-level deputy of Mr. Gerrard in the enterprise. Between September 2014 and June 2017, Mr. Hughes was a partner at Dechert, where he worked closely with Mr. Gerrard in organizing and structuring the enterprise, coordinating and carrying out its affairs, and directing and executing its

14

illegal acts. After suddenly leaving Dechert in 2017 and bringing the UK proceeding with him, Mr. Hughes joined Stewarts Law LLP as a partner, where he continued to work with Mr. Gerrard to manage and execute the affairs of the enterprise, including its criminal cover-up campaign.

24.    Defendant Mr. Del Rosso lives and resides in Charlotte, North Carolina, and is the owner of Defendant Vital. Mr. Del Rosso and Vital were hired by the enterprise, acting through Mr. Gerrard and Dechert, to conduct illegal computer hacking operations on its behalf in the U.S. and elsewhere. Mr. Del Rosso repeatedly met with other members of the enterprise in the U.S. to plan and coordinate its affairs. Mr. Del Rosso also worked with other members of the enterprise to obtain and disseminate hacked and stolen materials to harm Mr. Solomon and others; and to manipulate U.S. law enforcement in an effort to silence Mr. Solomon and distract from and conceal the enterprise's criminal conduct.

25.    Defendant Vital is a company organized under the laws of North Carolina and located at 1340 Environ Way, Chapel Hill, North Carolina, 27517. Vital purports to provide legitimate private investigative services but was, in fact, used by Mr. Del Rosso to participate in the enterprise's criminal conduct, including the receipt and transfer of funds into and from the U.S. to pay for and promote the enterprise's illegal hacking and smear operations and obstruction-of-justice campaign.

26.    Defendant Mr. Forlit is a resident of Israel and the owner of Defendants Insight and SDC-Gadot. Acting at the direction of Mr. Gerrard and other members of the enterprise, Mr. Forlit orchestrated the hacking and theft of private emails, and then assisted the enterprise in covering up such conduct through the obstruction of U.S. judicial proceedings. To carry out these crimes and conceal their past criminal actions on behalf of the enterprise, Mr. Forlit utilized Insight and

SDC-Gadot to receive and transfer funds into and from the U.S. to pay for and promote the enterprise's hacking and smear operations and obstruction-of-justice campaign.

27.     Defendant Insight is a limited liability company organized under the laws of Florida with its principal place of business at 13727 SW 152 Street, Unit 715, Miami, Florida. Insight is one of two U.S. entities created, owned, and controlled by Mr. Forlit that the enterprise used to receive millions of U.S. dollars in U.S. bank accounts sent from outside the U.S., which was then used by the enterprise to pay for and promote its hacking and smear operations and obstruction-of-justice campaign, including through further transfers to bank accounts outside of the U.S. In addition, Mr. Forlit used Insight to engage in further transfers in the U.S. to launder funds intended to pay for the enterprise's unlawful activity. Defendant Insight is an alter ego of Defendant Mr. Forlit as he is the sole member of same and exercises full and complete control over said entity.

28.     Defendant SDC-Gadot is a limited liability company organized under the laws of Florida with its principal place of business at 210 West 89th Street, Apt 1K, New York, New York, 10024. SDC-Gadot is one of two U.S. entities created, owned, and controlled by Mr. Forlit that the Enterprise used to receive millions of U.S. dollars in U.S. bank accounts sent from outside the U.S., which was then used by the enterprise to pay for and promote its hacking and smear operations and obstruction-of-justice campaign, including through further transfers to bank accounts outside of the U.S. In addition, Mr. Forlit used SDC-Gadot to engage in further transfers in the U.S. to launder funds intended to pay for the enterprise's unlawful activity. Defendant SDC-Gadot is an alter ego of Defendant Mr. Forlit as he is the sole member of same and exercises full and complete control over said entity.

29.     Defendant Mr. Handjani is a U.S. citizen who lives in New York, New York, and currently serves as a "Senior Advisor" with Defendant KARV. Handjani repeatedly met with other members of the enterprise in the U.S. and elsewhere to plan and coordinate its attacks on Mr. Solomon, Mr. Azima and others, and the cover-up of the enterprise's criminal actions. Mr. Handjani served for many years as a "front man" for the enterprise, tasked with responsibility for befriending Mr. Azima and deceiving him as to the enterprise's role in the hacking and theft of his documents, materials, and other information, all to the detriment of Mr. Solomon. Mr. Handjani also received reports prepared by enterprise hackers, regularly attended high-level enterprise meetings at one or more of Dechert's U.S. offices, and guaranteed offers of payment to witnesses in exchange for testimony concealing the roles of enterprise members.

30.     Defendant Mr. Frank is a U.S. citizen who lives in New York, New York, and is the founder and current President of Defendant KARV. Mr. Frank repeatedly met with other members of the enterprise in the U.S. and elsewhere to plan and coordinate its affairs, received materials unlawfully obtained from Mr. Azima and others by the enterprise through hacking, and then disseminated those materials to the press for the purpose of attacking the credibility of Mr. Solomon, Mr. Azima and others associated with Mr. Azima.

31.     Defendant KARV is a purported communications and lobbying firm located at 370 Lexington Avenue, Suite 2001, New York, NY 10017. According to Foreign Agents Registration Act filings, KARV has served as a registered foreign agent of RAK since 2013. KARV was a key architect of the enterprise's broader strategy for attacking and harming Mr. Azima, and by association, Mr. Solomon. In addition, KARV received materials unlawfully obtained from Mr. Azima and others by the enterprise through hacking and then disseminated those materials to the

press for the purpose of attacking the credibility of Mr. Solomon, Mr. Azima and others associated with Mr. Azima.

### C. Facts

32.     Mr. Solomon was the victim of a multi-million-dollar, and felonious, hack-and-smear operation carried out by an enterprise, which included the Defendants, that engaged in many illegal and racketeering activities over years and targeted individuals in multiple countries. Funding this widespread criminal operation was the ruler of one of the UAE's seven emirates, Sheikh Saud of Ras-al-Khaimah ("Sheikh Saud" or the "Ruler"). Sheikh Saud is believed to have grown convinced that Mr. Azima was part of a broader conspiracy of individuals trying to unseat him. Ras al Khaimah sits astride the Persian Gulf, and its close proximity to Iran makes it extremely strategic. Sheikh Saud directly and/or indirectly hired the Defendants. As part of their engagement, for which they were compensated, the Defendants and/or their Cohorts targeted a range of perceived threats to Sheikh Saud through illegal, unethical and immoral conduct, which inflicted damage upon several individuals, including the Plaintiff Mr. Solomon.

33.     As background, Mr. Solomon was briefed in the fall of 2012 by both American and Israeli intelligence officials that Iran was seeking to use the Republic of Georgia to evade Western sanctions and launder money. The briefings focused on three moneymen for the Islamic Revolutionary Guard Corps ("IRGC") — Houshang Hosseinpour, Pourya Nayebi, and Houshang Farsoudeh — as being at the center of this operation on behalf of the IRGC, a Foreign Terrorist Organization as designated by the US Department of State. The IRGC moneymen used Iranian state funds to buy a Georgian airline, bank, hotel and port. The hotel was sold by the ruler of Ras

al Khaimah, Sheik Saud. Mr. Azima brokered some of these sales, and at the time was on good terms with Sheikh Saud. Nevertheless, Mr. Azima served a source to Mr. Solomon and provided him with information that was critical to Mr. Solomon's reporting on the matter.

34.     About six months later, Mr. Solomon published a front-page story in the WSJ about the three Iranian moneymen and their laundering activities in Europe. The fallout was swift. Georgia ceased its visa-free policy for Iranian nationals in July of 2013 and froze 150 Iranian bank accounts in the country. Tehran's effort to use Georgia as a laundering center was upended, and Sheikh Saud was unable to sell his assets to the three IRGC moneymen, who were in the middle of literally the largest Iranian money laundering operations in the world. Sheikh Saud could have been penalized by the U.S. for sanctions violations and one of his closest personal advisors, Defendant Mr. Handjani, on information and belief, has developed and/or maintained through *inter alia* his work as President of PT International Commodity Trading, strong commercial and other ties with the Islamic Republic of Iran regime, which is designated a state sponsor of terrorism by the US government. Mr. Solomon believes that unbeknownst to him he became a person of concern to the Ruler at or around this time.

35.     Commencing in or around 2014, the Ruler hired Defendants Dechert and Mr. Gerrard to investigate claims of fraudulent activity at RAKIA, allegedly by its former CEO Khater Massaad ("Dr. Massaad"). Immediately prior to this engagement, from 2011-2013, Defendants Dechert and Mr. Gerrard served as counsel leading an internal investigation for the Eurasian Natural Resources Corporation ("ENRC"), in which the Defendants Dechert and Mr. Gerrard were recently found to have committed reckless and negligent breaches of duty by engaging in activities against the client's interests.

36.     In a similar vein, what resulted from the Defendants Dechert, Mr. Gerrard and Mr. Hughes' engagement with the Ruler did not resemble an ordinary, ethical legal services engagement, but rather an abusive display of thuggery, in which the Defendants Dechert, Mr. Gerrard and Mr. Hughes repeatedly and abusively asserted their then-prestigious reputation and role as counsel to Sheikh Saud, under the color of UAE law, to try and intimidate witnesses into providing false testimony against the Ruler's adversaries, while also engaging with a group of "investigation" firms to separately target these adversaries through illegal hacking operations.  All told, the "services" Defendants Dechert, Mr. Gerrard and Mr. Hughes provided initiated, solidified and/or intensified a multipronged conspiracy in which they played a central role leading, coordinating and/or participating, and which amounted to a global racketeering enterprise comprised of  various actors participating in repeated racketeering and other illegal acts that included, *inter alia*,  fraud, human rights abuses, kidnappings, torture, extortion, obstruction of justice, witness tampering, illegal hacking operations, money laundering and attacks against the free press.  This illegal activity also entailed the use of Sheikh Saud's control, by virtue of his position as the Ruler of RAK, over massive business operations and abundant wealth, which was shared with or among the Defendants and/or Cohorts in the form of lucrative contracts for services provided.  The illegal activities engaged in by the racketeering enterprises occurred in and/or impacted countries and cities across the world, *inter alia*, the United States of America, the Islamic Republic of Iran, The United Arab Emirates, the United Kingdom, the Republic of Georgia, Israel, Switzerland, and the Republic of Cyprus.

37.     Mr. Solomon was one of many people who were targeted and harmed by the Defendants and/or their Cohorts.  Specifically, the Defendants Dechert and Mr. Gerrard have

admitted having viewed Mr. Solomon as a threat due to his relationships with key witnesses of the Defendants relevant illegal activity, including when Mr. Solomon's name was mentioned to Mr. Gerrard by Mr. Azima, who was threatening to tell Mr. Solomon about Defendants Dechert and Mr. Gerrard's racketeering and other illegal activity. At the time, Mr. Solomon was garnering significant international attention for his coverage breaking news that the Obama Administration had secretly organized an airlift of wooden pallets reportedly stacked with $400 million worth of cash to Iran as part of a prisoner exchange. Indeed, Mr. Azima was a source for Mr. Solomon, who had also exposed certain illegal dealings of the racketeering enterprise with Mr. Azima's help, specifically the Iranian money laundering scheme that was of interest to the Ruler, and therefore to the Defendants and/or their Cohorts in their later investigation into emails of Mr. Azima that were hacked and dumped by the Defendants and/or their Cohorts.

38.    Upon discovering Mr. Azima and Mr. Solomon's relationship, Defendants Dechert and Mr. Gerrard immediately instructed their Cohorts including other Defendants to locate documents implicating Mr. Solomon from the batch of documents that were illegally hacked and stolen from Mr. Azima by the Defendants and/or their Cohorts, including via Defendants Mr. Del Rosso and Vital. Within weeks, a tranche of encrypted electronic communications was posted on the internet, which included an entire folder containing communications between Mr. Solomon and Mr. Azima. The Defendants and/or their Cohorts, including Defendants Mr. Forlit, Insight and SDC-Global, located files and created a dossier of communications, which were selected in a manipulative and misleading way to present a false narrative implicating Mr. Solomon in purported improper, unethical and/or fraudulent activities. The Defendants and/or their Cohorts wrongfully disclosed this dossier first to Mr. Solomon's employer, the *Wall Street Journal*, at its

Washington DC bureau, and then to other media outlets in an attempt to malign and discredit him. As a result of the Defendants' actions, Mr. Solomon was discredited and fired by the *Wall Street Journal*, thereby achieving one of the goals and objectives of the conspiracy.

39.     Mr. Solomon was unaware that he had been the target of the racketeering enterprise and that his termination was facilitated by illegal and malicious activity of the Defendants and/or their Cohorts, because the Defendants and/or their Cohorts, intentionally and fraudulently concealed their role in the hacking of Mr. Azima by committing and conspiring with others to commit perjury and by developing and presenting in court a fabricated story about how the Defendants came into knowledge and/or possession of the stolen documents.

40.     A series of filings in new and existing lawsuits collectively recently exposed the architecture and inter-workings of this global racketeering enterprise and highlighted the significant involvement of the attorneys of Defendant Dechert, particularly including but not limited to Defendant Mr. Gerrard, in engaging in a variety of shocking acts in furtherance of the conspiracy and enterprise, as well as the roles of all other Defendants. These filings revealed that a critical component of the racketeering enterprise was to silence, discredit and shift the blame and financial burden of the enterprise onto those individuals that the Defendants and/or their Cohorts perceived as possessing the requisite knowledge, resources and/or desire to expose the racketeering enterprise's illegal activities in material ways, which came to include Mr. Solomon who was fired from his job as a reporter for the *Wall Street Journal* as a result of the illegal, wrongful and conspiratorial conduct of the Defendants and/or their Cohorts.  Two of those filings were lawsuits commenced in 2020, by a pair of former RAKIA executives who claimed that the Ruler and Defendants Dechert, Mr. Gerrard and Mr. Hughes illegally kidnapped, robbed and tortured them

with the aim of extorting false confessions that would implicate the victims along with other targeted individuals perceived as threats to the racketeering enterprise. In their filings, the kidnapped claimants allege that they were abducted and unlawfully detained in September 2014 in RAK on bogus charges of fraud against RAKIA and that, while in detention, Defendants Dechert, Mr. Gerrard and Mr. Hughes made threats to them and their families, which would be carried out unless they gave false testimony implicating, among others, Mr. Azima, who was at the time a source of Mr. Solomon's for his important news gathering and investigative journalism efforts on issues of crucial concern to the public. A June 24, 2022 filing with the High Court of Justice Business and Property Courts of England & Wales, Business List revealed that in January of 2016, the Defendants and/or their Cohorts were aware and found significant that Mr. Azima had connected Mr. Solomon with one of those kidnapped claimants.

41.     As a result of the filing on October 15, 2020 of a complaint against Defendants Vital and its president and owner Mr. Del Rosso in U.S. District Court for the Middle District of North Carolina by Mr. Azima, Mr. Solomon learned of the allegations that Defendant Dechert was involved in the hacking and hired, paid, directed Defendants Mr. Del Rosso and Vital to hack Mr. Azima.  The allegations included, but were not limited to, that Defendants Vital and Mr. Del Rosso stole Mr. Azima's computer data, including emails, which were then dumped online and used by the Defendants and their Cohorts in an attempt to ruin Mr. Solomon and Mr. Azima's reputations and damage them financially.

42.     These stolen emails were used to ruin Mr. Solomon's reputation and damage him financially by causing him to, *inter alia,* lose his job with the *Wall Street Journal*.

43.     More information about the Defendants' fraudulently concealed roles in directing the hacking of Mr. Azima came to light on January 7, 2022, when an investigator named Stuart Page ("Mr. Page") filed a corrected witness statement with the Business and Property Courts of England and Wales as part of a lawsuit commenced in 2016 by RAK against Mr. Azima. This statement "corrected" his prior June 20, 2019 witness statement, which had initially corroborated Defendant Mr. Gerrard's June 24, 2019 statement, both in the same 2016 case.  Mr. Page and Defendant Mr. Gerrard's fabricated 2019 statements painted a picture of Mr. Page casually learning about Mr. Azima's hacked-and-dumped emails from a friend, Majdi Halabi, and passing this information along indirectly to Defendant Mr. Gerrard through then-RAKIA executive Jamie Buchanan ("Mr. Buchanan"). However, Mr. Page's corrected 2022 statement disclosed that he and Defendant Mr. Gerrard conspired with others to fabricate their testimony first at a meeting in Cyprus and later in Switzerland to participate in a mock trial led by Defendant Mr. Gerrard to ensure the perjury would withstand cross examination. In his corrected testimony, Mr. Page explained that the data was obtained by Mr. Forlit, an investigator who was a professional hacker who headed one or more companies which were being paid by "various RAK entities" through Mr. Page, who negotiated the budget with Defendant Mr. Gerrard and Mr. Buchanan. Mr. Page further explained that Mr. Forlit was retained to perform certain hacking efforts to discover information in particular about a transaction that Mr. Azima brokered—RAKIA's sale of the Sheraton Metechi Hotel in Tblisi, Georgia to three Iranian buyers who had been placed on the US sanctions list for laundering money on behalf of the Islamic Republic of Iran, a scheme which was uncovered due in part to the reporting of Mr. Solomon with the help of Mr. Azima and one of the kidnapped RAKIA executives.

44.     On February 2, 2022, Mr. Halabi submitted a corrected witness statement in which he disclosed that the cover story he provided in his earlier witness statement, like Mr. Page's, was "concocted during a number of meetings which took place been 2017 and 2019 between (variously)," Defendants Mr. Gerrard, Mr. Hughes, and Mr. Forlit, as well as co-conspirator non-defendants Mr. Page and Mr. Buchanan.  Both Mr. Halabi's cover story and details about the formation of the concocted and untrue cover story align with Mr. Page's accounts of each.

45.     Indeed, Defendant Mr. Gerrard's claim of playing no role in the hacking of Mr. Azima's email account were materially discredited and proved perjurious by the corrected statements filed by Mr. Page on January 7, 2022 and by Mr. Halabi on February 2, 2022. By way of this coordinated scheme to commit perjury, the Defendants concealed from Mr. Solomon the fact that they directed the hacking of Mr. Azima's account and were instrumental in using the communications that they themselves stole to get Mr. Solomon fired.

46.     Mr. Solomon's job and reputation as a reporter was integral to his ability to earn, his book publishing business and his identity, and the loss of his job and the tarnishing of his reputation has caused him serious economic loss, damage to business and property, severe mental anguish and extensive emotional injuries.

### Relevant History of RAK and the Ruler

47.     From the 1980s, Dr. Massaad established and managed businesses in RAK including RAK Ceramics, of which both he and Sheikh Saud, were founders and significant shareholders.

48.     In October 2010, the late Sheikh Saqr Bin Muhammad Al Qasimi (the "Late Sheikh")—who until then was the Emir of RAK—passed away.  His son, Sheikh Saud ultimately

received the backing of Abu Dhabi over his half-brother Sheikh Khaled bin Saqr Al Qasimi ("Sheikh Khaled") and succeeded his father as Emir of RAK. Sheikh Khaled was the Crown Prince and Deputy Ruler of RAK between around 1958 until around June 2003 when the Late Sheikh removed him and replaced him with the Ruler. This was an unpopular move in some quarters leading to street protests in favor of Sheikh Khaled in RAK, and he retained significant support in the Emirate to succeed the Late Sheikh. Accordingly, Sheikh Saud has long viewed Sheikh Khaled as a threat to his power.

49.    From 2006 to 2010, RAKIA made, with the full knowledge and approval of Sheikh Saud, very significant investments outside RAK, particularly in Georgia, which included shares in Poti Sea Port, the Sheraton Metechi Palace Hotel and Poti Port Free Industrial Zone, and a property development company called Rakeen Developments. The background to these investments is that, prior to his succession, the Ruler had been keen to build up RAKIA's investments outside RAK, and had directed that this be done, because he was concerned about Sheikh Khaled. The Ruler was concerned that when his father passed away Abu Dhabi, the most powerful of the Emirates, might favor Sheikh Khaled and allow him to succeed to the throne of RAK in his place. He wished to have considerable assets which he could control for his own benefit, with the assistance of Dr. Massaad, outside RAK, should he not become the next Emir, rather than holding assets within RAK/the UAE and which would therefore be within the direct reach of a future government of RAK with Sheikh Khaled as Emir.

50.    Upon his succession in October 2010, the Ruler appointed his son, Sheikh Mohammed bin Saud bin Saqr Al Qasimi ("Sheikh Mohammed"), as Crown Prince. In so doing, the Ruler broke his promise to make his brother Sheikh Faisal bin Sultan Al Qassimi ("Sheikh

Faisal") the Crown Prince, which he made in 2003 upon becoming Crown Prince himself. At about the same time, Sheikh Faisal was also removed from his role as Chairman of the Ras Al Khaimah Free Zone Authority and replaced by another of the Ruler's brothers, Sheikh Ahmed Bin Humaid Al Qasimi ("Sheikh Ahmed"), who was considered more loyal to the Ruler. This caused animosity between the Ruler and Sheikh Faisal, and the Ruler has viewed Sheikh Faisal as a threat to his power ever since.

51.    Also, upon his succession, the Ruler abolished the role of Deputy Ruler, which he had promised to his other brother Sheikh Taleb bin Saqr Al Qassimi ("Sheikh Taleb"), also in 2003. This caused animosity between the Ruler and Sheikh Taleb, and the Ruler has viewed Sheikh Taleb as a threat to his power ever since.

52.    At the time of the Ruler's succession, Dr. Massaad was serving as an adviser to the Ruler and as RAKIA's Chief Executive Officer; he was the Ruler's close friend and confidant, in his presence on a daily, or almost daily, basis. The Ruler and Dr. Massaad were also business partners, as co-founders and co-owners of RAK Ceramics, which had become the world's largest ceramics manufacturer due to Dr. Massaad's business acumen. The Ruler obtained significant private wealth through his shareholding in RAK Ceramics and RAKIA. Also in 2010, Defendant Mr. Handjani, then General Counsel for RAK Petroleum, was added to RAK Petroleum's Board of Directors. Defendant Mr. Handjani was and remains to this day, a trusted adviser of the Ruler. On information and belief, Defendant Mr. Handjani also maintains close ties to the Islamic Republic of Iran.

53.    In the face of continued lobbying through the media by Sheikh Khaled, the RAK economy suffering as a result of the global financial crisis, and the growing Arab Spring

27

movement, the Ruler grew concerned about domestic criticism and potential civil unrest in relation to RAKIA's investments outside RAK, initially made at his direction for his own potential personal financial and/or political benefit.

54.      The Ruler directed that RAKIA should change the policy of foreign investment set in place by Dr. Massaad, that he had previously approved and directed, and instead divest itself of its foreign investments, and invest the proceeds within RAK. Dr. Massaad disagreed with this change of policy, but the Ruler overruled him. The sudden change of policy led to the rushed sale of assets in Georgia at a premature stage with a detrimental effect on the return obtained from them.

55.      Meanwhile, as Crown Prince, Sheikh Mohammed wanted to become the Ruler's closest advisor in place of Dr. Massaad, to take control of RAKIA, and to reduce Dr. Massaad's influence in RAK. Ultimately Sheikh Mohammed succeeded in driving a wedge between the Ruler and Dr. Massaad, and the Ruler turned against Dr. Massaad.

56.      Following the attempted disposal of RAKIA's key overseas assets, Dr. Massaad was sidelined from RAK Ceramics and other RAK businesses during this period, although he continued to work practically full-time for RAKIA until he left RAK in around June 2012.

57.      In the fall of 2012, Mr. Solomon learned through confidential sources that Iran was seeking to use the Republic of Georgia to evade Western sanctions and launder money. The briefings focused on three moneymen for the Islamic Revolutionary Guard Corps ("IRGC") — Houshang Hosseinpour, Pourya Nayebi, and Houshang Farsoudeh — as being at the center of this operation. The IRGC moneymen used Iranian state funds to buy a Georgian airline, bank, hotel and port, of which two of the assets were sold by RAKIA at the direction of the Ruler. Mr. Azima

brokered some of these sales, and at the time was on good terms with the Ruler. Nevertheless, Mr. Azima served as a source to Mr. Solomon and provided him with information that was critical to Mr. Solomon's reporting on the matter.

58.     Mr. Solomon published a front-page story in the *Wall Street Journal* about the three Iranian moneymen and their laundering activities in Europe. The fallout was swift. Georgia ceased its visa-free policy for Iranian nationals in July of 2013 and froze 150 Iranian bank accounts in the country. Tehran's effort to use Georgia as a laundering center was upended, and the Ruler was unable to sell his assets to the three men. The Treasury Department placed the three IRGC operatives on the U.S. sanctions list in early 2014, which barred them from conducting any business in U.S. dollars or with American citizens or entities.

59.     After his attempted sale of the Georgian assets to Iran was frustrated by Mr. Solomon's reporting, the Ruler came to learn Dr. Massaad had launched a business in Lebanon that was backed by Sheikh Faisal, among others. As the Ruler had severely damaged his relationship with Sheikh Faisal in 2010, the Ruler became concerned that Dr. Massaad was working with Sheikh Faisal and others in order to destabilize the Ruler, and that Sheikh Faisal and others were plotting to remove the Ruler with the assistance of Abu Dhabi.

60.     Since finding out about Dr. Massaad's business relationship with Sheikh Faisal in 2014 and following on from the fall-out between Dr. Massaad and the Ruler, and the Ruler's concerns about Dr. Massaad's involvement in suspected moves to oust him by Sheikh Khaled and Sheikh Faisal, the Ruler retained Defendant Dechert, Defendant Mr. Gerrard, Mr. Stewart and others to assist him towards  investigating Dr. Massaad and his alleged co-conspirators, which included Mr. Azima, and with the ultimate goal to eliminate any threats they and/or others posed

to his power. The Ruler had identified Mr. Azima as the U.S.-based operation of those seeking to oust him and therefore as a significant threat.  The matter presented an extremely important – and potentially lucrative – opportunity for Defendants Mr. Gerrard and Dechert to generate substantial fees.

61.     In furtherance thereof, Defendant Mr. Gerrard quickly sought to expand Defendant Dechert's work for their new client.  Under Defendant Mr. Gerrard's direction, Defendant Dechert embarked on a wide-scale global "investigation," which targeted several perceived enemies of its new client. Defendant Dechert, Defendant Mr. Gerrard, Mr. Stewart and others assisted the Ruler with the torturous interrogation of two Jordanian businessmen, Mr. Karam Al Sadeq and Mr. Jihad Quzmar, who had been kidnapped and illegally detained by local police at the Ruler's direction. Defendants Mr. Gerrard, Mr. Hughes and other Dechert lawyers engaged directly and frequently with Mr. Al Sadeq and Mr. Quzmar, seeking to coerce them into providing false confessions that would implicate Dr. Massaad, Mr. Azima and others.

62.     Shortly before being kidnapped, Mr. Al Sadeq was introduced to Mr. Solomon by Mr. Azima in connection with Mr. Solomon's reporting on the IRGC money laundering scheme. A June 24, 2022 filing with the High Court of Justice Business and Property Courts of England & Wales, Business List revealed that in January of 2016, the Defendants and/or their Cohorts were aware and found significant that Mr. Azima had connected Mr. Solomon with Mr. Al Sadeq.

**Kidnapping and extortion of Mr. Al Sadeq**

63.     On January 28, 2020, Karam Salah Al Din Awni Al Sadeq ("Mr. Al Sadeq") initiated proceedings and on March 31, 2020 he filed a Particulars of Claim in the High Court of

Justice of England & Wales, Queen's Bench Division against Defendant Dechert, Defendant Mr. Gerrard, Defendant Mr. Hughes and Caroline Black ("Ms. Black"), another Dechert attorney.

64.     According to his claim, on September 5, 2014, Mr. Al Sadeq was forcibly taken from his home by RAK State Security Investigations personnel without being formally arrested in violation of UAE law. During his detention, Mr. Al Sadeq claims he was detained in inhumane conditions, and subjected to aggressive, coerced interrogations, while blindfolded with his hands tied behind his back, by Defendants Mr. Gerrard, Mr. Hughes and others who made clear that if Mr. Al Sadeq did not give false information to implicate Mr. Azima and his alleged co-conspirators in having committed acts of fraud against RAKIA, he would never be released and his wife Dima Al Sadeq ("Mrs. Al Sadeq") would be arrested on false charges of embezzlement. Mr. Al Sadeq alleged that Defendant Mr. Gerrard had been behind his kidnapping and illegal rendition and was, along with the Ruler, ultimately in charge of Mr. Al Sadeq's detention.

65.     On or around September 17, 2014, Mr. Al Sadeq was taken out of the General Headquarters in RAK, accompanied by Ms. Black and two of her other colleagues from Defendant Dechert, and taken to his office and his home in Dubai. Both these locations were searched by a large team of investigators wearing forensic clothing. Ms. Black was in charge of the search of both properties and directed the investigators to take all possessions from Mr. Al Sadeq's office as well as many from his home, such as papers relating to his business, clothing, jewelry belonging to his wife and children, all electronic items. None of the items taken during these searches were ever returned.

67.     In around early October 2014, during the middle of the night, Mr. Al Sadeq was transferred to the Al Barirat Camp in Al Ashqar in RAK ("Al Barirat"), a camp for the Ruler's

private militia–not an official prison within the RAK criminal justice system, where he claims he was placed  in solitary confinement, this time for around 560 days and was only allowed to leave his cell for limited purposes such as interrogations (many of which were conducted by Defendant Mr. Gerrard, Defendant Mr. Hughes or other attorneys working for Defendant Dechert).

68.     Defendant Mr. Gerrard, Mr. Hughes and Ms. Black and Defendant Dechert were fully aware of the atrocious and abusive conditions in which Mr. Al Sadeq was being kept at Al Barirat and represented that they had the power to ensure that the conditions of his detention improved, if he would confess to matters that were repeatedly put to him, and to implicate Dr. Massaad, Mr. Azima and others for their alleged wrongdoing. Defendant Mr. Gerrard also pressured Mr. Al Sadeq to pay Defendant Dechert's legal fees owed to the firm by RAK.

69.     In particular, Mr. Al Sadeq claims that Defendant Mr. Gerrard asked him to give false evidence that Mr. Azima was an international arms dealer, was manipulating an aviation firm in RAK called RAK Heavy Lift in order to use it as a gun-running vehicle and had embezzled money from the Poti Port project and a shopping center project in Georgia, which in fact had been carried out not by Mr. Azima but by persons known to, and with the knowledge and approval of, the Ruler.

70.     Meanwhile, Mr. Al Sadeq alleges that Ms. Black remained in contact with Mrs. Al Sadeq seeking to ensure that she would not cooperate with a journalist from the Guardian newspaper, Simon Goodley by whom she had been contacted.  Following several more months of being pressured by the Defendants to provide false testimony and without the benefit of legal advice, Mr. Al Sadeq claims he eventually signed statements confessing to his involvement in alleged fraud under duress.

Case 1:22-cv-03137-JEB   Document 47   Filed 02/17/23   Page 33 of 94

71.     Despite the false and fraudulent promises that were made to Mr. Al Sadeq, he remains incarcerated to this day.

**Illegal Hacking of Azima**

72.     In the fall of 2014, Mr. Azima learned of the unlawful detention and interrogations of Mr. Al Sadeq, and Defendant Dechert's involvement in the abuse and mistreatment of Mr. Al Sadeq and others believed to be enemies of RAK.

73.     Mr. Azima, Mr. Massaad, and others sought to end the mistreatment of Mr. Al Sadeq and secure his release by investigating and publicizing the conduct of Defendant Mr. Gerrard and others. Media outlets and humanitarian organizations were provided details of the abuse and began to investigate.  Mr. Azima became a target of Defendant Dechert's investigation on behalf of RAK when he sought to expose RAK's history of human rights abuses generally and, in particular, the human rights abuses against Mr. Al Sadeq and Defendant Mr. Gerrard's role in Mr. Al Sadeq's mistreatment.

74.     In 2015, Defendant Mr. Gerrard identified Mr. Azima as being part of a "US team" acting to publicize the activities of RAK and Defendants Dechert and Mr. Gerrard.  Defendants Mr. Gerrard, Mr. Handjani and Mr. Frank conspired with Mr. Buchanan and others to attack Mr. Azima as evidenced by a report that Defendant Mr. Gerrard admitted to reading and numerous emails between Defendants Mr. Gerrard, Mr. Handjani, and Mr. Frank, as well as Mr. Buchanan, and others, which discussed the conspiratorial scheme, plan and design to "target," "attack," and "go after" Mr. Azima by *inter alia* bringing civil or criminal lawsuits against Mr. Azima.  While at least one member of the enterprise recognized there was no basis for such litigation, the enterprise did in fact seek to bring civil and criminal charges against Mr. Azima based upon hacked

33

material.  The report stated that "[t]he campaign is not public yet, so we will be able to gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans."

75.     The enterprise's scheme to attack Mr. Azima and cause him to incur significant financial damages was reflected in writing.  The plan, which was drafted at least in part by Defendants Mr. Frank and KARV (for whom Defendant Mr. Handjani serves as a senior advisor) with direction from Defendant Mr. Gerrard and others, described a multi-prong approach by the enterprise to attack and damage Mr. Azima, including civil litigation, criminal investigations, and planting stories with media.  One of the objectives of the enterprise's scheme to defraud was to cause economic damages to Mr. Azima and his businesses.

76.     In December 2015, Defendant Mr. Frank, Defendant Mr. Gerrard, and others, including upon information and belief Defendant Mr. Handjani, met in New York to discuss this plan.  In early January 2016, Defendant Mr. Frank provided an informal outline of the plan, which was prepared based on documents obtained through the enterprise's hacking and intelligence-gathering operation described below.  The outline, titled "View from the Window," summarized a strategy for attacking and harming those who had sought to expose the enterprise's criminal conduct, with a particular focus on Mr. Azima.  In the document, Defendant Mr. Frank solicited additional information from Defendants Mr. Gerrard that Mr. Frank could use to develop the outline to attack Mr. Azima and others further.

77.     On or about January 26, 2016, the enterprise prepared a "comprehensive action plan" (the "Action Plan") stating that the enterprise's scheme was about to enter "a new and decisive phase in that a wide-scale legal action is about to commence in multiple jurisdictions"

against Mr. Azima and others. The Action Plan was created shortly after Defendant Mr. Frank's email to Defendant Mr. Gerrard describing the "View from the Window" and includes overlapping content, indicating that Defendants Mr. Frank and KARV were also responsible for drafting the Action Plan. This was later confirmed by Defendant Mr. Gerrard, who testified in a UK court that Defendant Mr. Gerrard hired Mr. Frank to create "a global strategic plan." The ten-page Action Plan identified steps the enterprise would take to damage Mr. Azima's "reputation and even [ex]pose him [to] criminal exposure," including "an online campaign against U.S. individuals." An important step outlined in the Action Plan was "the publishing of selected materials" and the use of "blogs in order to harm his reputation." This component of the Action Plan was also extended to Mr. Solomon who was also named in blogs and articles, and whose business, property and reputation were also targeted and damaged as a result.

78.    The conspiracy took the form of a hack and dump scheme, in which the enterprise through a series of transactions retained multiple, separate teams of hackers: one team consisting of Defendants Vital and Mr. Del Rosso as well as Cyber Defense, BellTrox and CyberRoot in India which hacked Mr. Azima's email account and dumped encrypted tranches of his emails onto a public location accessible through the internet; a second team consisting of Mr. Page, Defendant Mr. Forlit and others who claimed to have "independently" located and advised Defendant Dechert as to the location of those tranches presumably so that Defendant Dechert would have plausible deniability; and a third team consisting of NTi, a firm recommended by Defendant Mr. Del Rosso's lawyer, which downloaded the emails and provided them to Defendant Dechert. All three of these firms were directly or indirectly paid by RAK entities or Defendant Dechert, and in so doing joined and participated in the racketeering enterprise.

79.     The plan involved using these hired hackers to unlawfully access and steal Mr. Azima's confidential and highly sensitive documents, data, and other information, publishing the hacked data to discredit Mr. Azima, and then using that hacked data to embroil Mr. Azima in litigation.  This data included information about Mr. Solomon.

80.     Mr. Page was paid around $300,000 per month (sometimes more) for this work from a variety of RAK entities. This sum would be subject to occasional uplifts for specific pieces of additional work or expenditure which fell outside the scope of his original mandate. Approximately $250,000 per month was then paid by Mr. Page to Defendants Mr. Forlit and Insight for their assistance. Mr. Page made these payments in U.S. dollars sent from outside the U.S. to U.S.-based bank accounts at JP Morgan Chase, Citibank, and Bank of America belonging to Defendant Mr. Forlit's Florida-based companies, Defendant Insight and Defendant SDC-Gadot. At various times, Mr. Buchanan told Mr. Page that the Ruler was considering cutting his budget. However, when Mr. Page explained to Mr. Buchanan and Defendant Mr. Gerrard that this would involve losing access to some of Defendant Mr. Forlit's sources and methods, Defendant Mr. Gerrard and Mr. Buchanan were successful in ensuring that Mr. Page's budget remained at around this level throughout Mr. Page's engagement.

81.     Defendants Vital and Mr. Del Rosso were engaged and paid more than $1 million by Defendant Dechert in concert with RAKIA, directly or indirectly, for their work. Defendants Vital and Mr. Del Rosso paid CyberRoot more than $1 million for CyberRoot's hacking services and the distribution of Mr. Azima's stolen data. At least some of the payments made by Defendant Vital were sent to CyberRoot's bank, Kotak Mahindra Bank. Substantial payments were made to

CyberRoot around the time that Mr. Azima's stolen data was published online in August and September 2016.

82.     This scheme was designed to create the appearance that those responsible for hacking Mr. Azima, those who located the emails and those who provided them to Defendants Dechert and Mr. Gerrard were all disconnected, and at the same time, enable Defendants Dechert and Mr. Gerrard to control and strategically determine which emails would be shared, when and with whom.

83.     As alleged in Mr. Azima's complaint against Defendants Mr. Del Rosso and Vital, Defendant Mr. Gerrard hired Defendants Mr. Del Rosso and Vital purportedly to "investigate assets potentially stolen from the Government of" RAK. In reality, Defendants Mr. Gerrard and Dechert hired Defendants Mr. Del Rosso and Vital to target Mr. Azima and to obtain Mr. Azima's emails and confidential data, as well as for other purposes. Throughout the course of his work for Defendant Dechert, Defendant Mr. Del Rosso communicated with lawyers from Defendant Dechert on a "very regular basis." Defendant Mr. Del Rosso hired Chris Swecker, a North Carolina-based lawyer, to assist Defendants Mr. Del Rosso and Vital in their work for Defendants Dechert and Mr. Gerrard.

84.     Defendant Mr. Del Rosso hired the Indian hacking firm, CyberRoot, to provide the technical expertise to attempt to lure Mr. Azima into providing his login data, so that Defendants and their co-conspirators could have persistent access to Mr. Azima's accounts and computers. At least five employees of CyberRoot, including one of the company's directors, Vibhor Sharma, hacked Mr. Azima pursuant to Defendant Mr. Del Rosso's instructions. CyberRoot was assisted by BellTroX, which permitted CyberRoot to use BellTroX's infrastructure, including its server, to

conduct the hacking. This work was done at the direction of the Defendants and others. CyberRoot and BellTroX share common employees. One such employee is Preeti Thapiyal, whose LinkedIn page lists his work as including the creation of "undetectable phishing Payloads."

85.     CyberRoot, assisted by BellTroX, illegally and wrongfully hacked and gained access to Mr. Azima's computers and accounts through, *inter alia*, phishing and spear-phishing emails. The breach of Mr. Azima's computer systems gave CyberRoot covert and persistent access to Mr. Azima's email accounts and computers and his communications with Mr. Solomon.

86.     Acting at the direction of Defendants Dechert and Mr. Gerrard via Defendants Vital and Mr. Del Rosso, CyberRoot was to create, upload, and transmit multiple unauthorized copies of Mr. Azima's data onto the internet so that it could be independently located but not accessed by others.

87.     Meanwhile, Defendant Mr. Gerrard worked with Mr. Page purportedly to investigate allegations of fraud at RAKIA, but in reality to independently locate the hacked and dumped emails and perform other tasks. Mr. Page in turn retained Defendant Mr. Amit Forlit of Insight to assist with the investigation through the use of, among other methods, signal intelligence (or SIGINT), which is intelligence-gathering by the interception of communications.

88.     Mr. Page understood Defendant Mr. Forlit's firm Insight made use of subcontractors located outside of Israel which employed SIGINT and the use of hacking techniques. Effectively, Defendant Mr. Forlit was hired through Mr. Page to "discover" and disclose the encrypted hacked and dumped emails.

89.     In addition to undertaking some of the investigative work for the project, Mr. Page's role also included sharing reports prepared by Defendants Mr. Forlit and Insight with the Ruler,

Mr. Buchanan and Defendant Mr. Gerrard as securely as possible (given the sensitivity of the reports and what they contained).

90.     In late July 2016, Defendant Mr. Gerrard met with Mr. Azima and threatened him. Mr. Azima, in turn, advised Defendant Mr. Gerrard that he had important contacts, specifically agents of the Central Intelligence Agency and the Plaintiff Mr. Solomon, to whom the Defendants and/or their Cohorts knew he could disclose Defendants Dechert, Mr. Gerrard and RAK's human rights abuses and racketeering activity.

91.     Around this time, members of the enterprise became specifically interested in Mr. Page's investigation into RAKIA's sale of the Sheraton Metechi Hotel in Tblisi, Georgia to three Iranian buyers: Houshang Farsoudeh, Houshang Hosseinpour and Pourya Nayebi (who at the time of Mr. Page's investigation were on the US sanctions list, as a result of Mr. Solomon's reporting on the matter as described above).

92.     Mr. Buchanan told Mr. Page that Mr. Azima had introduced the three buyers to the transaction and asked Mr. Page to look into the sale of the hotel as part of his investigation. The reports ("Hacking Reports") produced by Defendant Mr. Forlit and his team in connection with this part of the investigation contained information derived from SIGINT (or hacked) material.

93.     Within days of Defendant Mr. Gerrard's meeting with Mr. Azima, CyberRoot, which was assisted by BellTroX, created blog sites on or about August 7, 2016, accusing Mr. Azima of fraud, include an entire confidential file wrongfully obtained and produced on the internet dedicated to Mr. Azima's relationship with Mr. Solomon. During this same period, Defendant Mr. Del Rosso made significant payments to CyberRoot for their efforts.

39

94.     The websites contained links to BitTorrent sites that Defendant Dechert later admitted contained large quantities of Mr. Azima's hacked and stolen data. These BitTorrent links were posted by users named anjames and an_james. The usernames anjames and an_james are usernames associated with Sharma at CyberRoot. CyberRoot also used the email account an_james@protonmail.ch to create these blog sites and upload Mr. Azima's hacked and stolen data. One tranche focused on Mr. Azima's dealings with Dr. Massaad. And the second contained stolen and manipulated correspondence between Mr. Azima and Mr. Solomon and was entitled: "Fraud Between Farhad Azima and Jay Solomon."

95.     CyberRoot posted the data on the internet to create the misimpression that the data CyberRoot and Defendants stole from Mr. Azima was available to anyone who used the internet. CyberRoot created BitTorrent links that contained Mr. Azima's hacked and stolen data and those links were posted on the blog sites alleging fraud by Mr. Azima. Mr. Page, Defendant Mr. Del Rosso, Defendant Mr. Gerrard, and an Israeli journalist, Majdi Halabi, created a false story and evidentiary trail to cover up their and RAKIA's responsibility for the hacking, and to wrongly suggest that Mr. Page had innocently found the hacked material on BitTorrents after being alerted to it by Mr. Halabi.

96.     In fact, the data on the BitTorrent links was not accessible to the public because the "seeders" necessary for the data to be downloaded were not available. Defendant Dechert, and others acting at their direction, are the only persons or entities known to have obtained the data from the BitTorrent sites at this time.

97.     In fact, it is now known that in August 2016, Defendant Mr. Forlit provided to Mr. Page the link to a tranche of Mr Azima's confidential data. Mr. Page then passed on the link to Mr. Buchanan and Defendant Mr. Gerrard for their further handling.

98.     According to Defendant Mr. Gerrard's witness statement, which has been refuted in significant part by at least two former corroborating witnesses, Defendant Mr. Gerrard contacted Defendant Mr. Del Rosso, asking for his lawyer's recommendation as to who could help with getting the material downloaded.   Defendant Mr. Del Rosso's lawyer, Chris Sweckler recommended Nti, which Defendant Mr. Gerrard engaged to download the stolen data and provide it to him.

99.     The downloaded hacked and stolen data provided by Nti, presented in a misleading way as to falsely implicate Mr. Solomon in an alleged set of improper dealings with Mr. Azima, under the heading "fraud" was then disseminated to the *Wall Street Journal*, Mr. Solomon's employer, as well as other media outlets. The enterprise falsely and with malice accused Mr. Solomon of being a fraud when it posted and disseminated the stolen emails under the heading "fraud".  These activities were originally outlined in an action plan prepared by the Defendants and/or their cohorts.  Specifically, the action plan called for the enterprise to "contact several world leading reporters and investigative journalists and supply them with materials and evidence" about Mr. Azima and his acquaintances such as Mr. Solomon "in order to be published."  To implement this aspect of the plan, the enterprise planted false and disparaging stories in the press alleging that Mr. Solomon was in the middle of hundreds of millions of dollars of fraudulent transactions.  The enterprise also used false information and stolen data to influence other stories in the media regarding Mr. Azima, Mr. Solomon and others.  Upon information and belief, the enterprise did

41

not reveal that they had stolen the information that they provided to reporters, nor did it reveal to the media that some of their information was produced through coerced interrogations of Mr. Al Sadeq in violation of international law.

100.    In furtherance of its repeated pattern of illegal racketeering activity, the enterprise proceeded to use the Hacking Reports to plan future attacks on Mr. Azima and others.  Defendant Mr. Gerrard assembled a team, including Mr. Buchanan, Mr. Page, and Defendant Mr. Forlit, to meet regularly and discuss strategy and tactics.  During these meetings, Defendant Mr. Gerrard, Mr. Buchanan, and others provided feedback to Mr. Page and Defendant Mr. Forlit regarding the contents of the reports and next steps in the investigation.

## The Firing of Jay Solomon

101.    In December of 2016, Mr. Solomon was told by the Washington DC bureau chief of the *Wall Street Journal*, Jerry Seib, that some Dow Jones lawyers wanted to speak with him. At a meeting in the *Wall Street Journal*'s Washington DC office, the Dow Jones attorney, Craig Linder, presented Mr. Solomon with some of the hacked and stolen correspondence between him and Mr. Azima.  Mr. Linder specifically mentioned a company called Denx that Mr. Azima was establishing and wanted to know if Mr. Solomon had joined the company. He said he would never join a company with Mr. Azima, as Mr. Azima was his source.

102.    Mr. Solomon responded that Mr. Azima had raised the possibility of Mr. Solomon joining the company along with some of the other ideas he had proposed to Mr. Solomon. Mr. Solomon explained that he never joined Denx; never said he was going to join it; and took no actions on behalf of the company.

103.    There was no way Dow Jones could have downloaded those emails off those BitTorrent accounts without the help of Defendant Dechert and/or their Cohorts, as the files were encrypted.  They could not be opened without a digital key, efforts to download the documents invited serious risk of infection and the sheer volume of data rendered the files inaccessible. Mr. Linder refused to tell Mr. Solomon how Dow Jones obtained the stolen and manipulated data, only that it came in "over the transom."  Notably, the parent of Dow Jones, News Corp. is a client of Defendant Dechert.

104.    Following this meeting, Mr. Solomon noticed some changes in how he was being treated on the job.  His employer had nominated him for many awards, including the Pulitzer Prize, in connection with his reporting on the US-Iran nuclear deal.  Subsequent to the meeting, in January of 2017, the *Wall Street Journal* withdrew Mr. Solomon's nomination for the Pulitzer and also—as Mr. Solomon later learned—declined to accept a National Press Club award he'd won for his coverage of the secret U.S. cash shipments to Iran.  However, Mr. Solomon remained employed and continued writing front page stories for the paper.

105.    In June 2017, Mr. Solomon was contacted by a Washington DC based Associated Press reporter, Jeff Horwitz, who said he was writing about Mr. Solomon's business dealings with Mr. Azima. Mr. Solomon told Mr. Horwitz the same thing that he had told Craig Linder, including denying that Mr. Solomon was ever part of any of Mr. Azima's companies. Mr. Horwitz was not placated and accused Mr. Solomon in communications with the *Wall Street Journal*'s public relations team of potentially being party to a string of criminal activities in tandem with Mr. Azima. On information and belief, Mr. Horwitz received his information from the stolen emails, which were provided to him by the Defendants.

43

106.    Among other things, Mr. Horwitz told the *Wall Street Journal*'s spokesman via email that he had evidence indicating Mr. Solomon played a role in trafficking arms to the Middle East; was part of a conspiracy to instigate a coup against the royal family of Kuwait; and had an interest in Denx. These claims mirrored some of the accusations which Defendant Mr. Gerrard made about Mr. Azima in British court proceedings. None of them were true, and despite Mr. Solomon's denials once Mr. Horwitz decided he was publishing this story, on June 21, 2017, Mr. Solomon was told by the *Wall Street Journal* that he was being fired in connection with the accusations advanced by Mr. Horwitz's reporting.

107.    At the time of the firing, Mr. Solomon was unaware that the hacking of Mr. Azima was a component of a larger racketeering enterprise that had been orchestrated by Defendants. Until the series of court filings, which started in 2020, Mr. Solomon believed he was hacked by Iran as retaliation for his investigative reporting on the money laundering scheme in 2013 and secret payments by the Obama administration in 2016.

108.    Moreover, the enterprise's criminal conduct did not stop there.  As detailed below, over the last four years, the enterprise continues to this day to engage in an extensive and prolonged effort to silence, discredit or otherwise harm Mr. Solomon, Mr. Azima and others as initially outlined in the action plan harm them and to cover up its crimes. Among other things, once the enterprise placed Mr. Solomon's stolen data on the internet, the enterprise used the data to induce media outlets to write false and damaging stories about Mr. Solomon in an attempt to harm him, his business and his properties.

109.    Then, as Mr. Azima came closer to uncovering the truth about the hacking through litigation in the U.S. and UK, which might have resulted in Mr. Solomon discovering the truth

sooner as well, the enterprise repeatedly sought to and did obstruct justice – including in multiple proceedings brought in U.S. courts, and in particular the US District Court for the District of Columbia – to avoid detection, and for other reasons.

### The Racketeering Enterprise's Continued Assault on Jay Solomon's Reputation and Literary Voice

110.    Even after Mr. Solomon was fired as a result of the enterprise's illegal conduct, the Defendants and/or their Cohorts in furtherance of the illegal activities of the enterprise continued to target him and his reputation to make sure his voice would be silenced by discrediting him and otherwise cause him harm to his business and properties.  They did so by taking the information that they had stolen via the hacking and disseminating or causing to be disseminated this information in articles that they published or caused to be published on pay-to-play websites and other online public sources.

111.    These articles include, but are not limited to:

    a.  Nick Kennedy, Expect more Iranian Cyber Attacks as Sanctions Continue to Bite, International Policy Digest (Oct. 11, 2019).[1]

    b.  Nick Kennedy, A Murky Cloud Surrounds the Claims of Farhad Azima, International Policy Digest (Oct. 11, 2019).[2]

    c.  Nick Kennedy, Something More than Money at Stake in Ras al Khaimah – Azima standoff, International Policy Digest (Oct. 28, 2019).

---

[1]    https://web.archive.org/web/20191011080349/https://intpolicydigest.org/2019/10/11/expect-more-iranian-cyber-attacks-as-sanctions-continue-to-bite/

[2] https://web.archive.org/web/20201024205403/https://intpolicydigest.org/2019/10/19/a-murky-cloud-surrounds-the-claims-of-farhad-azima/

d.  Nick Kennedy, The Lost Yachting Weekend at the Heart of the Azima-RAK Fraud Case, International Policy Digest (Nov. 7, 2019).[3]

e.  Nick Kennedy, Azima's Initial Reaction to the Hacking of his Information Tells the Story, International Policy Digest (Nov. 21, 2019).

f.  Henry St. George, The mystery of Farhad Azima: middleman or confidence man?, EU Reporter (Dec. 5, 2019).[4]

g.  Nick Kennedy, All is Not Well with the State of Iran, International Policy Digest (Mar. 4, 2020).[5]

112.  These articles caused significant damage to Mr. Solomon's economic opportunities, business interests, property interests and reputation from which he continues to suffer.

113.  Among other things, the continued manufactured press assault against Mr. Solomon's character interfered directly with concrete book publishing opportunities and the significant income they would have generated.  Around the time he was fired, Mr. Solomon had just published his first book, *The Iran Wars*, for which he was given a $270,000 advance, and he was working with his agents to sell another one. He was being positioned like many other major newspaper journalists to regularly publish books on global events and international affairs.

114.  But this opportunity disappeared after his firing. His agents advised Mr. Solomon that he had been blacklisted by the publishing industry due to the negative press that was

---

[3] https://web.archive.org/web/20191108132911/https://intpolicydigest.org/2019/11/07/the-lost-yachting-weekend-at-the-heart-of-the-azima-rak-fraud-case/

[4] https://www.eureporter.co/frontpage/2019/12/05/the-mystery-of-farhad-azima-middleman-or-confidence-man/

[5] https://web.archive.org/web/20200408163220/https://intpolicydigest.org/2020/03/04/all-is-not-well-with-the-state-of-iran/

wrongfully sabotaging his reputation. Just last year, Mr. Solomon wrote a book proposal about the Confederate Secretary of State, Judah P. Benjamin, which his agent could not sell, because he had been advised by publishers that they could no longer market Mr. Solomon given what had been reported about him on a continued basis, including by International Policy Digest through at least March 4, 2020.

115.     Moreover, Mr. Solomon was beginning to give regular speeches on international affairs in 2017 and appearing at major conferences.  In 2018 Mr. Solomon signed with a speakers' bureau and was initially advised by the bureau that he could expect his speeches to income of approximately $50,000 a year which could last as long as two decades. However, due to the Defendants' hack and smear campaign the opportunities and interest in Mr. Solomon's speeches did not materialize, thereby causing additional injuries.

### The Racketeering Enterprise's Fraudulent Concealment and Coordinated Perjury Initiatives

116.     The racketeering enterprise adopted secure communications protocols for handling Defendant Mr. Forlit's reports and sharing them with Defendants and Mr. Buchanan and the Ruler. The goal of this protocol was to leave no paper trail and to ensure that the reports were destroyed after having been read.

117.     An email account was created that only Defendant Mr. Forlit, Mr. Page and Mr. Page's personal assistant, Caroline Timberlake, could access, and for which the three knew the username and password. A draft email would be prepared (and stay in the draft folder of the email account) with instructions and a copy of the report. The report would then be downloaded to a standalone laptop (with no connection to Mr. Page's company's servers), printed from a standalone printer, and the draft message would be overwritten. The procedure is an electronic version of a

protocol called a "dead letter box" for ensuring that there is no paper trail connecting a sender to a recipient.

118.    Defendant Mr. Forlit (or someone from his team) would then use a secure messaging application (in the first instance, Silent Circle, and later on, Signal Messenger) to send a coded message to Mr. Page (or occasionally Ms. Timberlake) to indicate that there was something to be reviewed. These messages would then be deleted.

119.    Once the reports had been downloaded and printed in hard copy, Ms. Timberlake was instructed to delete the electronic copy. The reports were hand-delivered to Mr. Buchanan, the Ruler in RAK and Defendant Mr. Gerrard, starting in 2016. At first the reports were delivered (via courier or hand-delivered by Ms. Timberlake) to Defendant Mr. Gerrard (or Defendant Mr. Gerrard's secretary) first at Defendant Dechert's office in London and later to his home in Nutley, East Sussex.

120.    Mr. Page also arranged meetings with Defendant Mr. Forlit, Mr. Buchanan, and Defendant Mr. Gerrard between 2015 and 2019 in order to obtain guidance from Defendant Mr. Gerrard and Mr. Buchanan as to the direction of the cover-up work to be done.

121.    Starting in 2016, multiple meetings took place at Defendant Dechert's office in London. Towards the end of 2016 or the beginning of 2017, Defendant Mr. Gerrard became increasingly concerned about meeting at Defendant Dechert's office as he did not want a written record indicating that Defendant Mr. Forlit (or any other member of Defendant Mr. Forlit's team) had visited him. It was after this that when the enterprise convened in London, the participants gathered at Mr. Buchanan's suite in the Churchill Hotel or in Defendant Mr. Forlit's suite at the Metropolitan Hotel.

122.    Mr. Buchanan told Mr. Page that he also attended strategy meetings in New York every four to six weeks with Defendant Mr. Gerrard, Defendant Mr. Frank (of Defendant KARV), and Defendant Mr. Handjani to discuss the investigation and RAK's litigation.

123.    In September 2016, Defendant Mr. Hughes (a partner for Defendant Dechert at the time), on RAKIA's behalf, threatened to file a lawsuit in the U.K. against Mr. Azima and provided Mr. Azima's counsel with some of the emails that Defendant Vital, Defendant Mr. Del Rosso and CyberRoot had stolen from Mr. Azima. RAKIA, represented by Defendant Dechert, sued Mr. Azima in England in September 2016 relying on the data that Defendants Vital and Mr. Del Rosso stole from Mr. Azima.

124.    In 2018, in the context of RAK's proceedings, it became clear to Mr. Page that Defendant Mr. Gerrard was desperate to rely on the hacked material in support of RAKIA's claims against Mr. Azima.

125.    During the second half of 2018, it therefore became necessary for RAKIA to confirm and commit to a case as to how it had discovered the confidential data. In July 2018, Defendant Mr. Hughes falsely stated in a filing before this court, that a "public relations company" innocently found Mr. Azima's stolen data on the internet.  On August 8, 2018, Defendant Dechert filed a brief before the U.S. Court of Appeals for the D.C. Circuit falsely and misleadingly asserting that Mr. Azima's stolen data was "obtained via publicly available internet sources." In addition, Defendant Dechert falsely and misleadingly stated: "It is highly implausible that RAKIA had ten continuous months of unfettered access to Azima's personal computers, as Azima contends." Finally, Defendant Dechert falsely and misleadingly stated: "Again, there are no facts showing that anyone – much less RAKIA – accessed Azima's communications in real time or sent any

emails appearing to come from him." In November 2018, Mr. Page's name was disclosed by RAKIA to Mr. Azima in the context of their legal dispute as being the person who informed RAKIA of the existence of the tranches of data.

126.    Consequently, there were a series of meetings between (variously) Defendant Mr. Forlit, Mr. Buchanan, Defendant Mr. Gerrard and Mr. Page to discuss how to respond to Mr. Azima's inquiries in these proceedings regarding how his data had been discovered by RAKIA. Dechert partner Linda Goldstein also participated in at least two of these meetings.

127.    Defendant Mr. Forlit suggested that he would come up with an individual to act as a cover for the discovery, who later turned out to be Mr. Majdi Halabi, who Mr. Page knew as one of Defendant Mr. Forlit's subcontractors. Mr. Page subsequently met with Mr. Halabi and Defendant Mr. Forlit and discussed the idea of Mr. Halabi being used as a cover for Defendant Mr. Forlit's discovery of Mr. Azima's data. Mr. Page then discussed the idea of Mr. Halabi being used as a cover story with Mr. Buchanan and Defendant Mr. Gerrard, and it was subsequently agreed that the members of the racketeering enterprise would all meet to work out the plan. Initially Mr. Buchanan, Defendant Mr. Gerrard and Mr. Page discussed seeing the "Israeli boys" (i.e., Defendant Mr. Forlit and his team) in Israel as the safest option, but they later agreed to meet in Cyprus to sign off on the use of Mr. Halabi as a cover story.

128.    The racketeering enterprise convened in Cyprus multiple times in late 2018. The meeting was attended by Defendant Mr. Hughes, Defendant Mr. Gerrard, Mr. Buchanan, Mr. Halabi, Defendant Mr. Forlit and Mr. Page. It was agreed at this meeting that everyone would proceed with the cover story that Mr. Halabi (and not Defendant Mr. Forlit) had discovered and passed the link to Mr. Azima's confidential data to Mr. Page, and that, if necessary, Mr. Halabi

and Mr. Page would be willing to provide witness testimony to this effect.  Mr. Halabi's false testimony was necessarily intended, at least in part, to obstruct the D.C. District Court Proceeding.

129.    On November 6, 2018, Defendant Mr. Hughes signed another sworn statement in the UK proceeding falsely stating that Mr. Page had obtained the links to Mr. Azima's stolen data from an unnamed individual who was not an agent of RAK.  As alleged above, given the status of the D.C. District Court Proceeding, this false statement was necessarily intended, at least in part, to obstruct those proceedings and to conceal the Defendants' involvement in the enterprise from the victims, including Mr. Solomon.

130.    On or about November 21, 2018, Defendant Mr. Gerrard, Defendant Mr. Hughes, Mr. Page, Defendant Mr. Forlit, and Mr. Halabi met again in Cyprus to further develop Mr. Halabi's false narrative that he had discovered Mr. Azima's hacked data on the internet.  Defendant Dechert has admitted that Ms. Goldstein attended this meeting virtually from New York.

131.    On December 11, 2018, Defendant Mr. Hughes repeated the false narrative in another sworn statement in the UK proceeding, stating that "Mr Page was informed of the existence of the publicly available links to the first cache of data by a freelance journalist and lawyer called Majdi Halabi."  As alleged above, given the status of the D.C. District Court Proceeding, and the repeated similar false statements to the federal courts in D.C., this false statement was necessarily intended, at least in part, to obstruct those U.S. proceedings and to conceal the Defendants' involvement in the enterprise from the victims, including Mr. Solomon.

132.    On May 1, 2019, Mr. Halabi met in London with Defendant Mr. Gerrard, Defendant Mr. Forlit, and Mr. Page to further rehearse his false testimony.  Mr. Halabi did so again the next day with Defendant Mr. Gerrard, Mr. Buchanan, and Defendant Mr. Forlit.  On May 3, 2019, Mr.

Halabi met with Defendants Mr. Gerrard, Mr. Hughes, and Mr. Forlit at Defendant Dechert's office in London to prepare his false witness statement.  Mr. Halabi then met with other attorneys from Defendant Mr. Hughes's new law firm, Stewarts Law, and Defendant Dechert, including New York partner Ms. Goldstein, to help him prepare his witness statement for the UK Proceeding. As alleged above, given the status of the D.C. District Court Proceeding, this false statement was necessarily intended, at least in part, to obstruct those proceedings and to conceal the Defendants' involvement in the enterprise from the victims, including Mr. Solomon.

133.    During one meeting, Defendant Mr. Hughes raised his objection to the cover story, saying it was "not credible" and that it would not work, but Defendant Mr. Gerrard made it clear that this was going to be the best way forward, and that Defendant Mr. Hughes needed to fall in line. Mr. Page subsequently met with Ms. Black and Dorothy Cory-Wright of Defendant Dechert and others to prepare Mr. Page's fabricated witness statement, which he signed on June 20, 2019, in Defendant Dechert's London office.

134.    In that witness statement, Mr. Page falsely claimed that he first met Mr. Halabi at a roundtable lunch in 2012 and that Mr. Halabi was an Israeli journalist who specializes in Middle Eastern affairs. Mr. Page claimed that he and Mr. Halabi formed a friendly relationship because they both operate on both sides of the Palestinian/Israeli border.  Mr. Page falsely claimed that he never formally engaged Mr. Halabi as they had more of a friendship (or useful mutual relationship) than a professional relationship and there had never been a commercial arrangement between them. Mr. Page falsely claimed that at some point, Mr. Halabi called Mr. Page and told Mr. Page that he had come across something interesting on the internet about Mr. Azima, but not how he had come across this information. Mr. Page falsely testified that Mr. Halabi did not want to open the site

because it might have harmful viruses and he suggested Mr. Page should not do so either. Mr. Page, in his fabricated witness statement, claimed not to remember how he communicated Mr. Halabi's discovery to Defendant Mr. Gerrard and Mr. Buchanan, just that he knows he did so. Mr. Page also claimed that he did not know what Defendant Mr. Gerrard and Mr. Buchanan did with the information that Mr. Halabi had allegedly found, but indicated he was told that they intended to get a specialist firm to download it without his involvement. Mr. Page falsely claimed he was never instructed to investigate Mr. Azima, so he was not told at that time what information had been found in the downloaded material, which he also claimed he never downloaded himself. Mr. Page recanted most if not all of this testimony in his second witness statement in the case, which he filed in court on January 7, 2022.

135.    On June 24, 2019, Defendant Mr. Gerrard signed a witness statement that was emailed to Mr. Azima's UK counsel recounting the false story that he and RAK did not learn of the existence of Mr. Azima's hacked data until August 2016. Defendant Mr. Gerrard also falsely stated: "I should make it clear at the outset that I was never instructed . . . to hack Farhad Azima's emails or computer. I certainly did not undertake any such hack on my own initiative, nor did I give instructions to any person to hack Farhad Azima's documents. I do not know who hacked Farhad Azima's computers or other devices or when or how the hacking took place." As alleged above, given the status of the D.C. District Court Proceeding, this false statement was necessarily intended, at least in part, to obstruct those proceedings and to conceal the Defendants' involvement in the enterprise from the victims, including Mr. Solomon.

136.    According to Mr. Page's corrected testimony, as the trial of the proceedings in the Azima litigation (the "First Trial") approached, Mr. Page was asked by Defendant Mr. Forlit (who

had in turn been instructed by Defendant Mr. Gerrard) to organize and attend a meeting with him, Mr. Buchanan, Defendant Mr. Gerrard, and Mr. Halabi to rehearse their false testimony for the First Trial. They settled on Switzerland as the location for the meeting.

137.    This meeting took place over three days at a small boutique hotel in the mountains outside of Bern. Mr. Page arrived at the hotel on the evening of December 1, 2019 and left on December 4, 2019.

138.    Defendant Mr. Forlit and some of his team also attended the meeting and provided extensive security for the meeting.

139.    Mr. Page had arranged for a special protocol to be in place to ensure maximum security and secrecy. Mr. Page told Defendant Mr. Gerrard to leave his mobile phone at home or to switch it off so that his location could not be tracked. Defendant Mr. Gerrard and Mr. Page used burner phones for communication purposes, and Mr. Page left his mobile phone at home.

140.    To avoid detection, Mr. Page did not fly direct to Switzerland. On December 1, 2019, Mr. Page took a series of trains from London to Paris Gare du Nord, then Mr. Page transferred to Gare de l'Est. From Paris, Mr. Page then took a train to Strasbourg, then to Basel and finally a train from Basel to Bern. In Bern, Mr. Page was collected by a member of Defendant Mr. Forlit's security team and driven to the hotel.

141.    At the hotel, the members of the racketeering enterprise went through a mock trial, with Defendant Mr. Gerrard acting as both the judge and the cross-examining counsel. An effort was made to perfect the false narrative that they were to tell the English court about how Mr. Page had discovered the hacked data through Mr. Halabi.

142.    As Mr. Page admitted in his corrected testimony, the members of the racketeering enterprise who testified at trial, including Defendant Mr. Gerrard, indeed perjured themselves in furtherance of the racketeering conspiracy to obstruct justice.

143.    Mr. Page, Mr. Halabi, Defendant Mr. Gerrard, and Mr. Buchanan subsequently offered their well-refined perjury to the UK court in January 2020. Mr. Page and Mr. Halabi have since acknowledged through sworn testimony that the story fabricated in Cyprus and same rehearsed in Switzerland was false. In a sworn witness statement signed in 2022, and in other discussions, Mr. Halabi admitted that the false story was created by Defendant Mr. Gerrard, Mr. Defendant Hughes, Mr. Buchanan, Defendant Mr. Forlit, and Mr. Page. Mr. Halabi also admitted that he was first asked to provide this false story in 2017, when the D.C. District Court Proceeding was the only forum in which Mr. Azima's hacking claims were being litigated. RAK has recently sought to distance itself from the meeting in Switzerland, claiming that the meeting was organized by Mr. Gerrard without client authorization.

144.    The English court recently ruled that the story put forward by RAKIA and others on their behalf about how they discovered the stolen data was false. Specifically, the court said that the story told by Mr. Page, Mr. Halabi, and others of innocent discovery of Mr. Azima's stolen data was "not true," involved "unexplained contradictions, inconsistencies, and implausible elements," and "was both internally inconsistent and inconsistent with the contemporaneous documents." The English court said that "the true facts" about how Defendant Dechert and others obtained Mr. Azima's stolen data still "have not been disclosed," despite them being required to do so. The untrue story of innocent discovery was advanced by RAKIA's agents. Defendant Mr. Hughes signed a statement of truth for RAKIA advancing the story of innocent discovery. Others,

including Defendant Mr. Gerrard, Mr. Buchanan, and Mr. Page, put forward witness statements and testimony that supported the story the court has now found to be untrue.

145.    Defendant Mr. Del Rosso was an important part of RAKIA's false story of "innocent discovery" by Mr. Page of Mr. Azima's stolen data. For example, Defendants Mr. Gerrard and Mr. Del Rosso exchanged a series of emails on August 15 and 16, 2016, in which Defendant Mr. Gerrard purported to "break the news" of the discovery of the hacked material on websites. But other evidence showed that Defendant Mr. Del Rosso was aware of these websites at least a week earlier. The emails of August 15 and 16, 2016, between Defendants Mr. Gerrard and Mr. Del Rosso were clearly an attempt to lay a false "paper trail" of discovery.

146.    In his witness statement, Defendant Mr. Del Rosso hid his engagement of CyberRoot and denied any involvement in the hacking. Because of Defendant Mr. Del Rosso's concealment of the true facts, of which he had knowledge, neither Mr. Azima nor Mr. Solomon learned of the role played by Defendants Mr. Del Rosso and Vital until recently. As a direct result of his reliance on the false testimony given by the Defendants and/or their Cohorts, Mr. Solomon remained unaware of the fraudulently concealed conduct of the Defendants and/or their Cohorts that give rise to his claims.

147.    The enterprise also obstructed the D.C. District Court Proceeding by destroying evidence and documents, and by making false statements to Azima and his counsel regarding their efforts to preserve and retain relevant materials. Throughout the almost four years the D.C. District Court Proceeding was pending, Mr. Azima's counsel made at least five requests to Defendant Dechert and to the court intended to ensure the preservation of relevant evidence. Defendants Dechert, Mr. Gerrard, and Mr. Hughes, through correspondence from Ms. Goldstein and Mr.

56

Newbold, made affirmative, but false, assurances that relevant evidence was being reserved, despite knowing that evidence had already been destroyed and/or was in the process of being destroyed. For example, just one week after Mr. Azima filed the D.C. District Court Proceeding in September 2016, Mr. Buchanan brought his iPhone to an Apple store, where much of his webmail, including mail stored remotely in the "cloud," was allegedly deleted. On October 22, 2016, Mr. Buchanan informed Defendant Dechert's Ms. Goldstein that his emails and other data had been deleted but that the emails and data could be restored if steps were taken immediately. Ms. Goldstein instructed Mr. Buchanan to restore only emails from August to September 2016, ensuring that earlier emails, which upon information and belief they knew would necessarily include emails related to the hacking of Mr. Azima and the enterprise's preparation of Hacking Reports, would be permanently deleted, destroyed, and unrecoverable. The enterprise concealed this document destruction through false statements that were relied upon by Mr. Azima and Mr. Solomon.

148.    Mr. Buchanan's laptop also disappeared under mysterious circumstances. Mr. Buchanan claimed in a sworn statement that his laptop was stolen in January 2017, just a few months after Mr. Azima's D.C. District Court Proceeding was filed. At the time, Defendant Dechert had not taken any steps to preserve his laptop or its data. Upon information and belief, Mr. Buchanan destroyed the laptop to prevent evidence stored on it from being produced in the D.C. District Court Proceeding. The enterprise concealed this document destruction through false statements that were relied upon by Mr. Azima and Mr. Solomon.

149.    In July 2021, Defendant Dechert revealed that it had furnished Defendant Mr. Gerrard with at least fifteen different mobile devices between 2014 and 2020 – a period when

Defendant Mr. Gerrard and others were actively involved in the enterprise's unlawful activities. Defendant Dechert admitted that data and evidence from eight of those devices could not be retrieved and had not been preserved because the devices were "temporarily mislaid," "stolen," "reissued to another member of the firm," "returned to [the] Dechert IT team," or "lost." The enterprise concealed this document destruction until July 2021 through false statements that were relied upon by Mr. Azima and Mr. Solomon. Indeed, throughout his tenure with Defendant Dechert, Defendant Mr. Gerrard consistently and repeatedly replaced his devices – at least twenty-two times since he joined the law firm.

150.    Though Defendant Dechert was aware as early as 2016 that Mr. Buchanan and/or Mr. Gerrard had destroyed and/or failed to preserve relevant evidence, it repeatedly provided Mr. Azima and his counsel with false and misleading information regarding document retention and preservation in connection with the D.C. District Court Proceeding. Defendant Dechert did not disclose that data from Mr. Buchanan's laptop or Defendant Mr. Gerrard's cell phones had been lost or destroyed at any point in the D.C. District Court Proceeding. In fact, Defendant Dechert, through Ms. Goldstein, and with the knowledge and approval of Defendant Mr. Gerrard, Defendant Mr. Hughes, and others, falsely assured Mr. Azima's U.S. legal team that all relevant documents had been preserved even though Defendant Mr. Gerrard, Defendant Mr. Hughes, and others knew that relevant evidence had already been destroyed.

151.    Upon information and belief, Defendants Mr. Gerrard and Mr. Hughes caused Ms. Goldstein to make these false statements in order to obstruct discovery in the D.C. District Court Proceeding and to conceal the Defendants' involvement in the enterprise from the victims, including Mr. Solomon. Had the truth about the document destruction been known, Mr. Azima

would have immediately sought judicial intervention, which would have alerted Mr. Solomon who would have done the same.

152.    The above-described meetings, correspondence, and testimony were part of a broader scheme to conceal the enterprise's illegal acts. The RICO Conspirators' false statements, all transmitted over U.S. wires, prevented Mr. Solomon, the D.C. District court, and the U.S. Court of Appeals for the D.C. Circuit from learning material information about the enterprise and its illegal activities. As a result, Mr. Solomon did not learn about the extent of the RICO conspirators' false statements until years later, starting in late 2020, after Mr. Azima filed the North Carolina litigation and individuals involved in the hacking began confessing their involvement.

153.    On March 31, 2020, Mr. Al Sadeq filed his Particulars of Claim in the High Court of Justice of England & Wales, Queen's Bench Division against Defendants Dechert, Mr. Gerrard, and Mr. Hughes as well as Defendant Dechert attorneys Ms. Black.  On October 1, 2020, Mr. Quzmar filed his Particulars of Claim in the same court against Defendants Dechert and Mr. Gerrard.  In their filings, both Mr. Al Sadeq and Mr. Quzmar claim that they were abducted and unlawfully detained in September 2014 in RAK on bogus charges of fraud against RAKIA and pressured to give false testimony that would implicate, among others, Mr. Azima.

154.    On October 15, 2020, Mr. Azima filed his complaint against Defendants Vital and Mr. Del Rosso in U.S. District Court for the Middle District of North Carolina.  In the complaint it was alleged, *inter alia*, that Defendant Dechert was involved in the hacking and hired, paid, directed Defendants Mr. Del Rosso and Vital to hack Mr. Azima. The allegations included, but were not limited to, that Defendants Vital and Mr. Del Rosso stole Mr. Azima's computer data,

including emails which were then dumped online and used by the Defendants and their Cohorts in an attempt to ruin Mr. Solomon and Mr. Azima's reputations and damage them financially.

155.    On January 7, 2022, Mr. Page filed his corrected witness statement with the Business and Property Courts of England and Wales as part of the lawsuit commenced in 2016 by RAK against Mr. Azima.  Mr. Page's corrected 2022 statement disclosed that he and Defendant Mr. Gerrard conspired with others to fabricate testimony first at a meeting in Cyprus and later in Switzerland to participate in a mock trial led by Defendant Mr. Gerrard to ensure the perjury would withstand cross examination.

156.    On February 2, 2022, Mr. Halabi submitted a corrected witness statement in which he disclosed that the cover story he provided in his earlier witness statement, like Mr. Page's, was "concocted during a number of meetings which took place been 2017 and 2019 between (variously)," Defendants Mr. Gerrard, Mr. Hughes, and Mr. Forlit, as well as non-defendant co-conspirators Mr. Page and Mr. Buchanan.  In pertinent part, both Mr. Halabi's cover story and details about the formation of the cover story align with Mr. Page's accounts of each.

157.    On February 7, 2022, Mr. Page submitted a third witness statement, in which he discussed being asked by Defendants Mr. Gerrard and Mr. Handjani, at breakfast in early February 2020, to investigate who was funding Mr. Al Sadeq's litigation against Defendant Dechert, Defendant Mr. Gerrard and others.  Mr. Page, with Defendant Mr. Gerrard's knowledge, retained Defendant Mr. Forlit to employ hacking techniques to locate this information, and did locate such information, which he shared with Mr. Page and which Mr. Page in turn shared with Defendants Mr. Gerrard and Mr. Handjani.

158.    The illegal, improper and unethical acts of the Defendants and/or their Cohorts, as described herein, has produced sprawling litigation across multiple jurisdictions in the US and abroad, involving the individuals identified herein and others, which continue to elicit new facts about the breadth and score of the enterprise and conspiracy.

159.    On May 16, 2022, the High Court of Justice Business and Property Courts of England & Wales Commercial Court issued a judgment ruling that Defendant Mr. Gerrard was in reckless and negligent breach of duty as counsel to ENRC, which alleged that Defendant Mr. Gerrard's misconduct, including the leaking of confidential information to the press, resulted in legal fees to the Defendants Dechert and Mr. Gerrard of £13 million (even though they should have been no more than £2 million) and additional unnecessary third-party fees of £11 million.

160.    On July 15, 2022, the United States District Court for the Southern District of New York granted Mr. Azima's petition for discovery from Defendant Mr. Handjani (a close advisor to the Ruler and a close ally of the Islamic Republic of Iran), seeking documents and communications relating to Mr. Azima and to the Defendants and/or their Cohorts.

## Dechert's Responsibility and Involvement

161.    As explained above, not only did at least two Dechert partners participate as members of the enterprise, but the firm was also itself a central figure in the enterprise, including its conspiracy, crimes, and subsequent coverup. In addition to providing the resources and infrastructure for the criminal conduct of Dechert partners Mr. Gerrard and Mr. Hughes, Dechert also played an active and critical role in supporting, facilitating, and concealing the enterprise's misconduct.

162.     Defendant Dechert for years either had knowledge of, consciously disregarded, or was at least recklessly indifferent to accusations and, later, overwhelming evidence that two of its equity partners – Defendants Mr. Gerrard and Mr. Hughes – were masterminding and participating in a global criminal enterprise.   As alleged above, Defendant Dechert committed numerous predicate acts in violation of U.S. federal law in the ordinary course of Defendant Dechert's representation of RAKIA.  Motivated initially by legal fees and ultimately by a desire to cover up the Defendants Mr. Gerrard's and Mr. Hughes's misconduct, Defendant Dechert ignored red flags for years and continued to defend and protect Defendant Mr. Gerrard, Defendant Mr. Hughes, and the enterprise from public exposure and attempts by victims to hold them accountable for their campaign of rampant criminal conduct. Indeed, according to recent press reports, Defendant Dechert was "[g]ripped by Gerrard's moneymaking powers" and became a "shrine to Neil," who was regularly applauded for his high billings and was given a seat on the firm's Policy Committee. The firm reportedly went so far as to provide him with "do not enter" rooms that were dedicated to Defendant Gerrard's team and his work.

163.     Defendant Dechert, including partners in leadership positions, were aware of Defendant Mr. Gerrard's reputation before hiring him. In October 2010, then-Dechert partner Graham Defries informed Defendant Dechert management, including its chairman, that Defendant Mr. Gerrard engaged in unethical billing practices to increase client fee revenues.   Upon information and belief, this assessment was based upon Mr. Defries' firsthand observations. Defendant Dechert nevertheless hired Defendant Mr. Gerrard as a Global Co-Head of the firm's White Collar and Securities Litigation practice and agreed to pay him £2 million in annual compensation on the condition that he produce £12 million in annual fees.

164.     In April 2013, however, one of Defendant Dechert's largest clients fired Defendant Mr. Gerrard and Defendant Dechert after discovering that they had engaged in what a UK court later characterized as "shocking" betrayals of the client during the course of the representation. The client's firing of Defendants Mr. Gerrard and Dechert left Defendant Mr. Gerrard without a major source of revenue (as he had depended on it for almost the entirety of his billings) thus placing enormous pressure on Defendant Mr. Gerrard to find another deep-pocketed client he could exploit to justify the outsized compensation package he had received from Defendant Dechert. Notwithstanding this obvious red flag regarding Defendant Mr. Gerrard's conduct, Defendant Dechert continued to support Defendant Mr. Gerrard for approximately nine more years.

165.     By April 2014, Defendant Dechert received a sworn witness statement stating that Defendant Mr. Gerrard had admitted to engaging in unethical billing practices when billing the Defendant Dechert client referenced above. On information and belief, by February 2018, Defendant Dechert came into possession of another witness statement recalling another such admission by Defendant Mr. Gerrard. Notwithstanding these startling statements about Defendant Mr. Gerrard and his billing practices, Defendant Dechert continued to support Defendant Mr. Gerrard for approximately six more years.

166.     By 2015, Defendant Dechert was aware of accusations that Defendant Mr. Gerrard engaged in human rights abuses as part of his work. Mr. Al Sadeq had accused Defendants Mr. Gerrard, Mr. Hughes, and another Dechert partner of interrogating him under degrading, filthy, and illegal conditions in secret prisons in RAK. When Defendant Mr. Gerrard learned that Mr. Azima was planning to publicize Mr. Gerrard's human rights abuses, Defendant Mr. Gerrard

briefed Dechert's leadership on the potential threat posed by Mr. Azima's media campaign, which directly implicated Defendant Mr. Gerrard in human rights abuses. Nevertheless, Defendant Dechert continued to support Defendant Mr. Gerrard for approximately seven more years.

167.    Since 2016, Defendant Dechert and partners within the firm's leadership knew, were willfully blind, or otherwise recklessly indifferent to repeated allegations and evidence that Defendant Mr. Gerrard masterminded the hacking of Mr. Azima and suborned perjury before U.S. and UK courts. At each opportunity to rein in potential wrongdoing by Defendant Mr. Gerrard, Defendant Dechert instead actively defended him, and failed to expel him from the partnership.

168.    In March 2017, Mr. Azima's counsel told Defendant Dechert that Defendant Dechert remained the only party able to obtain Mr. Azima's hacked materials. Although this information should have caused Defendant Dechert to investigate why Defendants Mr. Gerrard and Mr. Hughes were the only ones who had access to supposedly publicly available documents – which by then had been downloaded to Defendant Dechert servers – Defendant Dechert continued to stonewall against allegations of misconduct by Defendant Mr. Gerrard and continued to permit Defendant Mr. Gerrard to manage related litigation.

169.    Defendant Dechert, through its partners, also played a central role in the cover-up of the enterprise's misconduct. In 2018 and 2019, Defendant Mr. Gerrard organized a series of meetings in Cyprus, London, and Switzerland to create, develop, and rehearse false testimony about Mr. Azima's stolen data. Defendant Dechert partner Ms. Goldstein (who was handling the U.S.-based D.C. District Court Proceeding at the time) participated in at least two of the meetings.

170.    Defendant Dechert was also willfully blind or recklessly indifference during separate civil litigation involving Defendant Mr. Gerrard and defended his misconduct even as

incriminating details emerged. In the ENRC case in the UK, Defendant Mr. Gerrard was accused of (and now has been found liable for) mailing an anonymous manilla envelope with sensitive, privileged client information to the UK Serious Fraud Office in order to harm Defendant Dechert's own client. One of the envelopes had a hair stuck to it, and Defendant Mr. Gerrard's client sought to DNA test the hair to see if it belonged to Defendant Mr. Gerrard or his assistant. Defendant Dechert opposed the testing of the hair, and the UK court found that there was a strong inference that the reason Defendant Dechert declined was because the DNA testing might have shown that the hair on the envelope was Defendant Mr. Gerrard's. Thus, when given a clear opportunity to discover Defendant Mr. Gerrard's misconduct, Defendant Dechert chose to obstruct and prevent the discovery, either because they already knew of the misconduct or because they didn't want to learn the extent of it.

171.    In mid-2019, RAK removed Defendant Mr. Gerrard from its cases, but Defendant Dechert continued with the representation and continued to push the false story that its client RAK had innocently found Mr. Azima's stolen documents on the internet. Even after Defendant Mr. Gerrard was removed, the firm remained on the case, with other Defendant Dechert partners, including Dechert Chairman Andrew Levander, taking a larger role in the representation. Though Defendant Mr. Gerrard was removed from the representation, he continued to participate in the enterprise's affairs and cover-up campaign, including for example organizing the Swiss meetings described above to perfect perjurious witness testimony.

172.    In January 2020, during Mr. Azima's First Trial, Defendant Mr. Gerrard falsely denied any involvement or knowledge of the hacking of Mr. Azima or improper treatment of Mr. Al Sadeq. Yet in June 2020, Defendant Mr. Gerrard recanted some of his false testimony

concerning the treatment of Mr. Al Sadeq. Defendant Dechert demonstrated reckless indifference to the fact that Defendant Mr. Gerrard provided false testimony and continued to permit Defendant Mr. Gerrard to testify.

173.    Defendant Dechert also provided Defendant Mr. Gerrard with "burner phones" and allowed him to repeatedly scrub the data from them. Remarkably, Defendant Dechert provided Mr. Gerrard with at least 15 different mobile devices between 2014 and 2020, during the height of the enterprise's conspiracy to harm Mr. Azima and Mr. Solomon, and the subsequent cover-up. Defendant Dechert did not preserve the data on many of these "burner" phones, even after the phones were returned to the firm.

174.    Even in those instances where Defendant Dechert did retain Defendant Mr. Gerrard's data, it was not produced as required in litigation. In July 2021, Dechert's International General Counsel James Croock conceded that the firm committed a "significant omission" by failing to disclose numerous text messages from 2011 through 2013 on Defendant Mr. Gerrard's mobile devices that showed Defendant Mr. Gerrard's previous testimony was false.

175.    According to press reports, even as the allegations around Defendant Mr. Gerrard mounted, Mr. Croock (the firm's now-retired former general counsel) "helped establish a 'party line'" that "Dechert and Mr. Gerrard were right." Upon information and belief, firm management sent emails to its partners indicating that Defendant Dechert had a strong case.

176.    Despite more than a decade of red flags and clear indications that Defendant Mr. Gerrard was engaging in unethical and illegal behavior, it was not until May 2022 that Defendant Dechert half-heartedly condemned Defendant Mr. Gerrard's conduct. Even then, Defendant

Dechert belatedly attempted to distance itself from Defendant Mr. Gerrard only following court findings that Defendant Mr. Gerrard lied under oath.

177.    But Defendant Dechert did not learn.  Rather, on June 14, 2022, just days after being asked to reconsider the truthfulness of some of statements in the D.C. District Court Proceeding made in reliance on Defendant Mr. Gerrard, Defendant Dechert General Counsel Benjamin Rosenberg replied that the firm had reviewed the record of the D.C. District Court Proceeding and could not find any statement that warranted correction, and repeated yet again Defendant Dechert's false statement that Mr. Azima's hacked documents, which included communications with Mr. Solomon, were found through publicly available sources.

178.    The judicial finding of Defendant Mr. Gerrard's criminal conduct ultimately led RAK to publicly disavow him.  On June 15, 2022, in a letter to Mr. Azima's counsel, RAK stated that it had been defrauded by "Mr. Gerrard and his gang" and was also a victim of "criminal wrongdoing" by Mr. Gerrard.  On June 23, 2022, RAK took the remarkable step of withdrawing from the UK proceeding, claiming it had been misled and lied to by Defendants Mr. Gerrard and Dechert.  In doing so, RAK conceded liability for the hack, saying it "is content for judgment to be entered against it, for damages to be assessed and it will take all necessary steps to ensure that such a judgment is satisfied."  RAK cited the recent judgment against Defendants Mr. Gerrard and Dechert that found Defendant Mr. Gerrard "to be a dishonest witness who engaged in serious wrongdoing and ethical violations towards a client." In a letter regarding its request to withdraw, RAK described Defendant Mr. Gerrard and other enterprise co-conspirators as "dishonest and unscrupulous third-party advisers who have taken steps to advance their own interests for their own gains."

179.    On August 9, 2022, in an effort to blame Defendant Mr. Gerrard for the firm's deliberate breaches of fiduciary duty, Defendant Dechert finally conceded through a spokesperson that the firm had "acted in reliance on the assurances given to us by Mr. Gerrard."  Defendant Dechert continues to repeat the enterprise's false story to fraudulently mislead Mr. Solomon, Mr. Azima, courts, law enforcement, and the public about how they had come into possession of the hacked documents.

180.    Accordingly, Defendant Dechert is liable for the acts of its partners Defendants Mr. Gerrard and Mr. Hughes, as well as the acts of their co-conspirators.

## COUNT I
## Civil RICO (Racketeer Influence and Corrupt Organizations Act)
### (18 U.S.C. §1964(c))

180.    Plaintiff repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

181.    As recounted above, the Defendants received income in the form of legal, consulting and/or other fees directly and indirectly from a pattern of racketeering activity in the operation of an enterprise engaged in interstate and foreign commerce.

182.    The Defendants and their Cohorts are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Amended Complaint; namely through a multi-year, multifaceted campaign of computer hacking, illegal surveillance, witness tampering and intimidation, obstruction of justice, perjury, money laundering, bank fraud, and wire fraud. The enterprise's goal, at least in the context of the RAK matter, was to, *inter alia,* manufacture and prosecute claims against, or otherwise silence, perceived enemies of RAK, including Plaintiff Mr. Solomon, and to

commit further crimes in the U.S. and overseas to cover up their unlawful conduct. Over the years, the Defendants and their Cohorts have adapted their scheme to changing circumstances, expanding the scope and nature of their activities to harm their targets and conceal their illegal conduct. The affairs of the enterprise were intended to, and have in fact resulted in, great financial gain for the Defendants through, *inter alia*, millions of dollars for their criminal services and great harm to the business and property of Mr. Solomon and others in the US.

183.    These Defendants and their Cohorts have organized their operation into a cohesive group with specific and assigned responsibilities and command structure, operating in the U.S. and other countries, with funding and direction coming to and going from the US. The enterprise has operated continuously since at least 2014.

184.    Defendant Mr. Gerrard was a leader of the enterprise, and he relied upon and utilized the vast resources of Defendant Dechert in executing the plan of the enterprise. Defendant Dechert, through Defendant Mr. Gerrard, oversaw and directed the use of hacking coordinators, Defendant Mr. Del Rosso and Mr. Page, each of whom engaged hackers to participate in the affairs of the enterprise as described above.

185.    Defendants Dechert and Mr. Gerrard directed the global racketeering enterprise from the onset.  The enterprise was initiated by agreement between on one side RAK, RAKIA and/or the Ruler and on the other side, Defendants Dechert and Mr. Gerrard.  This agreement was purportedly for the performance of legal services to investigate allegations of fraudulent activities within RAKIA performed by Mr. Massaad and Mr. Azima, however, the actions of Defendants Dechert and Mr. Gerrard, repeatedly and continually showed that their mission was to generate evidence of such alleged fraud by any means necessary, legal or otherwise, notwithstanding the

fact that its client was allegedly selling properties to the Islamic Republic of Iran thereby allowing the Iranian regime to evade sanctions imposed by the United States and others. Members of the enterprise and/or their Cohorts, including but not limited to Defendants Dechert, Mr. Gerrard and Mr. Hughes, and non-defendants Ms. Black, RAK, RAKIA, the Ruler and/or other affiliates, attempted to generate such false evidence by reportedly kidnapping at least two potential witnesses, allegedly stealing their possessions and extorting those witnesses to produce false testimony under the threats against their families.

186.    To control the behavior of the witnesses and their families, the enterprise hacked or caused to be hacked the email accounts of family members and later the lawyers of the kidnapped witnesses. As Mr. Azima learned of the kidnappings and later threatened to report the nefarious conduct of the enterprise led by Defendants Dechert and Mr. Gerrard to the authorities in the United States and to Mr. Solomon of the *Wall Street Journal*, the Defendants and/or their Cohorts committed more wire fraud in connection with illegally hacking into the email accounts of Mr. Azima and using and disseminating the stolen emails to discredit and attempt to silence Mr. Azima and his associates, including in particular Mr. Solomon.

187.    The illegal wire fraud and hacking operation directed by Defendants Dechert and Mr. Gerrard and conducted by the other Defendants who were all collectively members of the enterprise and conspiracy that proximately and directly caused Mr. Solomon to lose his job as a reporter for the *Wall Street Journal*, as the Defendants and/or their Cohorts used and disclosed Mr. Azima's stolen email communications with Mr. Solomon: first to Mr. Solomon's employer Dow Jones and second to other members of the press. The enterprise then engaged in further witness tampering and obstruction of justice by conducting several private meetings at which the enterprise

members conspired and coordinated false testimony as to fraudulently conceal how the Defendants and/or their Cohorts came into possession of the stolen communications.  Enterprise members, including Defendant Mr. Gerrard, proceeded to give the coordinated false testimony before England's High Court as well as this court.  This perjurious testimony concealed the Defendants' roles in directing and/or conducting the illegal hacking operations, such that it could not be proven by reasonable due diligence performed by Mr. Solomon, until January 7, 2022 when Mr. Page filed a second witness statement revealing that his prior testimony was falsified in coordination with the other Defendants and non-defendant members of the enterprise at the direction of Defendants Dechert and Mr. Gerrard.

188.    The Defendants have engaged in repeated acts of money laundering in furtherance of and to promote the unlawful objectives and activities of the enterprise. Members of the enterprise knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to themselves and other co-conspirators to promote unlawful activity including, but not limited to the funds described herein, and as described in Exhibit A attached hereto and incorporated herein by reference.

189.    As alleged herein, as part of the concealment, the Defendants and/or their Cohorts engaged in a wide-ranging scheme or artifice to (a) conceal their activities in litigation against Mr. Azima, (b) keeping Mr. Solomon in the dark as to who was responsible for his termination, and (c) preventing Mr. Solomon from seeking recourse to clear his good name, deplatforming him, keeping him silent, and destroying his businesses and ability to generate income. Many of the wires in furtherance of this scheme were sent in the past four years.

190.    As part of this scheme, the enterprise manufactured false evidence. The scheme included the use of wires to deceive Mr. Solomon, Mr. Azima, the U.S. courts, UK courts, and the public to believe that the Defendants and/or their Cohorts had found Mr. Azima and Mr. Solomon's stolen communications on publicly available links on the internet, when in fact the Defendants and/or their Cohorts hacked Mr. Azima and posted his communications with Mr. Solomon on the internet to hide the fact that they had stolen it.

191.    As part of the scheme to deplatform Mr. Solomon, the enterprise sent wires designed to harm Mr. Solomon's business, including posting his communications found in Mr. Azima's stolen data on WeTransfer links on the internet in 2016, sending stolen data to Mr. Solomon's employer and media outlets to create negative publicity to harm Mr. Solomon, and sending wires containing false statements about Mr. Solomon and his stolen data to deceive the courts and the public. The object of the scheme was to silence and cause financial harm to Mr. Solomon and his business.

192.    As further part of the scheme to deplatform Mr. Solomon and cause financial harm to him and his business, the enterprise engaged in a smear campaign through at least 2020, by disseminating or causing to be disseminated said information in articles that they published or caused to be published that portray Mr. Solomon in an undeserved negative light as specifically set forth in Paragraph 111 hereof.

193.    Mr. Solomon incorporates by reference Exhibit B, which sets forth particular use of 173 wire and mail communications in the U.S. in furtherance of the scheme to defraud and deplatform, describing which Defendant caused the communication to be mailed or wired, when the communication was made, and how it furthered the fraudulent scheme.

194.    Exhibit A sets forth money laundering transactions in furtherance of the scheme to defraud and deplatform. Each of these wire transfers was made in furtherance of the scheme to defraud and deplatform and constitutes another instance of wire fraud.  This scheme to defraud and deplatform was intended to, and in fact did, cause cognizable injury to Mr. Solomon (a U.S. citizen) by causing him to lose his job, book deals and speaking engagements, thereby depriving him of money and property in the U.S. and causing detrimental injuries to his U.S. business interests. These injuries included depriving Mr. Solomon of identifiable and quantifiable business opportunities and causing.  The injuries to Mr. Solomon were directly and proximately caused by the Defendants' fraudulent schemes in violation of the mail and wire fraud statute, have occurred within the past four years, and continue to this day.

195.    The Defendants' false and misleading statements have been relied on by Mr. Solomon by his refraining from pursing recourse via the U.S. courts and rehabilitating his name in the publishing and journalism sector. As a foreseeable and intended result of the Defendants' false and misleading statements, the fraudulent scheme has caused Mr. Solomon substantial damages and lost business opportunities.

196.    The global racketeering enterprise that the Defendants participated in engaged in or facilitated illegal activities that included, *inter alia*, sanctions evasion, money laundering, fraud, human rights abuses, kidnappings, torture, robbery, theft, conversion, extortion, obstruction of justice, witness tampering, illegal hacking operations, wire fraud, fraud in connection with access devices, and attacks against free press.

197.    The illegal activities engaged in by the racketeering enterprise occurred in, involved and/or impacted countries across the world including, but not limited to, the United States of

73

America, the Islamic Republic of Iran, The United Arab Emirates, the United Kingdom, the Republic of Georgia, Israel, India, Switzerland, and the Republic of Cyprus.

198.    In carrying out its racketeering activity, the Defendants conspired with each other as well as other public officials and private actors.

199.    The plaintiff Mr. Solomon was injured in his business and property by reason of a violation of 28 U.S.C. §1962, as the Defendants willfully acted and conspired to have Mr. Solomon's employment with the *Wall Street Journal* as a reporter terminated in furtherance of and in covering up its participation in acts and threats of kidnapping, robbery, extortion, wire fraud, fraud in connection with access devices, obstruction of justice and witness tampering, each of which are defined as racketeering activity and predicate offenses under 28 U.S.C. §1961(1).

200.    The Defendants conspired and aided and abetted in a pattern of acts of kidnapping through its role in RAKIA's illegal, forceful taking of Mr. Al Sadeq from his home against his will in violation of his rights, without lawful authority, confining him to a controlled space, isolated for an illegal purpose of obstructing justice through the securing of their false confessions and false testimony to wrongly implicate others in crimes.

201.    Defendants Dechert, Mr. Hughes and Mr. Gerrard engaged in and conspired to engage in a pattern of threats and acts of extortion, by obtaining or attempting to obtain false confessions and false testimony from Mr. Al Sadeq through threats against his liberties and his family.  The false testimony was a thing of value in that it affected the legal rights surrounding property and claims to power.

202.    Defendants Dechert, Mr. Hughes and Mr. Gerrard engaged in and conspired to engage in a pattern of threats and acts of obstruction of justice, by corruptly and by threats and

force, influencing, obstructing, and impeding, and endeavoring to influence, obstruct, and impede, the due administration of justice by obtaining and attempting to obtain false confessions and false testimony from Mr. Al Sadeq through threats against his liberties and his family.

203.    Defendants engaged in and conspired to engage in a pattern of threats and acts of obstruction of justice, by corruptly influencing, obstructing, and impeding, and endeavoring to influence, obstruct, and impede, the due administration of justice by coordinating acts of perjury with others including Mr. Page, Mr. Halabi, and Mr. Buchanan in the context of RAKIA's lawsuit against Mr. Azima.

204.    Defendants Dechert, Mr. Hughes and Mr. Gerrard engaged in and conspired to engage in a pattern of threats and acts of witness tampering, by using threats of physical force against both Mr. Al Sadeq with the intent to influence the testimony of him in an official proceeding.

205.    Defendants Dechert, Mr. Hughes and Mr. Gerrard performed each of these acts of racketeering in exchange for significant compensation falsely designated as payment for legal services.

206.    In furtherance of each of these acts, Defendants engaged in additional acts to evade the scrutiny of the free press, by *inter alia*, seeking to prevent journalists with sources aware of Defendants Dechert, Mr. Hughes and Mr. Gerrard's human rights abuses and racketeering activities from publishing on those activities, by attacking the reporter-source relationships and interfering with journalists' employment at their outlets.  Plaintiff Mr. Solomon was one of those journalists, and he lost his job as a reporter for the *Wall Street Journal* at the hands of the Defendants and/or their Cohorts, when Defendants Dechert and Mr. Gerrard arranged with

Defendants Mr. Del Rosso and Mr. Forlit for the illegal hacking of the emails of Mr. Solomon's source Mr. Azima, obtained emails stolen from Mr. Azima's account by said hacking, and presented or caused to be presented the stolen emails to Mr. Solomon's employer and other members of the press which framed Mr. Solomon for alleged violation of journalism ethics, in which he did not engage. As a result of the Defendants' collective efforts and acts, Mr. Solomon's employment with the *Wall Street Journal* was terminated without cause, to his economic and reputational detriment and causing him severe emotional harm and damages to his property and business. Given the competitiveness of the journalism space and the high demand for his position, it is unlikely that Mr. Solomon will ever be able to land a similar post.

207. Moreover, as a further result of the disclosures to the *Wall Street Journal* and others of Mr. Azima's private electronic and wire communications with Mr. Solomon, which continued until at least 2020, Mr. Solomon suffered additional damages in the form of, *inter alia,* lost awards, book publishing deals and speaking engagements drawing from Mr. Solomon's status and credibility as a *Wall Street Journal* reporter. Mr. Solomon cannot replicate these opportunities in quantity and magnitude, even through other employment.

208. WHEREFORE, the Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for the pain, suffering, mental anguish, emotional distress, and financial or economic loss in amounts to be proven, trebled, and for his costs expended, including attorneys' fees, and for an award of compensatory and punitive damages and otherwise as permitted by applicable law.

**COUNT II**
**Conspiracy to Intentionally Access Computers under the Computer Fraud and**
**Abuse Act**
**(18 U.S.C. §1030(a)(2) and (b))**
**(Primary and Secondary Liability)**

209.     Plaintiff repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

210.     In violation of 18 U.S.C. §1030(a)(2), the Defendants directly or indirectly through their non-Defendant Cohorts, intentionally and without authorization accessed Mr. Azima's computers and accounts through, *inter alia,* phishing and spear-phishing emails and thereby obtained information, specifically communications that Mr. Solomon sent or received, from Mr. Azima's computer, which is a protected computer within the definition of 18 U.S.C. §1030(e)(2), in that it is used in and affects interstate and foreign commerce and communication.

211.     Each of the Defendants directly or indirectly conspired with each other and certain non-Defendant Cohorts, at least some of which are identified herein, to intentionally and without authorization access Mr. Azima's computers and accounts through *inter alia,* phishing and spear-phishing emails and thereby obtain information, specifically communications that Mr. Solomon sent or received.

212.     Mr. Solomon suffered damage and loss by reason of the Defendants unauthorized access of Mr. Azima's computer, when the information, specifically communications that Mr. Solomon sent or received, which they obtained from Mr. Azima's computer was transmitted or caused to be transmitted by Defendants to Mr. Solomon's employer and other media outlets, under the false heading of "fraud" for the purpose of causing, and which did indeed cause, Mr. Solomon to lose his job and suffer damage to his property and business and reputation.     Given the

77

competitiveness of the journalism space and the high demand for his position, it is unlikely that Mr. Solomon will ever be able to land a similar post.

213.     Moreover, as a further result of the disclosures to the *Wall Street Journal* and others of Mr. Azima's private electronic and wire communications with Mr. Solomon, which continued until at least 2020, Mr. Solomon suffered additional damages in the form of, *inter alia,* lost awards, book publishing deals and speaking engagements drawing from Mr. Solomon's status and credibility as a *Wall Street Journal* reporter.  Mr. Solomon cannot replicate these opportunities in quantity and magnitude, even through other employment.

214.     The loss and injury inflicted on Mr. Solomon alone resulting from the Defendants unauthorized access of Mr. Azima's computer during many, if not all, of the one-year periods that followed Defendants' unauthorized access of Mr. Azima's computer far exceeds $5,000 in value.

215.     WHEREFORE, the Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for the pain, suffering, mental anguish, emotional distress, and financial or economic loss in amounts to be proven, trebled, and for his costs expended, including attorneys' fees, and for an award of compensatory and punitive damages and otherwise as permitted by applicable law.

### COUNT III
### Disclosure of Wire, Oral, or Electronic Communications under the Wiretap Act
### (18 U.S.C. §§ 2511(1)(c) and 2520)
### (Primary Liability)

216.     Plaintiff repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

217.     In violation of 18 U.S.C. §2511(1)(c), Defendants intentionally used and disclosed wire and electronic communications between Mr. Azima and Mr. Solomon knowing and/or having reason to know that the information was improperly and illegally obtained through interception.

218.     Defendants Dechert and Mr. Gerrard used CyberRoot (via Defendants Mr. Del Rosso and Vital) to hack Mr. Azima's emails and to intentionally disclose large quantities of Mr. Azima's intercepted data, which included communications with Mr. Solomon, by instructing that the data be posted on BitTorrent and WeTransfer. Links to those BitTorrent and WeTransfer sites were added to the blog sites that CyberRoot created. CyberRoot worked with BellTroX and at the direction of the Defendants to conduct the hacking and post the intercepted data. The BitTorrent and WeTransfer sites were posted by users named anjames and an_james, which are usernames associated with Sharma at CyberRoot. CyberRoot also used the email account an_james@protonmail.ch to create these blog sites and upload Mr. Azima and Mr. Solomon's stolen communications. The links were updated as recently as 2019.  The willful disclosure and use by the Defendants of the intercepted communications caused Mr. Solomon significant harm.

219.     Defendants and/or their Cohorts further intentionally used and disclosed large quantities of Mr. Solomon's communications to his employer Dow Jones as well as to other members of the press knowing that the information was obtained through the interception of Mr. Azima's wire and electronic communications.  This was done for the purpose of interfering with and seeking to cause the termination of Mr. Solomon's employment, which it did.

220.     Defendants Dechert, Mr. Gerrard, Mr. Del Rosso, and Vital caused CyberRoot and others to hack Mr. Azima's computers and email accounts. The hack gave CyberRoot persistent

access to Mr. Azima's computers and email accounts, including his communications with Mr. Solomon.

221.    Defendants Dechert and Mr. Gerrard knew that the information published on the BitTorrent and WeTransfer sites was obtained through interception because Defendants Dechert and Mr. Gerrard paid more than $1 million to Defendants Mr. Del Rosso and Vital, which in turn paid CyberRoot and others to conduct the hacking operation, to intercept Mr. Azima's data and to publish the stolen data, including Mr. Azima's private conversations with Mr. Solomon. Defendants Dechert and Mr. Gerrard also knew or had reason to know that the information was obtained through interception because, among other reasons discussed above, it included large quantities of privileged, private, financially sensitive and trade secrets data, including private email communications, banking documentation, and business plans, including confidential internal pricing lists relating to food transport for U.S. troops in Afghanistan.

222.    As a result of the disclosure to the *Wall Street Journal* and others of Mr. Azima's private electronic and wire communications with Mr. Solomon, Mr. Solomon suffered damages to his business and property. The disclosure of Mr. Solomon's communications first to Dow Jones and later to members of the press, directly and proximately caused Mr. Solomon to lose his prestigious employment as a reporter for the *Wall Street Journal*, causing immediate loss of income and reputational damage, resulting in additional damages in the form of *inter alia* lost awards, book publishing deals and speaking engagements drawing from Mr. Solomon's status and credibility as a *Wall Street Journal* reporter.  Mr. Solomon cannot replicate these opportunities in quantity and magnitude, even through other employment.

223.    Additionally, since at least June 2018 and continuing through at least 2020, the stolen data, including Mr. Solomon's wire and electronic communications with Mr. Azima, has continued to be available on online public sources, including but not limited to International Policy Digest, EUReporter and WeTransfer through links that were posted to the blog sites created by CyberRoot, resulting in more than $75,000 of statutory damages under 18 U.S.C. § 2520(c)(2)(B), and further monetary damages in an amount to be proven at trial.

224.    Upon information and belief, Defendants have made significant profits from their conspiratorial conduct and the resultant disclosure of Mr. Solomon's communications, having been paid large sums of money in the form of legal, consulting and other fees to hack and dump Mr. Azima's communications with Mr. Solomon. As a result of the continued disclosure of Mr. Solomon's stolen communications, Mr. Solomon has suffered, and will continue to suffer, irreparable harm to his person, reputation, business and property, and community standing.

225.    WHEREFORE, the Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for the pain, suffering, mental anguish, emotional distress, and financial or economic loss in amounts to be proven, trebled, and for his costs expended, including attorneys' fees, and for an award of compensatory and punitive damages and otherwise as permitted by applicable law.

### COUNT IV
### Use of Intercepted Wire, Oral, or Electronic Communications under the Wiretap Act
### (18 U.S.C. §§ 2511(1)(d) and 2520)

226.    Plaintiff repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

227.    Defendants Dechert, Mr. Gerrard, Mr. Del Rosso, and Vital willfully, intentionally, and knowingly agreed and conspired with CyberRoot, Mr. Page, and others to use Mr. Solomon's intercepted communications in violation of 18 U.S.C. §§ 2511 and 2520. Among other things, Defendants Dechert and Mr. Gerrard agreed and conspired to intercept Mr. Azima's data resulting in the hackers obtaining persistent access to Mr. Azima's computers and email accounts. Defendants Dechert and Mr. Gerrard paid more than $1 million for the interception of Mr. Azima's data. Defendants Dechert and Mr. Gerrard also used and conspired to use the intercepted data by instructing CyberRoot to publish the data on blog sites that were created by CyberRoot. CyberRoot used BitTorrent and WeTransfer to effectively disclose the stolen data to Defendants Dechert, Mr. Gerrard, Mr. Forlit, Insight and SDC-Gadot as well as other co-conspirators.

228.    The BitTorrent and WeTransfer links were posted by users named anjames and an_james, which are usernames associated with Sharma at CyberRoot. Defendants also used the email account an_james@protonmail.ch to create these blog sites and upload Mr. Solomon's stolen wire and electronic communications.

229.    Defendants, with full knowledge that they were engaged in wrongful actions, took steps in furtherance of the conspiracy, including paying more than $1 million to companies and/or contractors that conducted the hacking and accessing of the data, and later covering up the hacking through a story that the English court found to be false.

230.    Defendants further intentionally use and conspired to wrongfully use large quantities of Mr. Solomon's communications by transmitting the communications directly or indirectly to his employer Dow Jones as well as to other members of the press knowing that the information was obtained through the interception of Mr. Azima's wire and electronic

communications.  Defendants intentionally further used and conspired to use the large quantities of Mr. Solomon's communications for the purpose of interfering with and seeking to cause the termination of Mr. Solomon's employment relationship, which occurred as a result of the implementation of the Defendants' plan.

231.    As a result of the Defendants' use of Mr. Azima's private wire communications with Mr. Solomon, Mr. Solomon suffered damages. The Defendants' use directly and proximately caused Mr. Solomon to lose his prestigious employment as a reporter for the *Wall Street Journal*, causing immediate loss of income and reputational damage, resulting in additional damages in the form of, *inter alia,* lost awards, book publishing deals and speaking engagements drawing from Mr. Solomon's status and credibility as a *Wall Street Journal* reporter.  Mr. Solomon cannot replicate these opportunities in quantity and magnitude, even through other employment.

232.    Mr. Solomon has been injured and has suffered monetary damages as a result of Defendants' actions in an amount to be proven at trial. As a result of the Defendants' use and conspiracy to use Mr. Azima's intercepted data, specifically those communications with Plaintiff Mr. Solomon, Plaintiff has suffered, and will continue to suffer, irreparable harm to his person, reputation, business and property, and community standing.

233.    WHEREFORE, the Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for the pain, suffering, mental anguish, emotional distress, and financial or economic loss in amounts to be proven, trebled, and for his costs expended, including attorneys' fees, and for an award of compensatory and punitive damages and otherwise as permitted by applicable law.

**COUNT V**
**Disclosure of Wire or Oral Communications under DC Wiretap Act**
**(DC Code §§23-542(a)(2) and 23-554)**

234.     Plaintiff repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

235.     In violation of DC Code §23-542(a)(2) and giving rise to civil liability pursuant to DC Code §23-554, Defendants and/or their Cohorts willfully disclosed, to Mr. Solomon's employer and others, wire communications between Mr. Azima and Mr. Solomon knowing and/or having reason to know that the information was improperly and illegally obtained through interception.

236.     Defendants Dechert, Mr. Gerrard, Mr. Del Rosso and Vital directed CyberRoot to hack Mr. Azima's emails and to intentionally disclose large quantities of Mr. Azima's intercepted data, which included communications with Mr. Solomon, by instructing that the data be posted on BitTorrent and WeTransfer to be accessed by Defendants Forlit, Insight and SDC-Global. Links to those BitTorrent and WeTransfer sites were added to the blog sites that CyberRoot created. CyberRoot worked with BellTroX and at the direction of the Defendants to conduct the hacking and post the intercepted data. The BitTorrent and WeTransfer sites were posted by users named anjames and an_james, which are usernames associated with Sharma at CyberRoot. CyberRoot also used the email account an_james@protonmail.ch to create these blog sites and upload Mr. Azima and Mr. Solomon's stolen communications. The links were updated as recently as 2019.

237.     Defendants and/or their Cohorts further intentionally disclosed large quantities of Mr. Solomon's communications to his employer Dow Jones as well as to other members of the press knowing that the information was obtained through the interception of Mr. Azima's wire

communications.  This was done for the purpose of interfering with and seeking to cause the termination of Mr. Solomon's employment, which it did.

238.    Defendants Dechert, Mr. Gerrard, Mr. Del Rosso, and Vital caused CyberRoot to hack Mr. Azima's computers and email accounts. The hack gave CyberRoot persistent access to Mr. Azima's computers and email accounts, including his communications with Mr. Solomon.

239.    Defendants Dechert and Mr. Gerrard knew that the information published on the BitTorrent and WeTransfer sites was obtained through interception because Defendants Dechert and Mr. Gerrard paid more than $1 million to Defendants Mr. Del Rosso and Vital, which in turn paid CyberRoot to conduct the hacking operation, to intercept Mr. Azima's data and to publish the stolen data, including Mr. Azima's private conversations with Mr. Solomon, to be knowingly accessed by Defendants Forlit, Insight and SDC-Global. The Defendants also knew or had reason to know that the information was obtained through interception because, among other reasons discussed above, it included large quantities of privileged, private, financially sensitive and trade secrets data, including private email communications, banking documentation, and business plans, including confidential internal pricing lists relating to food transport for U.S. troops in Afghanistan.

240.    As a result of the disclosure to the *Wall Street Journal* and others of Mr. Azima's private wire communications with Mr. Solomon, Mr. Solomon suffered damages. The disclosure of Mr. Solomon's communications first to Dow Jones and later to members of the press, directly and proximately caused Mr. Solomon to lose his prestigious employment as a reporter for the *Wall Street Journal*, causing immediate loss of income and reputational damage, resulting in additional damages in the form of, *inter alia,* lost awards, book publishing deals and speaking engagements

drawing from Mr. Solomon's status and credibility as a *Wall Street Journal* reporter.  Mr. Solomon cannot replicate these opportunities in quantity and magnitude, even through other employment.

241.    Additionally, since at least June 2018 and continuing through at least 2020, the stolen data, including Mr. Solomon's wire communications with Mr. Azima, has continued to be available on online public sources, including but not limited to International Policy Digest, EUReporter and WeTransfer through links that were posted to the blog sites created by CyberRoot, resulting in monetary damages in an amount to be proven at trial.

242.    Upon information and belief, Defendants have made significant profits from their conspiratorial conduct and the resultant disclosure of Mr. Solomon's communications, having been paid large sums of money in the form of legal, consulting and other fees to hack and dump Mr. Azima's communications with Mr. Solomon. As a result of the continued disclosure of Mr. Solomon's stolen communications, Mr. Solomon has suffered, and will continue to suffer, irreparable harm to his person, reputation, business, and community standing.

243.    WHEREFORE, the Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for the pain, suffering, mental anguish, emotional distress, and financial or economic loss in amounts to be proven, trebled, and for his costs expended, including attorneys' fees, and for an award of compensatory and punitive damages and otherwise as permitted by applicable law.

### COUNT VI
### Use of Intercepted Wire, Oral, or Electronic Communications under the Wiretap Act
### (DC Code §§23-542(a)(3) and 23-554)

244.    Plaintiff repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

245.     Defendants willfully, intentionally, and knowingly agreed and conspired with CyberRoot, Mr. Page, and others to use Mr. Solomon's intercepted communications in violation of DC Code §23-542(a)(3) and giving rise to civil liability pursuant to DC Code §23-554. Among other things, Defendants agreed and conspired to intercept Mr. Azima's data resulting in the hackers obtaining persistent access to Mr. Azima's computers and email accounts. Defendants paid and/or received more than $1 million for the interception of Mr. Azima's data. Defendants also used and conspired to use the intercepted data by instructing CyberRoot to publish the data on blog sites that were created by CyberRoot. CyberRoot used BitTorrent and WeTransfer to send the stolen data to Defendants and/or their Cohorts.

246.     The BitTorrent and WeTransfer links were posted by users named anjames and an_james, which are usernames associated with Sharma at CyberRoot. Defendants also used the email account an_james@protonmail.ch to create these blog sites and upload Mr. Solomon's stolen wire and electronic communications.

247.     Defendants with full knowledge that they were engaged in wrongful actions, took steps in furtherance of the conspiracy, including paying more than $1 million to the company that conducted the hacking, and later covering up the hacking through a story that the English court found to be false.

248.     Defendants further willfully used and conspired to wrongfully use large quantities of Mr. Solomon's communications by transmitting them to his employer Dow Jones as well as to other members of the press knowing that the information was obtained through the interception of Mr. Azima's wire communications.  Defendants intentionally further used and conspired to use the large quantities of Mr. Solomon's communications for the purpose of interfering with and

seeking to cause the termination of Mr. Solomon's employment relationship, which occurred as a result of the implementation of the Defendants' plan.

249.    As a result of the Defendants' use of Mr. Azima's private wire communications with Mr. Solomon, Mr. Solomon suffered damages. The Defendants' use directly and proximately caused Mr. Solomon to lose his prestigious employment as a reporter for the *Wall Street Journal*, causing immediate loss of income and reputational damage, resulting in additional damages in the form of, *inter alia,* lost awards, book publishing deals and speaking engagements drawing from Mr. Solomon's status and credibility as a *Wall Street Journal* reporter.  Mr. Solomon cannot replicate these opportunities in quantity and magnitude, even through other employment.

250.    Mr. Solomon has been injured and has suffered monetary damages as a result of Defendants' conspiratorial actions in an amount to be proven at trial. As a result of the Defendants' use and conspiracy to use Mr. Azima's intercepted data, specifically those communications with Plaintiff Mr. Solomon, Plaintiff has suffered, and will continue to suffer, irreparable harm to his person, reputation, business and property, and community standing.

251.    WHEREFORE, the Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for the pain, suffering, mental anguish, emotional distress, and financial or economic loss in amounts to be proven, trebled, and for his costs expended, including attorneys' fees, and for an award of compensatory and punitive damages and otherwise as permitted by applicable law.

## COUNT VII
## Tortious Interference with Business Relationships

252.    Plaintiff repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

253.    Mr. Solomon was employed by the *Wall Street Journal* pursuant to his then existing and valid employment agreement with Dow Jones.

254.    Defendants had knowledge and was aware that Mr. Solomon was employed by the *Wall Street Journal*, as Defendant Mr. Gerrard testified to the fact that in the summer of 2016 Mr. Azima had advised him about his relationship with Mr. Solomon, as well as Mr. Solomon's job and place of employment.

255.    Defendants intentionally and improperly interfered with Mr. Solomon's employment relationship with Dow Jones, as part of its effort to silence Mr. Solomon and his source Mr. Azima, who was knowledgeable about Defendants' illegal conduct, racketeering activities and contributions to human rights abuses, who had threatened to report them to Mr. Solomon, an esteemed reporter at a major newspaper of global circulation who had a reputation for breaking news on similarly high profile matters arising out of the Middle East as set forth herein.

256.    Defendants' improper intentional interference consisted of the following but not limited to acts: (a) engaging several firms to hack, dump and retrieve Mr. Azima's email account; (b) delivering or causing to deliver a dossier of stolen emails under the false heading of "fraud" to Mr. Solomon's employer and other media outlets that painted an unfair and wrong impression of Mr. Solomon and Mr. Azima's relationship; (c) after Mr. Solomon's employer investigated the emails and chose not to terminate his employment relationship, delivering or causing to be delivered the same dossier of stolen emails under the false heading of "fraud" to several media outlets, which resulted in the publication of the stolen emails and forced Mr. Solomon's employer to terminate his employment relationship in a public and humiliating manner; and (d) engaging in

a conspiracy to commit perjury and cause others to commit perjury in such a manner as to conceal and cover-up Defendants' involvement in the hacking of Mr. Azima's email account.

257.    As a result of Defendants' interference, and as a foreseeable consequence thereof, Mr. Solomon was terminated from his job at Dow Jones in a public and humiliating manner, cause Mr. Solomon significant damage in the forms of, *inter alia,* economic injury, lost employment, damaged reputation, lost awards, forgone opportunities to build on his reputation such as prestigious job opportunities, high value speaking engagements and book publishing deals that would have otherwise been available to him, public humiliation, emotional distress, mental grieving, pain and suffering.  As these book publishing deals and speaking engagements drew from Mr. Solomon's status and credibility as a *Wall Street Journal* reporter, Mr. Solomon cannot replicate these opportunities in quantity and magnitude, even through other employment.

258.    WHEREFORE, the Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for the pain, suffering, mental anguish, emotional distress, and financial or economic loss in amounts to be proven, trebled, and for his costs expended, including attorneys' fees, and for an award of compensatory and punitive damages and otherwise as permitted by applicable law.

### COUNT VIII
### Civil Conspiracy

259.    Plaintiff repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

260.    Defendants entered into agreements with each other and several other intelligence or hacking firms including BellTroX, and CyberRoot (as well as the several other entities and persons mentioned in this Amended Complaint or who may be later discovered) to engage in a

90

scheme to hack into Mr. Azima's email accounts, for the purpose of using the stolen emails as a means of silencing Mr. Azima, who was knowledgeable about Defendants' illegal conduct, racketeering activities and contributions to human rights abuses, and had threated to report them to Mr. Solomon, an esteemed reporter at a major newspaper of global circulation who had a reputation for breaking news on similarly high profile matters arising out of the Middle East.

261.    The type of hacking operation that Defendants commissioned for the purpose of silencing Mr. Azima is illegal under several applicable federal and state, criminal and civil laws, including but not limited to the tortious and illegal conduct as described in each of the preceding Counts, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, which prohibits accessing a computer without or in excess of authorization.

262.    An injury to Mr. Solomon was caused by an overt act of Defendants and/or their Cohorts in the illegal taking of emails from Mr. Azima and using them in the manner described herein to cause Mr. Solomon to lose his job, and suffer damages that include, *inter alia*, economic injury, lost employment, damaged reputation, forgone opportunities to build on his reputation such as prestigious job opportunities, high value speaking engagements and book publishing deals that would have otherwise been available to him, public humiliation, emotional distress, mental grieving, pain and suffering. As these reporting, book publishing deals and speaking engagements drew from Mr. Solomon's status and credibility as a *Wall Street Journal* reporter, Mr. Solomon cannot replicate these opportunities in quantity and magnitude, even through other employment.

263.    The overt acts set forth herein were done pursuant to and in furtherance of the common scheme to silence, Mr. Solomon and his source Mr. Azima.

264.     WHEREFORE, the Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for the pain, suffering, mental anguish, emotional distress, and financial or economic loss in amounts to be proven, trebled, and for his costs expended, including attorneys' fees, and for an award of compensatory and punitive damages and otherwise as permitted by applicable law.

### COUNT IX
### Punitive damages
### 18 U.S.C. §1964(c)

265.     Plaintiff repeats, realleges and incorporates by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

266.     Defendants engaged in grossly improper conduct including but not limited to fraud, wantonness, malicious and/or willful disregard for Mr. Solomon in furtherance of the illegal scheme, design, enterprise and conspiracy and other acts as set forth in this Amended Complaint, thereby entitling the Plaintiff to an award of punitive damages in such amount as shall be determined at trial.

267.     Mr. Solomon has been grossly injured as a result of the conspiratorial and other conduct of the Defendants and is entitled to punitive damages as a result thereof.

268.     WHEREFORE, the Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for the pain, suffering, mental anguish, emotional distress, and financial or economic loss in amounts to be proven, trebled, and for his costs expended, including attorneys' fees, and for an award of compensatory and punitive damages and otherwise as permitted by applicable law.

**PRAYER FOR RELIEF**

269.    WHEREFORE, Plaintiff requests this Court find the Defendants, jointly and severally, liable for the Causes of Actions listed above and enter Judgment against the Defendants as follows:

270.    Awarding Plaintiff compensatory damages against the Defendants, jointly and severally, for the actions described in this Amended Complaint in amounts as shall be determined at trial in accordance with evidence to be submitted to this Court;

271.    Awarding Plaintiff punitive or exemplary damages against Defendants, jointly and severally, in amounts consistent with evidence as shall be determined at trial in accordance with evidence to be submitted to this Court;

272.    Awarding Plaintiff post judgment interest as computed and calculated at the maximum rate allowable by law;

273.    Awarding Plaintiffs their costs and disbursements and reasonable allowances of reasonable fees for Plaintiffs' counsel and experts and reimbursement of expenses;

274.    Leave to amend this Amended Complaint as the interests of justice may allow;

275.    For trial by jury on all issues so triable; and

276.    Granting any and all such further relief as the Court may deem just and proper.


Dated: February 17, 2023

                    Respectfully submitted,

                    HEIDEMAN NUDELMAN & KALIK, P.C.
                    5335 Wisconsin Ave., Suite 440
                    Washington, DC 20015

(202) 463-1818
By: */s/Richard D. Heideman*
Richard D. Heideman (DC Bar No. 377462)
Noel J. Nudelman (DC Bar No. 449969)
Tracy Reichman Kalik (DC Bar No. 462055)
Joseph H. Tipograph (DC Bar No. 997533)