**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SOLOMON                                        :
                                               :
          Plaintiff,                           :
                                               :   Civil Action No. 22-cv-03137-JEB
     v.                                        :
                                               :
                                               :
DECHERT LLP, et al.                            :
                                               :
          Defendants.                          :
…………………………………………………………:

**<u>PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW WITH POINTS AND
AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**


Dated:  May 31, 2023            Respectfully Submitted,

                                HEIDEMAN NUDELMAN & KALIK P.C.


                                By:     */s/ Noel J. Nudelman*_____
                                        */s/ Tracy Reichman Kalik*_____
                                        Richard D. Heideman (No. 377462)
                                        Noel J. Nudelman (No. 449969)
                                        Tracy Reichman Kalik (No. 462055)
                                        Joseph H. Tipograph (No.997533)
                                        HEIDEMAN NUDELMAN & KALIK, PC
                                        5335 Wisconsin Avenue, NW; Suite 440
                                        Washington, DC  20015
                                        Telephone: 202.463.1818
                                        Facsimile: 202.463.2999

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 1

STANDARD OF REVIEW ....................................................................................... 2

ARGUMENT .......................................................................................................... 3

   I.   The Statute of Limitations for Plaintiff to Bring His Claims Has Not Expired................. 3

      A.  Defendants Fraudulently Concealed Their Wrongdoing by Coordinating Perjury, Knowingly Producing, Serving and Filing False Litigation Documents and Destroying Evidence. ................................................................................................... 5

      B.  The Plaintiff Lacked Sufficient Notice Until January of 2022 ...................................... 7

      C.  Defendants Fail to Establish Plaintiff's Lack of Due Diligence ................................... 12

      D.  Defendants Reliance on the North Carolina *Del Rosso* Opinion is Misplaced.............. 14

      E.  Defendants' Wrongful Conduct Against Plaintiff Continued Through 2020 ............... 15

   II.   Plaintiff Has Sufficiently Plead Facts for this Court to Find that he has Stated Claims for each of his Causes of Action. ........................................................................................ 16

      A.  The FAC Adequately Alleges Civil and Conspiracy RICO........................................... 16

      B.  Plaintiff Adequately Alleges a Claim under the Computer Fraud and Abuse Act ........ 69

      C.  The FAC Adequately Pleads Defendants' Violations of the Wiretap Act.................... 74

      D.  The FAC alleges the Defendants Tortiously Interfered with Plaintiff's Business Relationships .................................................................................................. 77

      E.  The FAC Adequately Pleads a Civil Conspiracy Among the Defendants.................... 79

      F.  Plaintiff is Entitled to Punitive Damages ............................................................... 81

   III.   This Court has Personal Jurisdiction over Defendants Hughes, Gerrard, Del Rosso and Vital Management ................................................................................................. 83

      A.  Personal Jurisdiction over Defendants Del Rosso and Vital is established via 18 U.S.C. § 1965(b)........................................................................................................ 83

      B.  Exercise of Personal Jurisdiction is Proper Over All Defendants Under DC's Long-Arm Statute ........................................................................................................... 85

CONCLUSION ....................................................................................................... 92

# TABLE OF AUTHORITIES

Page(s)

Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
   562 F.3d 630 (4th Cir. 2009) ........................................................................... 71
*Adair v. England*,
   183 F. Supp. 2d 31 (D.D.C. 2002) ..................................................................... 4
*AEPA Architect Engineers, P.C. v. Aziz*,
   No. 1:21-CV-01457 (TNM), 2022 WL 35618 (D.D.C. Jan. 4, 2022) ............... 16, 32
*Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*,
   374 A.2d 284 (D.C. 1977) ................................................................................. 77
*Al-Kazemi v. Gen. Acceptance & Inv. Corp.*,
   633 F. Supp. 540 (D.D.C. 1986) .................................................................. 81, 82
*Am. Nat. Ins. Co. v. F.D.I.C.*,
   642 F.3d 1137 (D.C. Cir. 2011) .......................................................................... 2
*Anderson v. Ayling*,
   396 F.3d 265 (3d Cir. 2005) ............................................................................. 66
*Ass'n of Am. Physicians & Surgeons v. Schiff*,
   518 F. Supp. 3d 505 (D.D.C. 2021) ................................................................... 68
*Azima v. Del Rosso*,
   No. 1:20CV954, 2021 WL 5861282 (M.D.N.C. Dec. 10, 2021) ..................... 14, 18
*Bailey v. Greenberg*,
   516 A.2d 934 (D.C. 1986) .............................................................................. 5, 12
*Bakala v. Krupa*,
   No. 9:18-CV-2590-DCN-MGB, 2021 WL 3508585 (D.S.C. Aug. 10, 2021) ....... 67
*Baker v. A.H. Robins Co.*,
   613 F. Supp. 994 (D.D.C. 1985) ........................................................................ 11
*Beck v. Prupis*,
   529 U.S. 494, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000) ................................. 65
*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ............................... 2, 3
*Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*,
   45 F.3d 493 (D.C. Cir. 1995) ............................................................................ 77
*Bergen v. Rothschild*,
   648 F. Supp. 582 (D.D.C. 1986) ....................................................... 21, 24, 51, 62
*Beyond Pesticides v. Monsanto Co.*,
   311 F. Supp. 3d 82 (D.D.C. 2018) ..................................................................... 16
*Blumenthal v. Drudge*,
   992 F. Supp. 44 (D.D.C. 1998) .......................................................................... 89
*Boyd v. Farrin*,
   958 F. Supp. 2d 232 (D.D.C. 2013) ..................................................................... 3

*Boyle v. United States*,
   556 U.S. 938, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009) ................................................ 18, 20

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) ......................................... 57, 58, 81

*Briscoe v. Costco Wholesale Corp.*,
   61 F. Supp. 3d 78 (D.D.C. 2014) ....................................................................................... 3

*Browning v. Clinton*,
   292 F.3d 235 (D.C. Cir. 2002) ......................................................................................... 68

*Bussineau v. President & Directors of Georgetown Coll.*,
   518 A.2d 423 (D.C. 1986)................................................................................................ 11

*Byrne v. Clinton*
   410 F. Supp. 3d (D.D.C. 2019) ........................................................................................ 67

*Callan v. State Chem. Mfg. Co.*,
   584 F. Supp. 619 (E.D. Pa. 1984) .................................................................................... 65

*Campbell v. D.C.*,
   972 F. Supp. 2d 38 (D.D.C. 2013) ..................................................................................... 3

*Carpenter v. United States*,
   484 U.S. 19, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987) ....................................................... 32

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001) .................................................. 21

*Chase v. Peay*,
   286 F. Supp. 2d 523 (D. Md. 2003) ................................................................................. 92

*Chen v. Bell-Smith*,
   768 F. Supp. 2d 121 (D.D.C. 2011) ................................................................................. 79

*Chisolm v. TranSouth Fin. Corp.*,
   95 F.3d 331 (4th Cir. 1996)............................................................................................. 33

*Cline v. Reetz-Laiolo*,
   329 F. Supp. 3d 1000 (N.D. Cal. 2018) (denying motion .................................................. 79

*Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials Corp.*,
   887 F. Supp. 2d 9 (D.D.C. 2012) ............................................................................... 51, 58

*Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*,
   622 F. Supp. 2d 1357 (S.D. Fla. 2009)............................................................................. 73

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
   891 F. Supp. 2d 13 (D.D.C. 2012) .............................................................................. 75, 76

*Covington v. City of New York*,
   No. 98 CIV. 1285 (MGC), 1999 WL 739910 (S.D.N.Y. Sept. 22, 1999) ............................... 92

*D.C. v. Air Fla., Inc.*,
   750 F.2d 1077 (D.C. Cir. 1984) ........................................................................................ 3

*Dawson v. Eli Lilly & Co.*,
   543 F. Supp. 1330 (D.D.C. 1982) .................................................................................... 11

*Democratic Nat'l Comm. v. Russian Fed'n*,
   392 F. Supp. 3d 410 (S.D.N.Y. 2019).............................................................................. 44

*Diamond v. Davis*,
   680 A.2d 364 (D.C. 1996)............................................................................................... 13

*D'Iorio v. Adonizio*,
   554 F. Supp. 222 (M.D. Pa. 1982) ....................................................................... 21, 32, 34

*Dist. Telecommunications Dev. Corp. v. Dist. Cablevision, Inc.*,
    638 F. Supp. 418 (D.D.C. 1985) ................................................................................ 22

*Doe v. Exxon Mobil Corp.*,
    No. 1:01-CV-1357-RCL, 2022 WL 3043219 (D.D.C. Aug. 2, 2022) ...................................... 11

*Dooley v. United Techs. Corp.*,
    803 F. Supp. 428 (D.D.C. 1992) ................................................................................ 33, 41, 50

*Drouet v. Moulton*,
    245 Cal. App. 2d 667, 54 Cal. Rptr. 278 (Ct. App. 1966) ...................................... 78

*Dunleavy v. Wayne Cnty. Comm'n*,
    No. 04-CV-74670-DT, 2006 WL 8431836 (E.D. Mich. May 11, 2006) ................................. 65

*Edmond v. U.S. Postal Serv. Gen. Couns.*,
    949 F.2d 415 (D.C. Cir. 1991) ................................................................................ 88

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
    48 F.3d 1260 (D.C. Cir. 1995) ................................................................................ 52, 53

*EF Cultural Travel BV v. Explorica, Inc.*,
    274 F.3d 577 (1st Cir. 2001) ................................................................................ 73

*Eisenberg v. Gagnon*,
    564 F. Supp. 1347 (E.D. Pa. 1983) ................................................................................ 17

*Fed. Info. Sys., Corp. v. Boyd*,
    753 F. Supp. 971 (D.D.C. 1990) ................................................................................ passim

*Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
    873 F. Supp. 2d 288 (D.D.C. 2012) ................................................................................ passim

*Figueroa v. D.C. Metro. Police Dep't*,
    633 F.3d 1129 (D.C. Cir. 2011) ................................................................................ 16

*Firestone v. Firestone*,
    76 F.3d 1205 (D.C. Cir. 1996) ................................................................................ 4, 5, 6, 12

*First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*,
    218 F. Supp. 2d 369 (S.D.N.Y. 2002) ................................................................................ 63

*Fraternal Ord. of Police Libr. of Cong. Lab. Comm. v. Libr. of Cong.*,
    692 F. Supp. 2d 9 (D.D.C. 2010) ................................................................................ 91

*Fritz v. Islamic Republic of Iran*,
    320 F. Supp. 3d 48 (D.D.C. 2018) ................................................................................ 56

*Genetic Sys. Corp. v. Abbott,
    Lab'ys*, 691 F. Supp. 407 (D.D.C. 1988) ................................................................................ 77

*George S. May Int'l Co. v. Hostetler*,
    No. 04 C 1606, 2004 WL 1197395 (N.D. Ill. May 28, 2004) ................................................ 73

*Grateful Dead Prods. v. Sagan*, No. C,
    06-07727 JW, 2008 WL 11389542 (N.D. Cal. Dec. 18, 2008) ................................................ 79

*Greggs v. Autism Speaks, Inc.*,
    987 F. Supp. 2d 51 (D.D.C. 2014) ................................................................................ 3

*Griva v. Davison*,
    637 A.2d 830 (D.C. 1994) ................................................................................ 80

*Grunewald v. United States*,
    353 U.S. 391, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957) ................................................ 44

*Guerrero v. Gates*,
    110 F. Supp. 2d 1287 (C.D. Cal. 2000) ................................................................................ 63

*Guttenberg v. Emery*,
   41 F. Supp. 3d 61 (D.D.C. 2014) ................................................................. 90

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989) .......................... 51, 52

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ................................................................... 80

*Handeen v. Lemaire*,
   112 F.3d 1339 (8th Cir. 1997) ................................................ 26, 40, 63, 83

*Hargraves v. Cap. City Mortg. Corp.*,
   140 F. Supp. 2d 7 (D.D.C. 2000) ........................................................ passim

*Hilska v. Jones*,
   217 F.R.D. 16 (D.D.C. 2003) ..................................................................... 91

*Hobson v. Wilson*,
   737 F.2d 1 (D.C. Cir. 1984) ......................................................................... 5

*HUB Grp., Inc. v. Clancy*,
   No. CIV.A. 05-2046, 2006 WL 208684 (E.D. Pa. Jan. 25, 2006) ................. 73

*Hunt v. Weatherbee*,
   626 F. Supp. 1097 (D. Mass. 1986) ..................................................... 48, 64

*I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*,
   307 F. Supp. 2d 521 (S.D.N.Y. 2004) ......................................................... 73

*IMark Mktg. Servs., LLC v. Geoplast S.p.A.*,
   753 F. Supp. 2d 141 (D.D.C. 2010) ............................................................ 90

*In re Am. Exp. Co. S'holder Litig.*,
   39 F.3d 395 (2d Cir. 1994) ......................................................................... 59

*In re Parmalat Sec. Litig.*,
   421 F. Supp. 2d 703 (S.D.N.Y. 2006) ......................................................... 92

*In re Swine Flu Immunization Prod. Liab. Litig.*,
   880 F.2d 1439 (D.C. Cir. 1989) ................................................................. 11

*Jones v. Meridian Towers Apartments, Inc.*,
   816 F. Supp. 762 (D.D.C. 1993) ................................................................... 5

*Jordan v. Medley*,
   711 F.2d 211 (D.C. Cir. 1983) ................................................................... 81

*Jung v. Ass'n of Am. Med. Colleges*,
   300 F. Supp. 2d 119 (D.D.C. 2004) ............................................................ 86

*Kelly v United States*,
   140 S. Ct 1565 (2020). ............................................................................. 59

*Kerby v. Mortg. Funding Corp.*,
   992 F. Supp. 787 (D. Md. 1998) ......................................................... 32, 33

*Kershaw v. Nautica S.A. Ltd.*,
   885 F. Supp. 617 (S.D.N.Y. 1995) ............................................................ 16

*Kubicki on behalf of Kubicki v. Medtronic, Inc.*,
   293 F. Supp. 3d 129 (D.D.C. 2018) ............................................................ 11

*Lannan Found. v. Gingold*,
   300 F. Supp. 3d 1 (D.D.C. 2017) ......................................................... 79, 80

*Lee v. Wolfson*,
   265 F. Supp. 2d 14 (D.D.C. 2003) ............................................................. 11

*Lewis-Burke Assocs., LLC v. Widder*,
  725 F. Supp. 2d 187 (D.D.C. 2010) ................................................................ 71, 72
*Lu v. Lezell*,
  45 F. Supp. 3d 86 (D.D.C. 2014) ....................................................................... passim
*Lujan v. Defs. of Wildlife*,
  504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) ..................................... 56
*Luna Distrib. LLC v. Stoli Grp. (USA), LLC*,
  No. SACV171552DOCJDEX, 2018 WL 5099277 (C.D. Cal. July 10, 2018) ....................... 78
*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir. 2009) ............................................................................ 71
*Mackin v. Auberger*,
  59 F. Supp. 3d 528 (W.D.N.Y. 2014) .................................................................. 18
*Massey v. Helman*,
  196 F.3d 727 (7th Cir. 1999) ............................................................................. 92
*Mayle v. Felix*,
  545 U.S. 644, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005) ...................................... 11
*McCullough v. Suter*,
  757 F.2d 142 (7th Cir. 1985) ............................................................................. 21
*McMurtry v. Brasfield*,
  654 F. Supp. 1222 (E.D. Va. 1987) .................................................................... 63
*Meng v. Schwartz*,
  116 F. Supp. 2d 92 (D.D.C. 2000) .................................................................. 58, 59
*Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc.*,
  18 F.3d 260 (4th Cir. 1994) ............................................................................... 58
*Mitchell v. E-Z Way Towers, Inc.*,
  269 F.2d 126 (5th Cir. 1959) ............................................................................. 91
*Mruz v. Caring, Inc.*,
  991 F. Supp. 701 (D.N.J. 1998) ......................................................................... 66
*Murphy v. Farmer*,
  176 F. Supp. 3d 1325 (N.D. Ga. 2016) .............................................................. 47
*Napoli v. United States*,
  32 F.3d 31 (2d Cir. 1994) .............................................................................. 26, 40
*Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*,
  74 F. Supp. 2d 221 (E.D.N.Y. 1999) ...................................................... 62, 63, 64, 65
*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994) ..................................... 55, 65
*No. 498, United Food & Com. Workers v. SDC Inv., Inc.*,
  788 F.2d 535 (9th Cir. 1986) ............................................................................. 84
*Nuevos Destinos, LLC v. Peck*,
  No. 15-CV-1846 (EGS), 2019 WL 78780 (D.D.C. Jan. 2, 2019) ................................. 84
*Nygard v. Bacon*,
  No. 19 CIV. 1559 (LGS), 2021 WL 3721347 (S.D.N.Y. Aug. 20, 2021) ........................ 67
*Pac. Aerospace & Elecs., Inc. v. Taylor*,
  295 F. Supp. 2d 1188 (E.D. Wash. 2003) .......................................................... 73
*Pac. Mar. Freight, Inc. v. Foster*,
  10-CV-0578-BTM-BLM, 2010 WL 3339432 (S.D. Cal. Aug. 24, 2010) ......................... 78

*Pereira v. United States*,
   347 U.S. 1, 74 S. Ct. 358, 98 L. Ed. 435 (1954) ...................................................... 33
*R.A.G.S. Couture, Inc. v. Hyatt*,
   774 F.2d 1350 (5th Cir. 1985) ................................................................................ 17
*Radbod v. Moghim*,
   269 A.3d 1035 (D.C. 2022) ............................................................................ 11, 13
*Rahman v. Johanns*,
   501 F. Supp. 2d 8 (D.D.C. 2007) ........................................................................... 91
*Rainbolt v. Johnson*,
   669 F.2d 767 (D.C. Cir. 1981) ............................................................................... 82
*Redfearn v. Trader Joe's Co.*,
   20 Cal. App. 5th 989, 230 Cal. Rptr. 3d 98 (2018) ............................................... 79
*Reich v. Lopez*,
   38 F. Supp. 3d 436 (S.D.N.Y. 2014) ...................................................................... 67
*Reiter v. Sonotone Corp.*,
   442 U.S. 330, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979) ......................................... 64
*Reynolds v. Condon*,
   908 F. Supp. 1494 (N.D. Iowa 1995) ................................................................ 63, 65
*Rice v. Janovich*,
   109 Wash. 2d 48, 742 P.2d 1230 (1987) ................................................................ 64
*Richards v. Mileski*,
   662 F.2d 65 (D.C. Cir. 1981) ......................................................................... passim
*Riddell v. Riddell Washington Corp.*,
   866 F.2d 1480 (D.C. Cir. 1989) ................................................................. 5, 11, 13
*RJR Nabisco, Inc. v. European Cmty.*,
   579 U.S. 325 (2016) ............................................................................................... 47
*Rodonich v. House Wreckers Union, Loc. 95 of Laborers' Int'l Union of N. Am.*,
   627 F. Supp. 176 (S.D.N.Y. 1985) ......................................................................... 64
*Rotella v. Wood*,
   528 U.S. 549, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000) ................................ 4, 8
*Sanders v. United States*,
   373 U.S. 1, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963) ............................................. 84
*Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*,
   319 F.3d 205 (5th Cir. 2003) .................................................................................. 58
*Sandwich Shoppe, Inc. v. Carr Realty Corp.*,
   749 A.2d 724 (D.C. 2000) ...................................................................................... 80
*Second Amend. Found. v. U.S. Conf. of Mayors*,
   274 F.3d 521 (D.C. Cir. 2001) ............................................................................... 86
*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985) ...................... 16, 17, 62, 63
*Shenton v. Potomac Elec. Power Co.*,
   No. CV 19-1426 (RBW), 2020 WL 12980379 (D.D.C. Nov. 30, 2020) ................ 11
*Smith v. Brown & Williamson Tobacco Corp.*,
   3 F. Supp. 2d 1473 (D.D.C. 1998) ......................................................................... 11
*Snead v. Hygrade Food Prod. Assocs.*,
   No. CIV. A. 98-2657, 1998 WL 910223 (E.D. Pa. Dec. 28, 1998) ........................ 64

*Subscription Television of Greater Washington v. Kaufmann*,
    606 F. Supp. 1540 (D.D.C. 1985) .................................................................. 82
*Swierkiewicz v. Sorema N. A.*,
    534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) ............................... 3, 91
*Thomas v. Principi*,
    394 F.3d 970 (D.C. Cir. 2005) ......................................................................... 2
*Trump v. O'Brien*,
    403 N.J. Super. 281, 958 A.2d 85 (App. Div. 2008) ..................................... 68
*U.S. S.E.C. v. e-Smart Techs., Inc.*,
    926 F. Supp. 2d 231 (D.D.C. 2013) ............................................................... 84
*Union Mut. Life Ins. Co. v. Simon*,
    22 F.R.D. 186 (E.D. Pa. 1958) ....................................................................... 16
*United States v. Abbell*,
    271 F.3d 1286 (11th Cir. 2001) ...................................................................... 42
*United States v. Adefehinti*,
    510 F.3d 319 (D.C. Cir. 2007) ........................................................................ 50
*United States v. Benny*,
    559 F. Supp. 264 (N.D. Cal. 1983) ........................................................... 21, 52
*United States v. Coiro*,
    922 F.2d 1008 (2d Cir. 1991) ......................................................................... 53
*United States v. Daidone*,
    471 F.3d 371 (2d Cir. 2006) ...................................................................... 54, 55
*United States v. Hartley*,
    678 F.2d 961 (11th Cir. 1982) ........................................................................ 21
*United States v. Kubrick*,
    444 U.S. 111, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979) ................................... 8
*United States v. Loc. 560*,
    550 F. Supp. 511 (D.N.J. 1982) ...................................................................... 48
*United States v. Lundwall*,
    1 F. Supp. 2d 249 (S.D.N.Y. 1998) ................................................................ 44
*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ...................................................................... 35
*United States v. Pollack*,
    534 F.2d 964 (D.C. Cir. 1976) ........................................................................ 32
*United States v. Richardson*,
    167 F.3d 621 (D.C. Cir. 1999) ........................................................................ 18
*United States v. Walters*,
    997 F.2d 1219 (7th Cir. 1993) ........................................................................ 59
*United States v. Zichettello*,
    208 F.3d 72 (2d Cir. 2000) ............................................................................. 21
*US Dominion, Inc. v. Powell*,
    554 F. Supp. 3d 42 (D.D.C. 2021) .................................................................. 87
*Vasquez v. Whole Foods Mkt., Inc.*,
    302 F. Supp. 3d 36 (D.D.C. 2018) ............................................................. 87, 90
*Vox Media, Inc. v. Mansfield*,
    322 F. Supp. 3d 19 (D.D.C. 2018) ........................................................ 5, 12, 13

*W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
   235 F.3d 629 (D.C. Cir. 2001) ........................................................................ 17, 52
*Wagner v. Georgetown Univ. Med. Ctr.*,
   768 A.2d 546 (D.C. 2001) ...................................................................................... 11
*Watson v. Norris*,
   No. CIV. A. 89-0625(CRR), 1991 WL 7165 (D.D.C. Jan. 11, 1991)................................ 18, 22
*Weaver v. Bratt*,
   421 F. Supp. 2d 25 (D.D.C. 2006) ........................................................................ 59
*Wilcox v. Ho-Wing Sit*,
   586 F. Supp. 561 (N.D. Cal. 1984) ...................................................................... 21
*Wilson v. On the Rise Enterprises, LLC*,
   305 F. Supp. 3d 5 (D.D.C. 2018) ............................................................................ 5
*Yien-Koo King v. Wang*,
   No. 14-CV-7694 (LJL), 2020 WL 6875403 (S.D.N.Y. Nov. 23, 2020) .................................. 67
*Youming Jin v. Ministry of State Sec.*,
   335 F. Supp. 2d 72 (D.D.C. 2004) .................................................................... 84, 85
*Zandford v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   30 F. Supp. 2d 1 (D.D.C. 1998) ............................................................................ 4

## Statutes

15 U.S.C. § 15 ........................................................................................... 64
18 U.S.C. § 1030(a)(2) .............................................................................. 71, 72
18 U.S.C. § 1030(a)(2)(B) ............................................................................. 69
18 U.S.C. § 1030(c)(4)(A)(i)(I) ...................................................................... 71
18 U.S.C. § 1030(e)(6)(11) ...................................................................... 71, 72, 73
18 U.S.C. § 1030(g) ........................................................................... 4, 71, 72
18 U.S.C. § 1201(a)(1) ................................................................................ 47
18 U.S.C. § 1341, 1343 ................................................................................ 32
18 U.S.C. § 1343 ........................................................................... 32, 37, 38
18 U.S.C. § 1503 ..................................................................................... 42, 49
18 U.S.C. § 1956 ......................................................................................... 50
18 U.S.C. § 1956(a)(2)(A) .............................................................................. 50
18 U.S.C. § 1961 ............................................................................... 1, 32, 51
18 U.S.C. § 1962(c) ................................................................................ 1, 51
18 U.S.C. § 1964(c) ................................................................................ 1, 20
18 U.S.C. § 1964(d) ................................................................................ 1, 16
18 U.S.C. § 1965(b) .............................................................................. 83, 84
18 U.S.C. § 2511(1)(c)-(d) ......................................................................... 1, 74
18 U.S.C. § 2520(e) ..................................................................................... 4
28 U.S.C. § 1604, 1605 ................................................................................. 12
D.C. Code Ann. § 12-301(8) ............................................................................. 4
D.C. Code Ann. § 13-423 ................................................................. 85, 86, 87, 88, 90
D.C. Code Ann. § 22-3251 ............................................................................... 48
D.C. Code Ann. § 23-541(3) ............................................................................ 74
D.C. Code Ann. § 23-542(a) ........................................................................ 1, 2, 74
D.C. Code Ann. § 23-554 .............................................................................. 1, 2

18 U.S.C. § 1030(a)(b)..................................................................................................... 69, 71

**<u>Rules</u>**

Fed. R. Civ. P. 4(k)(1).................................................................................................... 84
Fed. R. Civ. P. 9(b)......................................................................................................... 41
Fed. R. Civ. P. 12(b)...................................................................................................... 1,2,3
Fed. R. Civ. P. 12(e)....................................................................................................... 2, 91, 92
Fed. R. Civ.P. 15(c)(1)(B) ............................................................................................ 11

## INTRODUCTION

The Plaintiff's First Amended Complaint ("FAC") sets forth more than sufficient facts which, on its face, and which when proven at trial before a jury, demonstrates the Defendants, acting both alone and in conspiracy, engaged in acts designed to harm the Plaintiff, Jonathan "Jay" Solomon (hereinafter "Solomon" or "Plaintiff").  Specifically, the Plaintiff has averred, *inter alia*, that Defendants engaged in conspiracy, racketeering, mail and wire fraud, wiretap, computer hacking and tortious interference which caused damage to Plaintiff.   The Defendants, Israel Insight Analysis and Research, LLC, SDC-Gadot LLC, Andrew Frank, Amir Handjani, KARV Communications, Dechert LLP, David Graham Hughes, David Neil Gerrard and Nicholas Del Rosso and Vital Management Services, Inc. (together "Defendants"), have moved to dismiss Plaintiff's FAC on the grounds of Fed. R. Civ. P. 12 (b)(2) and (6). (D.E. 53, 54, 55, 56, 57, 58). On April 11, 2023, by Minute Order, this Court granted Plaintiff's Motion to file an Omnibus opposition to the Defendants' pending Motions to Dismiss.

## STATEMENT OF FACTS

Plaintiff's FAC sets out in 94 pages of extraordinary detail the facts and circumstances which support his allegations of liability for civil RICO (Racketeer Influence and Corrupt Organizations Act (18 U.S.C. § 1964(c)) (Count I), RICO conspiracy (18 U.S.C. § 1964(d) (Counts I and VIII) for violating the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a)(2) and (b) both for primary and secondary Liability, (Count II), for disclosing wire and/or electronic communications in violation of the Federal Wiretap Act (18 U.S.C. § 2511(1)(c) and 2520) (Count III), for using intercepted wire and/or electronic communications in violation of the Federal Wiretap Act (18 U.S.C. § 2511(1)(d) and 2520) (Count IV), for disclosing wire or oral communications in violation of the  D.C. Wiretap Act (D.C. Code Ann. § 23-542(a)(2) and 23-554

1

(a)(1)) (Count V), for using intercepted wire, oral, or electronic communications in violation of the D.C. the Wiretap Act (D.C. Code Ann. § 23-542(a)(3) and 23-554) (Count VI), for tortiously interfering in Plaintiff's business relationships, (Count VII) and for engaging in a civil conspiracy designed to harm the Plaintiff (Count VIII). While Plaintiff will not recount all of the facts that are set forth in FAC, certain relevant facts are highlighted, *infra*, which when accepted as true, as this Court must do when considering a Motion to Dismiss, more than support the causes of action alleged.

In addition to the overlapping arguments the Defendants have each made in the various oppositions, certain Defendants have offered unique defenses, which Plaintiff addresses in response at the end of the omnibus opposition, see *infra*. Specifically, Defendants Hughes, Gerrard, Del Rosso and Vital Management all argue that this Court does not have personal jurisdiction over them invoking Fed. R. Civ. P. 12(b)(2). Defendants Israel Insight Analysis and SDC-Gadot move for a more definite statement in accordance with Fed. R. Civ. P. 12(e).

## <u>STANDARD OF REVIEW</u>

Under Fed. R. Civ. P. 12(b)(2) a defendant may move to dismiss a complaint if the Court does not have personal jurisdiction over the defendant. Similarly, under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. In evaluating motions to dismiss, the court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim for only one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

Motions to dismiss under Fed. R. Civ. P. 12(b) do not test a plaintiff's ultimate likelihood of success on the merits; rather, they test whether a plaintiff has properly stated claim. *See Greggs v. Autism Speaks, Inc.*, 987 F. Supp. 2d 51, 55 (D.D.C. 2014). To survive such a motion, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp.*, 550 U.S. at 555 (internal quotation marks and citations omitted). In deciding a 12(b)(6) motion, it is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint. *Briscoe v. Costco Wholesale Corp.*, 61 F. Supp. 3d 78, 84 (D.D.C. 2014). *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511–14, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). The court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. See *Campbell v. D.C.*, 972 F. Supp. 2d 38, 44 (D.D.C. 2013). Therefore, a complaint should not be dismissed unless the court determines that the allegations do not support relief on any legal theory. *Boyd v. Farrin*, 958 F. Supp. 2d 232, 237 (D.D.C. 2013). Nonetheless, the complaint must set forth sufficient information to suggest that there is some recognized legal theory upon which relief may be granted. *Id. citing D.C. v. Air Fla., Inc.*, 750 F.2d 1077, 1078 (D.C. Cir. 1984). Here, the Plaintiff has set forth sufficient information, cognizable legal theories and alleged facts, beyond labels and conclusions, to demonstrate the Court has personal jurisdiction over each of the Defendants.

## **ARGUMENT**

I.     **The Statute of Limitations for Plaintiff to Bring His Claims Has Not Expired.**

The extreme measures that the Defendants undertook to conceal their role in the hacking of Farhad Azima and their use of his stolen documents and communications to cause the Plaintiff's injuries, as set forth in the FAC and below, illustrate precisely why the D.C. Circuit has long held that "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely

on the face of the complaint." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (citing

*Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981)); *Adair v. England*, 183 F. Supp. 2d 31, 54

(D.D.C. 2002). Recognizing that "statute of limitations issues often depend on contested questions

of fact," D.C. courts have found "dismissal is appropriate only if the complaint on its face is

conclusively time-barred." *Firestone*, 76 F.3d at 1209; *see also Adair*, 183 F. Supp. 2d at 54–5[1].

Indeed, the FAC advances a legitimate basis for finding that the statute of limitations did

not begin to run until at the earliest January of 2022, less than one year before this action was filed.

There is no dispute that the statutes of limitations for the actions alleged in this case range from

two to four years.[2]

It is well-settled law in this District that the running of the statute of limitations is tolled

when (1) defendants engage in a course of conduct designed to conceal evidence of their alleged

wrongdoing for as long as (2) the plaintiffs are not on actual or constructive notice of that evidence,

---

[1] "The plaintiffs correctly submit that they need not plead fraudulent concealment in the complaint, but rather that their obligation to do so arises only when defendant raises the statute of limitations as a defense. For all these reasons, the court applies the D.C. Circuit's well-settled precedent and concludes that a ruling on the defendants' statute-of-limitations argument would be premature. Accordingly, the court denies without prejudice the defendants' motion to dismiss certain claims on limitations grounds and will reconsider the defendants' argument if it is raised in a possible motion for summary judgment after the parties have conducted discovery."

[2] The statute of limitations for: civil RICO claims is four years, *Rotella v. Wood*, 528 U.S. 549, 555, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000); civil claims under the CFAA is two years, 18 U.S.C. § 1030(g); civil claim under the federal wiretap law is two years, 18 U.S.C. § 2511, 2520(e); tortious interference with business relationships and civil conspiracy under D.C. law is three years, D.C. Code Ann. § 12-301(8) (West); *Zandford v. Nat'l Ass'n of Sec. Dealers, Inc.*, 30 F. Supp. 2d 1, 24 (D.D.C. 1998). The D.C. Wiretap Act does not specify the applicable statute of limitations, so claims under the statute are subject to D.C.'s residual three-year statutory limitations period. D.C. Code Ann. § 12-301(8); *see also* Memorandum of Law in Support of Defendant Dechert LLP's Motion to Dismiss the Amended Complaint, *Solomon v. Dechert, et al*, 1:22-cv-03137-JEB at 11-12 (D.C.D.C., Mar. 17, 2023) (D.I. 55-1) (hereinafter, "Dechert Memo"); Memorandum in Support of Motion to Dismiss the Amended Complaint [on behalf of Defendants Amir Handjani, Andrew Frank, and KARV Communications, Inc.], *Solomon v. Dechert, et al*, 1:22-cv-03137-JEB at 24, 27, 33, 39 (D.C.D.C., Mar. 17, 2023) (D.I. 56-1) (hereinafter, "KARV Memo"); Memorandum in Support of Defendants, SDC-Gadot, LLC and Insight Analysis and Research, LLC's Motion to Dismiss and Motion for More Definite Statement, *Solomon v. Dechert, et al*, 1:22-cv-03137-JEB at 28, 34, 46 (D.C.D.C., Mar. 9, 2023) (D.I. 53) (hereinafter, "SDC Memo"); Memorandum of Law in Support of Motion to Dismiss [on behalf of Defendants Nicholas Del Rosso and Vital Management Services, Inc.], *Solomon v. Dechert, et al*, 1:22-cv-03137-JEB at 14-20 (D.C.D.C., Mar. 17, 2023) (D.I. 54-1) (hereinafter, "Del Rosso Memo"); Memorandum of Law in Support of Defendant David Neil Gerrard's Motion to Dismiss the Amended Complaint, *Solomon v. Dechert, et al*, 1:22-cv-03137-JEB at 16 (D.C.D.C., Mar. 17, 2023) (D.I. 58-1) (hereinafter, "Gerrard Memo"); Memorandum of Law in Support of Defendant David Graham Hughes' Motion to Dismiss, *Solomon v. Dechert, et al*, 1:22-cv-03137-JEB at 10 (D.C.D.C., Mar. 17, 2023) (D.I. 57-1) (hereinafter, "Hughes Memo").

despite (3) their exercise of diligence. *Vox Media, Inc. v. Mansfield*, 322 F. Supp. 3d 19, 24 (D.D.C. 2018) (citing *Firestone*, 76 F.3d at 1209). Fraudulent concealment is generally established when the defendant makes an affirmative misrepresentation that tends to prevent discovery of the wrongdoing. *Id.*

The fraudulent concealment doctrine is "read into every federal statute of limitations". *Wilson v. On the Rise Enterprises, LLC*, 305 F. Supp. 3d 5, 14 (D.D.C. 2018). It is also a recognized ground for tolling the statute of limitations under D.C. state court common law. *Bailey v. Greenberg*, 516 A.2d 934 (D.C. 1986). In D.C., fraudulent concealment has been the basis for tolling limitations periods for a myriad of causes of actions, including those alleged here. *Richards*, 662 F.2d at 73, *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1483 (D.C. Cir. 1989) (RICO), *Jones v. Meridian Towers Apartments, Inc.*, 816 F. Supp. 762 (D.D.C. 1993) (RICO).

Importantly, for cases like this one, where the concealment is in furtherance of a conspiracy, affirmative acts of concealment by one or more of the conspirators are imputed to their co-conspirators for purposes of tolling the statute of limitations. *Riddell*, 866 F.2d at 1493; *see also Firestone*, 76 F.3d at 1209 ("Simply because a person knows he has been injured by one person cannot reasonably mean he should be held to know of every other participant.").

A.   **Defendants Fraudulently Concealed Their Wrongdoing by Coordinating Perjury, Knowingly Producing, Serving and Filing False Litigation Documents and Destroying Evidence.**

"[T]he construction of a scheme which is by its nature unknowable" could satisfy the fraud element of tolling doctrine. *Trustees of United Ass'n Full-Time Salaried Officers and Employees of Local Unions, Dis. Councils, State and Provincial Ass'ns Pension Plan v. Steamfitters Local Union* 395, 641 F.Supp.44, 446 (D.D.C. 1986) *citing Hobson v. Wilson*, 737 F.2d 1, 34 (D.C. Cir.

1984). "A 'misleading' scheme 'designed to mask the existence of a cause of action' would be all that is needed." *Id.*

The FAC lays out in great detail the tremendous measures undertaken by the Defendants, in particular their intensive efforts to coordinate and indeed deliver perjurious testimony, which shielded from the Plaintiff and the public their involvement and complicity in the wrongdoings that caused the Plaintiff's injuries until at least January 7, 2022.[3]   On that day, one of the Defendants' co-conspirators and non-party Stuart Page, filed a corrected witness with the Business and Property Courts of England and Wales, in which he admitted to brokering an arrangement in which Defendants Dechert and Gerrard retained Defendants Forlit, SDC-Gadot, and Insight (collectively the "Forlit Entity Defendants") to "perform certain hacking efforts," including the recovery of the documents that the Defendants used to, *inter alia,* cause the Plaintiff to lose his job and suffer the damages for which he seeks redress through this action.[4]   Prior to that time, the Plaintiff alleges and the Defendants confirm, that he believed the hacking was performed by the Islamic Republic of Iran ("Iran").[5]

The FAC alleges that Defendant Hughes filed false statements about how the documents were discovered, first with this Court in in July 2018 and then in a UK court in November and again in December of 2018.[6]   It alleges that Defendant Dechert filed a similar false statement with this Court in August of 2018, and helped craft and file similar false statements for Defendant Gerrard and non-parties Page and Halibi that were filed in UK court in June of 2019.[7]   The FAC further alleges that a series of meetings took place starting in Cyprus in 2018 that were attended

---

[3] FAC, *Solomon v. Dechert, et al*, 1:22-cv-03137-JEB at ¶¶43-45, 120, 124-151, 155
[4] *Id.* at ¶¶45, 155.
[5] *Id.* at ¶107; SDC Memo at 50 (quoting from article written by Plaintiff that he suspected "the Iranian government or its proxies"), *see also* Dechert Memo at 16-17, Del Rosso Memo at 6, KARV Memo at 26, Gerrard Memo at 19 (citing to same article).
[6] FAC at ¶¶125, 129, 131
[7] FAC at ¶¶125, 132, 133, 135

by Defendants Forlit, Gerrard, Hughes, other lawyers of Defendant Dechert and other non-parties where the attendees discussed and developed the false cover up story.[8]   The false testimony was then rehearsed at a meeting in Defendant Dechert's London office in May of 2019,[9] then again over three days of meetings, which included a mock trial, in Switzerland in December of 2019 and then was given in Court.[10]

The FAC further alleges how Defendants Del Rosso and Gerrard colluded to exchange a staged series of pretextual emails to create the appearance that Gerrard was breaking the news to Del Rosso about the discovery of the stolen documents despite evidence that Del Rosso was aware of them at least a week earlier.[11]   It further alleges that Defendant Del Rosso himself filed a false statement in legal proceedings, denying his involvement in the hacking.[12] The FAC also alleges extensive acts of destruction/spoliation of evidence, including at least fifteen mobile devices that Defendant Dechert furnished to Defendant Gerrard during the pendency of litigation, which was also accompanied with the filing of false statements including in this Court.[13]

## B.   The Plaintiff Lacked Sufficient Notice Until January of 2022

The Defendants argue that "whatever the lengths to which [they have] gone to conceal the wrongs," the statute of limitations should not be tolled because the Plaintiff was "on notice of a potential claim" on June 21, 2017, when he was terminated from his job as a result of the Defendants then unknown conduct.[14]

The Defendants' arguments, however, are undermined by the facts of the case and the law of this Court, including the cases they cite.  Because of the Defendants' coordinated perjury, it was

---

[8] FAC at ¶¶126-28, 130.
[9] FAC at ¶132
[10] FAC at ¶¶136-141
[11] FAC at ¶145
[12] FAC at ¶146
[13] FAC at ¶¶147-50
[14] Dechert Memo at 14; *see also,* KARV Memo at 25, SDC Memo at 30, Del Rosso Memo at 15.

impossible for the Plaintiff to fully realize his claim prior to when Stuart Page corrected his witness statement on January 7, 2022.

*First*, the Defendants wrongly assert that for the statute of limitations to begin to run the Plaintiff need only have knowledge of the injury, and not the individuals who are responsible for causing the injury.[15]  Defendant Dechert claims that Plaintiff's "*knowledge of his injury*— i.e., the disclosure of his emails and his termination from the Journal—by no later than June 2017. . .*was all that was required for Plaintiff's claims to accrue*."[16] Yet the *Rotella* case, which Dechert cites, makes perfectly clear that a plaintiff's knowledge of the cause and the perpetrator is also required. *Rotella*, 528 U.S. at 555–6 ("We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury *or its cause* should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; *and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain*. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt *and who has inflicted the injury. He is no longer at the mercy of the latter.*") (emphasis added) (quoting *United States v. Kubrick*, 444 U.S. 111, 122, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979)). The Supreme Court set out three "basic policies of all limitations provisions: [a] repose, [b] elimination of stale claims, and [c] certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella*, 528 U.S. at 555.  All of these policies counsel towards tolling the statute of limitations here, as the flurry of filings and decisions that continue to this day to reveal new facts pointing to the Defendants' different illegal acts and enhanced culpability.[17]

---

[15] *Id.*
[16] Dechert Memo at 13 (emphasis added).
[17] FAC at ¶¶156-160.

The seminal *Richards v. Mileski* case is illustrative of this point in the context of lost employment. *Richards*, 662 F.2d 65 ("tolling is proper because the defendants have concealed . . . their involvement in a cause of action about which the plaintiff might otherwise be aware"). In *Richards,* the plaintiff had resigned from the United States Information Agency in 1955 under the weight of false charges that he had engaged in homosexual activity. Though he knew at the time that the charges were made that they were false, he did not know until 1978, twenty-three years later, that it was his superiors who had knowingly filed false reports on which the charges were based. The D.C. Circuit held that his action against his superiors was not time-barred, finding that it "was no mere 'detail' in 1955 that the false charges against Richards had been fabricated as part of a deliberate conspiracy against him, or that his own superiors rather than an unknown informant were the source of his misery." *Id.* at 69.

The Defendants cite cases in which courts have rejected fraudulent concealment arguments because the plaintiff was unaware of either the *pattern* of racketeering activities[18] or the identities of *some* of the wrongdoers.   The Court need not entertain these straw arguments, which creatively mischaracterize Plaintiff's actual contentions.   As pled, the Defendants fraudulently concealed all of their involvement specifically in those illegal acts that proximately caused Plaintiff's injuries,[19] and the Defendants do not—because they cannot—point to a single case in this Circuit where the court has found that the statute of limitations should start to run when the shielding of such critically important facts are sufficiently established by the Plaintiff.

*Second,* the Defendants argue that the Plaintiff should be deemed to have been on notice of the hacking based on a 2016 lawsuit against Ras Al Khaimah (RAK) filed by Azima in this

---

[18] See e.g. Dechert Memo at 12 (citing *Hargraves v. Cap. City Mortg. Corp*., 140 F. Supp. 2d 7, 16 (D.D.C. 2000))
[19] FAC at ¶¶16, 116-151

District.[20] They argue this, because in situations where defendants' misrepresentations do not conceal plaintiffs' underlying injuries, the statute of limitations is only tolled until the plaintiffs' discover the defendants' misrepresentation that shielded the fact that they caused it. *Richards*, 662 F.2d at 70.

However, the Defendants' references to Azima's 2016 lawsuit illustrates that neither the plaintiff in that case (Azima) nor Solomon here had actual or inquiry notice of the Defendants' wrongdoings.  First, none of the Defendants in this case were named as defendants in Azima's lawsuit against RAK, which has now distanced itself from the Defendants claiming "it had been misled and lied to by Defendants Gerrard and Dechert."[21]  Further, as the FAC recounts, the Defendants coordinated perjury was presented to and caused the Business and Property Courts of England and Wales to initially mistakenly rule in favor of Ras Al Khaimah Investment Authority ("RAKIA") and against Azima in May 2020,[22] only to see RAK withdraw from the proceeding and concede liability for the hack—despite maintaining its lack of knowledge of it and the coordination of perjury—on June 23, 2022.[23]

*Third,* assuming *arguendo*, as Defendants assert, that Azima's 2016 lawsuit, could have provided Plaintiff with "inquiry" notice of his cause of action, which it did not, the Defendants are misstating the standard.  The inquiry notice standard that the Defendants advocate[24] is the standard applied under a discovery rule analysis, not fraudulent concealment. Under the discovery rule, a cause of action does not begin to accrue until the plaintiff knows, or by the exercise of reasonable

---

[20] Dechert Memo 15; Del Rosso Memo 16-17; KARV Memo at 25, 40-41
[21] FAC at ¶178.
[22] RAKIA v. Azima, [2020] EWHC 1327 (Ch), No. HC-2016-002798 (May 22, 2020).
[23] FAC at ¶¶144, 178.
[24] KARV Memo at 40-41, SDC Memo at 48, Del Rosso Memo at 19, Dechert Memo at 14.

diligence should know, of (1) the injury, (2) its cause in fact, and (3) some evidence of wrongdoing. *Radbod v. Moghim*, 269 A.3d 1035, 1044 (D.C. 2022).[25]

By contrast, "a defendant who has engaged in fraudulent concealment, in order to make out a defense based on the plaintiff's lack of due diligence, must show something closer to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment." *Riddell*, 866 F.2d at 1491

Here, Solomon only became aware of *accusations* that any of the Defendants were involved in the hacking on October 15, 2020, when Azima filed a complaint against Defendants Vital and Del Rosso in the U.S. District Court for the Middle District of North Carolina alleging that "Defendant Dechert was involved in the hacking and hired, paid, directed Defendants Del Rosso and Vital to hack Azima."[26] Even if the Court deems this filing as having provided Plaintiff with sufficient actual or inquiry notice, as to commence the running of the statute of limitations, none of Plaintiff's claims would be time barred, given the operative date of October 14, 2022, when this action was filed. (D.E. 1).[27]

*Fourth,* the Plaintiff was not on notice that he had *any viable cause of action* until he learned about the Defendants' wrongdoing. "If the party asserting the statute of limitations is

---

[25] Notably, in discovery rule cases, like fraudulent concealment cases, DC courts have repeatedly rejected defendants' arguments that statute of limitations period should begin to run when "a plaintiff is aware of the injury but lacks knowledge of its cause or of *wrongdoing by the defendant.*" *Shenton v. Potomac Elec. Power Co.*, No. CV 19-1426 (RBW), 2020 WL 12980379, at *3 (D.D.C. Nov. 30, 2020) (emphasis in original) (citing *Lee v. Wolfson*, 265 F. Supp. 2d 14, 18 (D.D.C. 2003); *Dawson v. Eli Lilly & Co.*, 543 F. Supp. 1330 (D.D.C. 1982); *Bussineau v. President & Directors of Georgetown Coll.*, 518 A.2d 423 (D.C. 1986); *In re Swine Flu Immunization Prod. Liab. Litig.*, 880 F.2d 1439 (D.C. Cir. 1989); *Baker v. A.H. Robins Co.*, 613 F. Supp. 994 (D.D.C. 1985); *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998).

[26] FAC at ¶41.

[27] While the complaint was since amended on February 17, 2023, all of Plaintiff's claims properly relate back to the original filing date. FRCP 15(c)(1)(B) ("An amendment to a pleading relates back to the date of the original pleading when… the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out— or attempted to be set out—in the original pleading"); see also *Doe v. Exxon Mobil Corp.*, No. 1:01-CV-1357-RCL, 2022 WL 3043219, at *9 (D.D.C. Aug. 2, 2022); *Kubicki on behalf of Kubicki v. Medtronic, Inc.*, 293 F. Supp. 3d 129, 159 (D.D.C. 2018) (citing *Mayle v. Felix*, 545 U.S. 644, 664, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005)); *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 557 (D.C. 2001).

found to have fraudulently concealed information needed to determine whether there is *a basis for litigation*, that party will be estopped from asserting the statute." *Bailey*, 516 A.2d at 941 (emphasis added).

As alleged, until the Defendants' wrongdoing was revealed, Solomon believed he was hacked by Iran,[28] and the Defendants all argue that Azima's 2016 litigation against RAK, put him on notice that RAK was behind the hacking.[29] As both non-party RAK and non-party Iran are sovereign government entities, they are shielded from litigation in the United States except in limited, inapplicable situations. 28 U.S.C. § 1604, 1605. Thus, the Plaintiff lacked any basis for litigation against both the actor he believed committed the hack (Iran), and the actor that the Defendants claim he should have believed committed the hack (RAK), and he did not and could not have discovered any *cause of action* stemming from the hacking until he discovered the identity of the perpetrators.

### C.    Defendants Fail to Establish Plaintiff's Lack of Due Diligence

Finally, the Defendants argue that even if they fraudulently concealed and thereby prevented the Plaintiff from having any notice—actual or inquiry—that it was they who caused the Plaintiff's damage, the Court should dismiss the complaint because the Plaintiff was not diligent in his efforts to ascertain his perpetrator.[30]  This is also wrong as a matter of law and fact.

The plaintiff's lack of due diligence is an affirmative defense that requires "a fact-specific judgment in each case as to what the court expects a reasonable plaintiff to do in uncovering the elements of his claim." *Vox Media, Inc.*, 322 F. Supp. 3d at 26; *Firestone*, 76 F.3d at 1209.  It is

---

[28] *Id.* at ¶107; SDC Memo at 50 (quoting from article written by Plaintiff that he suspected "the Iranian government or its proxies"), *see also* Dechert Memo at 16-17, Del Rosso Memo at 6, KARV Memo at 26, Gerrard Memo at 19 (citing to same article).
[29] None of the Defendants were named as defendants in Azima's 2016 case, none had any been added by the time the case was closed, and none have pointed—or can point—to any other lawsuit in which any were named as defendants prior to October 15, 2020. *Azima v. RAK Investment Authority*, No. 16-cv-1948 (D.D.C. Jul. 9, 2020)
[30] Dechert Memo at 14, KARV Memo at 25, 39, Del Rosso 20.

the Defendants' burden to prove "the plaintiff could have discovered their involvement or the cause of action if he had exercised due diligence." *Richards*, 662 F.2d at 71; *Riddell*, 866 F.2d at 1491.

A court must measure "the plaintiff's efforts to uncover his cause of action against what a *reasonable person would have done* in his situation given the same information." *Vox Media, Inc.*, 322 F. Supp. 3d at 26 (emphasis added).  As explained in a case cited by Defendant Dechert, "what constitutes a reasonably diligent investigation is a 'highly factual analysis' that requires consideration of all relevant circumstances, including the *defendant's conduct and misrepresentations*, and the *reasonableness of the plaintiff's reliance on the defendant's actions.*" *Radbod*, 269 A.3d at 1044 (emphasis added) (quoting *Diamond v. Davis*, 680 A.2d 364 (D.C. 1996)).  "In some circumstances, the relevant facts may be such that *it may be reasonable to conduct no investigation at all*." *Id.* (emphasis added) (internal quotations omitted).

The point in time that discovery of the truth was merely *possible* "is utterly irrelevant," particularly where a plaintiff has "no reason to suspect" that such a request would reveal the "startling" truth. *Richards*, 662 F.2d at 71.  "Though the law of fraud does not endorse a hear no evil, see no evil approach, neither does it require that an aggrieved party have proceeded from the outset as if he were dealing with thieves." *Id.*

A reasonable person in the Plaintiff's situation, who reasonably believed or had reason to believe that immune sovereign entities such as Iran—an enemy state to the United States—or RAK—which transacted business with Iran—commissioned the hacking of Azima, would have no reason to suspect that Defendant Dechert and its ethic-bound attorneys would be intimately involved, if not at the helm of, the hacking operation and would have engaged in such egregious

conduct as coordinating perjury and other obstructions of justice among its co-conspirator Defendants.

### D.    Defendants Reliance on the North Carolina *Del Rosso* Opinion is Misplaced

The Defendants would like this Court to follow the decision of the Middle District of North Carolina in *Azima v. Del Rosso et al.*, which rejected the plaintiff's arguments that the statute of limitations should be tolled due to the Defendants' efforts to fraudulently conceal their wrongdoing. *Azima v. Del Rosso*, No. 1:20CV954, 2021 WL 5861282, at *8–9 (M.D.N.C. Dec. 10, 2021).[31]   However, this Court need and must not substitute in place of its own application of DC law to the FAC before it, as plead by Plaintiff, the decision of an out of circuit court, evaluating a different complaint, as plead by a different plaintiff, who had different access to evidence by virtue of his involvement in non-public proceedings in a foreign court.

Indeed, in contrast to the clearly articulated contours of the fraudulent concealment doctrine in the District of Columbia described above, the court in the *Del Rosso* case, stated that "[t]he exact elements of North Carolina fraudulent concealment are murky." *Azima*, 2021 WL 5861282, at *5.  The court rejected the plaintiff's fraudulent concealment argument on the grounds that he failed to plead "reliance on the defendant's misrepresentations or omissions," which it found to be an essential element "to the extent that fraudulent concealment has been recognized by North Carolina courts as a tolling doctrine."  *Azima*, 2021 WL 5861282, at *5.  Notably, and for good reason, none of the Defendants argue or cite a single case in support of an argument that this Court should reject Plaintiff's fraudulent concealment argument for the failure to allege reliance.[32]  As discussed above, the clear law of this Court more than adequately addresses the requisite mental

---

[31] Dechert Memo at 16; KARV Memo at 25; Del Rosso Memo at 17.
[32] *See* Dechert Memo at 16; KARV Memo at 25; Del Rosso Memo at 17.  Nevertheless, the Plaintiff does allege that he relied on the Defendants' fraudulent acts to conceal their illegal activities. FAC at ¶¶16, 146-149, 195.

state of the plaintiff as it relates to illegal activity that is fraudulently concealed, and the facts as alleged in the FAC are more than sufficient to defeat the Defendants' statute of limitations arguments at this stage of the litigation.

### E.    Defendants' Wrongful Conduct Against Plaintiff Continued Through 2020

In addition to the extensive allegations as to how the Defendants fraudulently concealed their involvement, the FAC also alleges how the Defendants' wrongful conduct itself continued well beyond the date of Plaintiff's termination and into 2020.  The Plaintiff specifically alleges that the Defendants "in furtherance of the illegal activities of the enterprise continued to target him and his reputation to make sure his voice would be silenced by discrediting him and otherwise cause him harm to his business and properties."[33]

The Plaintiff further alleges that the Defendants "did so by taking the information that they had stolen via the hacking and disseminating or causing to be disseminated this information in articles that they published or caused to be published on pay-to-play websites and other online public sources."[34]  The Plaintiff provides a list of seven articles, each of which was published in the sixth month period between October 11, 2019 and March 4, 2020,[35] and explains how each of "these articles caused significant damage to Solomon's economic opportunities, business interests, property interests and reputation," including by "interfere[ing] directly with concrete book publishing opportunities and the significant income they would have generated," causing him to be "blacklisted by the publishing industry due to the negative press," and preventing "opportunities and interest in Solomon's speeches" from materializing.[36]

---

[33] FAC at ¶110.
[34] Id.
[35] Id. at ¶111.
[36] Id. at ¶¶112-5.

Where a plaintiff alleges "a series of repeated violations that are of an identical nature . . . each violation gives rise to a new cause of action [and] each violation begins a new statute of limitations period as to that particular event." *Beyond Pesticides v. Monsanto Co.*, 311 F. Supp. 3d 82, 87–8 (D.D.C. 2018) *citing Figueroa v. D.C. Metro. Police Dep't*, 633 F.3d 1129, 1135 (D.C. Cir. 2011) (internal quotations omitted).

Therefore, even assuming *arguendo* that the Court determines that Plaintiff's argument that the Defendants' fraudulent concealment does not toll the statute of limitations, it may still find that each of the articles—sourced from stolen emails—that were published or caused to be published by the Defendants between at least October 11, 2019 and March 4, 2020 (for the purpose of interfering, and which indeed interfered with the Plaintiff's reputation, job prospects and business and property in the form of book publishing deals and public speaking opportunities) are separate acts each of which give rise to a new cause of action under Plaintiff s' RICO, tortious interference, conspiracy and use/disclosure of stolen electronic communications claims and cannot possibly be time barred.

II.   **Plaintiff Has Sufficiently Plead Facts for this Court to Find that he has Stated Claims for each of his Causes of Action.**

A.   **The FAC Adequately Alleges Civil and Conspiracy RICO**

The FAC states valid claims for damages under 18 U.S.C. § 1964(c) and (d)[37] of the RICO statute.  The US Supreme Court has long held that "RICO is to be read broadly." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985).  Indeed, this Court has recently recognized that a valid RICO claim can be "light on details" so long as "the Complaint, taken as a whole, alleges the necessary elements." *AEPA Architect Engineers, P.C. v. Aziz*, No.

---

[37] Count I (RICO) and Count VIII (Civil Conspiracy) incorporates those facts and allegations set forth in all the foregoing paragraphs. *See e.g., Kershaw v. Nautica S.A. Ltd.*, 885 F. Supp. 617, 618 (S.D.N.Y. 1995); *Union Mut. Life Ins. Co. v. Simon*, 22 F.R.D. 186, 186 (E.D. Pa. 1958).

1:21-CV-01457 (TNM), 2022 WL 35618, at *3 (D.D.C. Jan. 4, 2022);  *see also R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1355 (5th Cir. 1985) ("The scope of the civil RICO statute is breathtaking. An allegation of fraud in a contract action can transform an ordinary state law claim into a federal racketeering charge.")

A violation of § 1962(c) is established by showing conduct of an enterprise through a pattern of racketeering." *Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 308 (D.D.C. 2012) (quoting *W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001)).  In addition, the plaintiff must establish standing to recover by establishing the extent to which he has been injured in his business or property as a result of the conduct of the defendants.  *Sedima, S.P.R.L.*, 473 U.S. at 496 ("But the statute requires no more than this. Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise."). The elements of the offense or claim under RICO are the same whether the case is civil or criminal. *Eisenberg v. Gagnon*, 564 F. Supp. 1347, 1352 (E.D. Pa. 1983).

In refuting Plaintiff's RICO claim, the Defendants collectively argue the following:

1) Plaintiff fails to allege an enterprise;
2) Plaintiff fails to allege racketeering activity;
3) Plaintiff fails to satisfy the pattern requirement;
4) Plaintiff fails to establish that the Defendants' actions proximately caused the Plaintiff's injury; and
5) the damage alleged by the Plaintiff does not qualify as the type of harm for which the RICO statute provides redress.

Each of these arguments ignore the extensive allegations advanced by the Plaintiff that more than satisfy the broad, liberally pleading standards that Congress has purposefully enacted and the Supreme Court and this Court have recognized for stating a civil RICO claim.

    1.  <u>Plaintiff alleges an associated-in-fact enterprise</u>

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009). It is an "expansive" concept with considerable "breadth" and is defined to have "a wide reach." *Lu v. Lezell*, 45 F. Supp. 3d 86, 98 (D.D.C. 2014) (J.Boasberg); *Boyle*, 556 U.S. at 944; *See also Mackin v. Auberger*, 59 F. Supp. 3d 528, 542 (W.D.N.Y. 2014) (Alleging a RICO enterprise is "generally not a high threshold.")

Indeed, an "association in fact" enterprise is established through identification of (1) a common purpose among the participants, (2) organization, and (3) continuity. *Hargraves v. Cap. City Mortg. Corp.*, 140 F. Supp. 2d 7, 24 (D.D.C. 2000) (citing *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999)). Collectively, the Defendants argue, at least facially, that Plaintiff failed to plead facts establishing each of these elements,[38] but the primary argument across the board is that Plaintiff failed to allege an association as "an entity separate and apart from the pattern of racketeering activity in which it engages."[39]

The Supreme Court has ruled that the existence of an association-in-fact enterprise may be inferred by the pattern of racketeering activity in which the participants engaged. *Boyle*, 556 U.S. at 951. The FAC provides more than adequate detail of the enterprise's structure as a distinct entity

---

[38] See e.g. Del Rosso at 23-25, SDC Memo at 25-28 (the arguments raised here more closely address what Plaintiff argues *infra* under the pattern requirement)

[39] Dechert Memo at 32 (quoting *Watson v. Norris*, No. CIV. A. 89-0625(CRR), 1991 WL 7165, at *2 (D.D.C. Jan. 11, 1991)); see also KARV Memo at 21; Gerrard Memo at 18; Del Ross Memo at 24-25.

comprised of a network of advisors and investigators, collaborating to engage in illegal activity all of which to generate fees from their shared paranoid client of boundless wealth.[40]

> ### a) The Defendants shared a Common Purpose of generating revenue from a wealthy Emirate leader through racketeering

The FAC pleads that the Defendants are part of a group of persons associated together in fact for the common purpose of marginalizing the perceived enemies of Sheikh Saud of RAK.[41] Over the years, the Defendants adapted their scheme to changing circumstances, expanding the scope and nature of their activities to harm their targets and conceal their illegal conduct, but the affairs of the enterprise were always intended to, and have in fact resulted in, great financial gain for the Defendants through, *inter alia*, millions of dollars for their criminal services paid by RAK.[42]

The Defendants engaged in activities, all with the goals of, *inter alia*, (a) helping the Ruler of RAK entrench himself in power; (b) eliminating the threats posed by his adversaries, and (c) expanding the scope of services that the Defendants would perform thereby enhancing income that they would receive.[43]

The FAC lays out in detail the background on Sheikh Saud's ascension to power, identifying the many enemies he made (including several in his own family) along the way, and his perception that Azima was part of a broader conspiracy of individuals trying to unseat him.[44] Throughout the operation of the enterprise, the actions of Defendants Dechert and Gerrard, repeatedly and continually showed that the enterprise's mission was to generate evidence against Sheikh Saud's perceived enemies, by any means necessary.[45] As the Defendants waded deeper

---

[40] FAC at ¶¶18-32, 36, 48-51, 53, 59-61.
[41] FAC ¶182. Defendant Gerrard wrongly states that the "Amended Complaint alleged that the purpose of the enterprise was to carry out a criminal enterprise and commit further crimes and cover up the crimes." Gerrard Memo at 30.
[42] FAC ¶182.
[43] FAC ¶12.
[44] FAC ¶¶32, 47-59.
[45] FAC ¶185.

into their illegal racketeering activity, they also focused on silencing, discrediting and shifting the blame and financial burden onto anyone who they perceived as possessing the requisite knowledge, resources and/or desire to expose their illegal activities.[46]

> b) *Plaintiff alleges an organized hub-and-spoke enterprise with Defendants Dechert and Gerrard at the center.*

The Supreme Court has set a sensibly low bar for pleading the structure of an enterprise, holding that plaintiffs only need to establish an "organization with some sort of framework, formal or informal, for carrying out its objectives." *Boyle*, 556 U.S. at 942. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. *Boyle*, 556 U.S. at 948. Members need not have fixed roles; and the group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. *Boyle*, 556 U.S. at 948. Not all participants need to be named or identified and there need not be an extensive "core of constant personnel". *Hargraves*, 140 F. Supp. 2d at 24 (sufficient to allege one other member).

RICO liability is "not limited to those with primary responsibility for the enterprise's affairs," or "those with a formal position in the enterprise," only "*some* part in directing the enterprise's affairs is required." *Feld Entertainment Inc.*, 873 F. Supp. 2d at 315 (emphasis in original) ("An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."). The type of conduct that this Court has deemed sufficient to render a defendant's involvement in an enterprise subject to §1964(c) scrutiny includes proffering advice, assuming any directive role, knowingly implementing criminal decisions or exercising broad discretion. *Lu*, 45 F. Supp. 3d at 95

---

[46] FAC ¶¶ 40, 75.

(quotations omitted).  As the FAC pleads both RICO and civil conspiracy, the Plaintiff is not required to plead that all Defendants took part in directing the enterprise's affairs.  *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) ("[F]or a defendant to be convicted of a substantive RICO violation under Section 1962(c), the defendant must have taken some part in directing the enterprise's affairs," however, "[n]o such requirement exists under Section 1962(d)").

Several courts, including this one, have recognized that the RICO enterprise and the RICO defendant may be the same entities. *Bergen v. Rothschild*, 648 F. Supp. 582, 589–590 (D.D.C. 1986) (citing *McCullough v. Suter*, 757 F.2d 142 (7th Cir. 1985) (sole proprietor may be deemed to associate with his business for purposes of RICO); *United States v. Hartley*, 678 F.2d 961 (11th Cir. 1982) (a corporation could simultaneously be named as RICO defendant and satisfy "enterprise" requirement of RICO); *United States v. Benny*, 559 F. Supp. 264 (N.D. Cal. 1983) (individual could be named as both "enterprise" and RICO defendant);   *Wilcox v. Ho-Wing Sit*, 586 F. Supp. 561 (N.D. Cal. 1984) (there was no identity between the enterprise and the limited and general partners sufficient to defeat the RICO claim);  *D'Iorio v. Adonizio*, 554 F. Supp. 222 (M.D. Pa. 1982) (foreign named business entities could properly be named defendants pursuant to RICO)).

The FAC identifies both individuals and the businesses that they worked for or through (as beneficial owners), and as the law sensibly permits, the structure of the enterprise can be seen by looking at the role played by each individual/business cluster. Civil RICO liabilities "applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001).

21

As alleged, the Defendants organized their operation into a cohesive group with specific and assigned responsibilities and command structure, operating in the U.S. and other countries, with funding and direction coming to and going from the US.[47] The business of the enterprise was to provide services by investigating and targeting a range of perceived threats to Sheikh Saud, in exchange for which they would receive substantial compensation.[48]  That they did much of this through illegal, unethical and immoral conduct, which injured many victims, does not change the fact, contrary to the Defendants assertions,[49] that as an organized, interconnected association of contracted service providers to Sheikh Saud, the enterprise had an existence apart from the acts of racketeering in which the Defendants engaged. *Dist. Telecommunications Dev. Corp. v. Dist. Cablevision, Inc.*, 638 F. Supp. 418, 421 (D.D.C. 1985).

In challenging the Plaintiff's allegations of an enterprise, the Defendants primarily rely on two cases:  *District Telecommunications Development Corp.*, 638 F. Supp. at 421; and *Watson*, 1991 WL 7165, at *2.  In *District Telecommunications Development Corp.*, 638 F. Supp. 418, a contractor who lost a local municipal bid sued its bid winning rival and the rival's advisor, because two years after the bid was awarded, the winning contractor told the District of Columbia that its initial proposal was not feasible and was able to rework the contract to terms that the plaintiff argued would not have won the bid, nothing further.  *District Telecommunications Development Corp.*, 638 F. Supp. at 421.  In *Watson*, the *pro se* plaintiff is a convicted drug felon sued three police officers who he claimed—without any apparent substantiating evidence—conspired to commit perjury at his drug trial causing his conviction, and nothing further. *Watson*, 1991 WL 7165, at *2.

---

[47] FAC ¶183.
[48] FAC ¶¶ 12, 32, 80-81.
[49] KARV Memo at 21, Dechert Memo at 32; Gerrard Memo at 29-30; Del Ross Memo at 24-25

The allegations in the FAC are more elaborate.  Each Defendant's connection to the enterprise is summarized in detail at the outset of the FAC.[50]  The FAC alleges the Defendants were generally organized within the enterprise as follows:

- **Dechert, Gerrard, Hughes** – The hub cluster of the enterprise that lead and participated in the affairs of the enterprise, collaborated with the strategic cluster to design plans to target perceived threats, worked with the hacking clusters to implement the plans, and collaborated with the clusters to conceal the enterprise's activities.
- **KARV, Frank, Handjani** – The strategic cluster of the enterprise that lead the development of the plans to target perceived threats, Handjani in particular served for many years as a "front man" for the enterprise, tasked with responsibility for befriending Azima and deceiving him as to the enterprise's role in the hacking and theft of his documents, materials, and other information and as alleged guaranteeing offers of payment to witnesses in exchange for testimony concealing the roles of enterprise members.
- **Vital, Del Rosso** – The hacking cluster that, working with others, penetrated Azima's email account and made an encrypted tranche of the stolen data publicly available, and
- **Insight, SDC-Gadot, Forlit** - The hacking cluster that, working with others, accessed the encrypted tranche of stolen data for further use by the Defendants.

      i.     Defendants Gerrard and Dechert were at the center of the enterprise with Hughes significantly involved in many aspects of the enterprise

Defendant Gerrard was one of the leaders of the enterprise and Defendant Dechert, both as Defendant Gerrard's employer and in its own distinct way, played a central role in the enterprise's affairs and criminal activity.[51] Defendant Gerrard was a partner at Defendant Dechert from 2011-2020 and as recent as April 4, 2022 was listed on Defendant Dechert's website as a "Retired Partner".[52] During his tenure, Defendant Gerrard was Defendant Dechert's co-head of its White-Collar Practice, with over one hundred attorneys working out of Defendant Dechert's offices in London, New York and Washington DC, and a member of Defendant Dechert's Policy Committee.[53] In those roles, Defendant Gerrard used the substantial resources provided by

---

[50] FAC ¶¶ 18-31.
[51] FAC ¶¶19-21.
[52] FAC ¶21.
[53] FAC ¶21.

Defendant Dechert to direct and oversee the enterprise's illegal operations and the years-long cover up of the enterprise's crimes.[54]

Defendant Hughes is a lawyer and former Dechert partner who served as a high-level deputy of Defendant Gerrard in the enterprise.[55]   Between September 2014 and June 2017, Defendant Hughes was a partner at Defendant Dechert, where he worked closely with Defendant Gerrard in organizing and structuring the enterprise, coordinating and carrying out its affairs, and directing and executing its illegal acts.[56] After suddenly leaving Defendant Dechert in 2017 and bringing the UK proceeding with him, Defendant Hughes joined Stewarts Law LLP as a partner, where he continued to work with Defendant Gerrard to manage and execute the affairs of the enterprise, including its criminal cover-up campaign.[57]

Partnerships, such as Dechert LLP, are "subject to joint and several liability for the acts of the individual partners." *Bergen*, 648 F. Supp. at 589; *see also* Feld Entertainment Inc., 873 F. Supp. 2d at 317. In addition to Defendant Dechert being vicariously liable for the acts of its leading partner Defendant Gerrard, the FAC describes in great detail the numerous ways that Defendant Dechert itself was actively involved in the RICO enterprise and conspiracy.[58] The enterprise relied upon Defendant Dechert's infrastructure, partners, employees, financial resources, and reputation and Defendant Dechert received millions of dollars in fees as a result.[59] Along with Defendants Gerrard and Hughes, other non-Defendants that are current and former partners and employees of Defendant Dechert participated in the illegal affairs of the enterprise, including *inter alia*, Caroline

---

[54] FAC ¶21.
[55] FAC ¶23.
[56] FAC ¶23.
[57] FAC ¶23.
[58] FAC ¶¶41, 161–180.
[59] FAC ¶20

Black and Linda Goldstein, all with knowledge, consent, agency, and to the economic benefit of Defendant Dechert.[60]

The FAC puts Defendants Dechert and Gerrard in particular at the center of the enterprise, describing in detail extensive communications and meetings with each of the other clusters to coordinate among them the several different racketeering violations that constituted the pattern of the enterprises conduct.

Defendants Gerrard and Hughes and other lawyers of Defendant Dechert assisted with the torturous interrogation of two Jordanian businessmen, Karam Al Sadeq and Jihad Quzmar, who had been kidnapped and illegally detained.[61] The Dechert lawyers engaged directly and frequently with Al Sadeq and Quzmar, seeking to coerce them into providing false confessions that would implicate Dr. Khater Massaad, Azima and other perceived enemies of Sheikh Saud.[62]

Defendant Dechert, through Defendant Gerrard, oversaw and directed the use of Defendants Del Rosso and Vital as a hacking coordinator.[63] After the hacking was performed, Defendants Gerrard and Del Rosso exchanged a scripted series of emails to create a fake "paper trail" of discovering the hacked information.[64]

Starting in 2016, Defendant Gerrard met regularly with Defendant Forlit in London—first, in Defendant Dechert's office, and later to avoid creating a written record, in the Churchill or Metropolitan Hotels.[65]   At the very same time, Defendant Gerrard conducted regular strategy meetings in with Defendants Frank and Handjani to discuss the findings of the hacking operation.[66] At breakfast in early February 2020, Defendants Gerrard and Handjani, asked Page to investigate

---

[60] FAC ¶19.
[61] FAC ¶61.
[62] FAC ¶61.
[63] FAC ¶184.
[64] FAC ¶145.
[65] FAC ¶121.
[66] FAC ¶122.

who was funding Al Sadeq's litigation against Defendants Dechert and Gerrard and others.[67]  Page, with Defendant Gerrard's knowledge, retained Defendant Forlit to employ hacking techniques to locate this information, and did locate such information, which was then shared with Defendants Gerrard and Handjani.[68]

Defendant Gerrard directed the enterprise to conspire to obstruct justice, by developing amongst themselves a false factual narrative about how they obtained the hacked documents, in support of which they agreed each would testify in U.S. and U.K. court.[69] On several occasions in the second half of 2018, Defendants Dechert and Hughes did obstruct justice by providing false information about how the hacking reports were discovered in filings before this Court, the U.S. Court of Appeals for the D.C. Circuit and a UK court.[70]   In December 2019, when the enterprise convened in Switzerland to perfect and rehearse the false narrative that would be presented in court,  Defendant Gerrard lead the mock trial acting as both the judge and the cross-examining counsel to ensure the story would withstand scrutiny.[71]

Lawyers may be liable for operating or managing the enterprise when they participate in the central activities of the enterprise, including knowingly procuring false testimony. *Feld Entertainment Inc.*, 873 F. Supp. 2d at 327 (citing  *Napoli v. United States*, 32 F.3d 31, 36 (2d Cir. 1994) (enterprise was fraudulent litigation, attorneys who conducted the litigation, bribed witnesses and suborned perjury operated the enterprise);  *Handeen v. Lemaire*, 112 F.3d 1339, 1349–50 (8th Cir. 1997) (when purpose of the enterprise was to manipulate bankruptcy process, attorneys who created and executed plan to fraudulently hide assets and inflate debt and made

---

[67] FAC ¶157.
[68] FAC ¶157.
[69] FAC ¶¶124-125.
[70] FAC ¶¶125, 129, 131.
[71] FAC ¶141.

representations to bankruptcy court based on that plan are liable; court found "an underlying distinction between acting in an advisory professional capacity ... and acting as a direct participant in [an enterprise's] affairs").)

        ii.    KARV, Handjani, Frank worked closely with Dechert, Gerrard to develop, oversee and operate the enterprise's scheme to defraud.

Defendants KARV, Frank and Handjani's involvement in the enterprise was important and extensive. KARV was a key architect of the enterprise's broader strategy for attacking and harming Azima, and by association, Plaintiff.[72] In addition, KARV received materials unlawfully obtained from Azima and others by the enterprise through hacking and then disseminated those materials to the press for the purpose of attacking the credibility of Plaintiff, Azima and others associated with Azima.[73]

As a Senior Advisor for Defendant KARV, Defendant Handjani served for many years as a "front man" for the enterprise, tasked with responsibility for befriending Azima and deceiving him as to the enterprise's role in the hacking and theft of his documents, materials, and other information.[74] Handjani also is alleged to have guaranteed offers of payment to witnesses in exchange for testimony concealing the roles of enterprise members.[75] He is also a longstanding trusted advisor of Sheikh Saud with suspected ties to the regime in Iran.[76]

In his capacity as the founder and current President of Defendant KARV, Defendant Frank (along with Defendant Handjani) repeatedly met with other members of the enterprise in the U.S. and elsewhere to plan and coordinate its affairs, received materials unlawfully obtained from

---

[72] FAC ¶35.
[73] FAC ¶¶6, 35.
[74] FAC ¶29.
[75] FAC ¶29.
[76] FAC ¶52.

Azima, and disseminated those materials to the press for the purpose of attacking the credibility of Solomon, Azima and others associated with Azima.[77]

The KARV cluster's involvement in the enterprise dates back to, at the latest 2015, when Defendants Handjani and Frank conspired with Defendant Gerrard, non-Defendant Jamie Buchanan and others to attack Azima, for having been identified by Defendant Gerrard as being part of a "US team" acting to publicize the activities of RAK and Defendants Dechert and Gerrard.[78] This was evidenced by numerous emails between Defendants Gerrard, Handjani, Frank, and others, as well a report, which was drafted at least in part by Defendans Frank, at the direction of Defendant Gerrard.[79] These materials laid out the conspiratorial scheme, plan and design to "target," "attack," and "go after" Azima and his known associates by gathering intelligence, monitoring their activities, attempting to contain or ruin their plans, bringing civil or criminal lawsuits, which were known to be frivolous and based upon illegally and fraudulently obtained material, and planting contrived stories with media.[80]

In early January 2016, Defendant Frank provided via email to Defendant Gerrard an informal outline of the plan, which was prepared based on documents obtained through the enterprise's hacking and intelligence-gathering operation.[81] The outline, titled "View from the Window," summarized a strategy for attacking and harming those who had sought to expose the enterprise's criminal conduct, with a particular focus on Azima.[82]  In the document, Defendant Frank solicited additional information from Defendant Gerrard to further develop the plan to attack Azima and others.[83]

---

[77] FAC ¶30.
[78] FAC ¶74.
[79] FAC ¶¶74-75.
[80] FAC ¶¶74-75.
[81] FAC ¶76.
[82] FAC ¶76.
[83] FAC ¶76.

By about January 26, 2016, Defendant Frank contributed to preparing a "comprehensive action plan" (the "Action Plan") developed from the "View from the Window" outline, stating that the enterprise's scheme was about to enter "a new and decisive phase in that a wide-scale legal action is about to commence in multiple jurisdictions" against Azima and others.[84]

The ten-page Action Plan identified steps the enterprise would take to damage Azima's "reputation and even [ex]pose him [to] criminal exposure," including "an online campaign against U.S. individuals."[85]  An important step outlined in the Action Plan was "the publishing of selected materials" and the use of "blogs in order to harm his reputation."[86] This component of the Action Plan was later extended to Solomon who was also named in blogs and articles, and whose business, property and reputation were also targeted and damaged as a result.[87]

As the plan was subsequently implemented, Defendants Frank and Handjani would meet frequently with Defendant Gerrard contemporaneously with Defendant Gerrard's regular meetings with Defendant Forlit, as to stay apprised on the developments.[88] As recent as February 2020, Defendant Handjani convened with Defendant Gerrard and others to commission Defendant Forlit to use hacking techniques to investigate who was funding Al Sadeq's litigation against Defendants Dechert, Gerrard and others.[89] Defendant Forlit did locate this information, and it was then shared with Defendants Gerrard and Handjani.[90]

      iii.    Del Rosso and Vital (on one hand) and Forlit, Insight and SDC-Gadot (on the other hand) were individual hacking operations that worked through Dechert and Gerrard to implement the plan devised by KARV, Frank and Handjani

---

[84] FAC ¶77.
[85] FAC ¶77.
[86] FAC ¶77.
[87] FAC ¶77.
[88] FAC ¶¶121-122.
[89] FAC ¶157.
[90] FAC ¶157.

The Action Plan, as implemented by the enterprise, took the form of a hack and dump scheme, carried out by multiple, separate teams of hackers.[91] One team consisting of Defendants Vital and Del Rosso as well as others procured by the Defendants hacked Azima's email account and dumped encrypted tranches of his emails onto a public location accessible through the internet.[92] A second team consisting of Defendant Forlit and others procured by the Defendants, independently" located and advised Defendant Dechert as to the location of those tranches so that Defendant Dechert could obtain the materials under the guise of plausible deniability as to its involvement in the hacking itself.[93] A third firm, procured by the Defendants, downloaded the emails and provided them to Defendant Dechert.[94] All three of these firms were directly or indirectly paid by RAK entities or Defendant Dechert, and in so doing joined and participated in the racketeering enterprise.[95]

Defendants Vital and Del Rosso were engaged and paid more than $1 million by Defendant Dechert in concert with RAKIA, directly or indirectly, for their work.[96] Defendants Vital and Del Rosso in turn made substantial payments to the cyber firm that employed the hackers, particularly around the time that Azima's stolen data was published online in August and September 2016.[97] Defendant Del Rosso used Defendant Vital to participate in the enterprise's criminal conduct, including to receive and transfer funds into and from the U.S. to pay for and promote the enterprise's illegal hacking-and-smear operations and obstruction-of-justice campaign.[98] Specifically, Defendants Vital and Del Rosso stole Azima's computer data, including emails,

---

[91] FAC ¶78.
[92] FAC ¶78.
[93] FAC ¶78.
[94] FAC ¶78.
[95] FAC ¶78.
[96] FAC ¶81.
[97] FAC ¶81.
[98] FAC ¶25.

which were then dumped online and used by the Defendants to ruin the reputations of Solomon and Azima, and to damage them financially.[99]

In addition to the hacking work, Defendant Del Rosso repeatedly met with other members of the enterprise in the U.S. to plan and coordinate its affairs.[100] Defendant Del Rosso also worked with other members of the enterprise to disseminate stolen materials to harm Solomon and others; and to manipulate U.S. law enforcement in an effort to silence Solomon and distract from and conceal the enterprise's criminal conduct.[101]

Approximately $250,000 per month was paid to Defendants Forlit and his entities for their contributions to the hacking operation.[102] These payments were made in U.S. dollars sent from outside the U.S. to U.S.-based bank accounts at JP Morgan Chase, Citibank, and Bank of America belonging to Defendant Forlit's Florida-based companies, Insight and SDC-Gadot.[103] Defendant Gerrard helped ensure that Defendant Forlit's compensation remained at around this level as to preserve access to Defendant Forlit's sources and methods.[104]

Acting at the direction of Defendant Gerrard and other members of the enterprise, Defendant Forlit orchestrated the hacking and theft of private emails, and then assisted the enterprise in covering up such conduct through the obstruction of U.S. and other judicial proceedings.[105] To carry out these crimes and conceal their past criminal actions on behalf of the enterprise, Defendant Forlit utilized Insight and SDC-Gadot (both of which he created, owned, and exclusively controlled) to receive and transfer millions of U.S. dollars into and from the U.S.

---

[99] FAC ¶41.
[100] FAC ¶24.
[101] FAC ¶24.
[102] FAC ¶80.
[103] FAC ¶80.
[104] FAC ¶80.
[105] FAC ¶26.

to pay for and promote the enterprise's hacking and smear operations and obstruction-of-justice campaign and to launder funds intended to pay for the enterprise's unlawful activity.[106]

### 2.   The FAC Alleges that the Enterprise Committed Several Predicate Offenses

The FAC adequately pleads that the Defendants, operating as a criminal enterprise, committed a number of racketeering offenses identified in 18 U.S.C. § 1961 over the course of its extensive multifaceted campaign of wrongful activity including, but not limited to, wire fraud, mail fraud, obstruction of justice, kidnapping, extortion, and money laundering.[107]

#### a)   Predicate Offenses – Mail and Wire Fraud

The federal mail and wire fraud statutes, 18 U.S.C. § 1341, 1343, "reach any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *AEPA Architect Engineers, P.C.*, 2022 WL 35618, at *3 (citing *Carpenter v. United States*, 484 U.S. 19, 27, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987)).  The statute plainly sets fines and imprisonment for "whoever . . . .transmits or causes to be transmitted by means of wire . . . communication in interstate *or foreign commerce*, any writings . . .  for the purpose of executing such scheme."  18 U.S.C. § 1343 (emphasis added).

"The mail and wire fraud statutes have been held to be *in pari materia* so that cases construing one apply equally to the other." *D'Iorio v. Adonizio*, 554 F. Supp. 222, 226 n.3 (M.D. Pa. 1982) (citing *United States v. Pollack*, 534 F.2d 964, 971 (D.C. Cir. 1976)).  "In the context of a RICO action, the mailings or wirings do not have to contain the misrepresentations that defrauded the plaintiff, but must merely be in furtherance of the fraudulent, material misrepresentation." *Kerby v. Mortg. Funding Corp.*, 992 F. Supp. 787, 798–99 (D. Md. 1998). "A civil RICO suit may be maintained, not only in mail [or wire] fraud cases where the deceitful mailing [or wiring] is the

---

[106] FAC ¶¶26-28.
[107] FAC ¶¶40, 182, 193.

blade rushing down toward the guillotine victim, but also in cases involving more grandiose schemes to cheat, where the mailing [or wiring] is but part of the frame that holds the blade." *Kerby*, 992 F. Supp. at 799 (quoting *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir. 1996)).

To state a RICO claim based upon mail or wire fraud, a plaintiff must allege the existence of a scheme to defraud, defendant's knowing participation in that scheme, and use of interstate mails or wires in furtherance of the scheme. *Dooley v. United Techs. Corp.*, 803 F. Supp. 428, 441 (D.D.C. 1992). Alleging mail or wire fraud "does not require the elucidation of every detail of the alleged fraud" rather it "requires the presentation of the situation out of which the claim arose." *Kerby*, 992 F. Supp. at 799 (internal quotations omitted). Courts have found the existence of a scheme based on arrangements made by defendants to fraudulently induce participation or "with references to specific communications, dates, senders and recipients." *Feld Entertainment Inc.*, 873 F. Supp. 2d at 312. However, courts have found adequate as a "description as to when and how the fraud took place," the identification of just a single date followed by a general allegation of "and on other occasions." *Fed. Info. Sys., Corp. v. Boyd*, 753 F. Supp. 971, 976 (D.D.C. 1990)

The Defendants' attempts to deflect from their fraudulent conduct by emphasizing that the fraudulent statements were not directed towards the Plaintiff are of little consequence.[108] "[P]laintiffs do not have to rely on the mail and wire communications themselves" and "the mails and wires do not have to be used by each defendant, but merely in furtherance of the scheme". *Kerby*, 992 F. Supp. at 801 (citing *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S. Ct. 358, 98 L. Ed. 435 (1954)). Courts have found wire and mail fraud based on "mail and wire transmissions [] between the defendants and themselves or third parties". *Kerby*, 992 F. Supp. at 801.

---

[108] Dechert Brief at 24-25; KARV Brief at 12

Nor is it necessary, for the purpose of establishing mail or wire fraud, that the defendants obtain the plaintiff's property or money.  *Feld Entertainment Inc.*, 873 F. Supp. 2d at 312.   The crucial relationship between the mailings or wirings and the scheme turns not "on time or space but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings [or wirings] in question." *D'Iorio v. Adonizio*, 554 F. Supp. 222, 228 (M.D. Pa. 1982)

Contrary to what the Defendants argue,[109] Plaintiff with more than adequate specificity alleges a number of very specific instances of the Defendants knowingly using the wires and mail to defraud individuals, businesses and the public in furtherance of the enterprise's objective and scheme to generate substantial revenue through Defendant Dechert's engagement with RAK.

> i.   The campaign to deplatform and silence Solomon was facilitated and reinforced by a series of at least nine acts constituting wire and/or mail fraud implicating Defendants Dechert, Gerrard, Del Rosso, Vital, KARV, Frank and Handjani

As alleged, sometime in late 2016, Defendant Dechert transmitted via wire and/or mail a fraudulently obtained, fraudulently presented package of communications—i.e., organized to falsely convey to an innocent viewer that Solomon engaged in fraud—to the Washington DC Bureau of Solomon's employer, the *Wall Street Journal*.[110] This transmittal constituted an act of wire or mail fraud, as the communications reflected an array of illegal and unethical conduct (e.g., that Solomon supposedly: played a role in trafficking arms to the Middle East, conspired to instigate a coup against the royal family of Kuwait, and joined a company started by his source) that may have been requested of Solomon, but in which he in fact did not engage.[111]

---

[109] Dechert Memo at 24, Gerrard Memo at 27, KARV Memo at 11, Del Rosso Memo at 25; SDC Memo at 20
[110] FAC ¶¶ 101, 103.
[111] FAC at ¶¶102, 105, 106

Though Solomon was able to keep his job initially by refuting the false accusations that were implicitly presented, as indeed they were untrue, his employer nevertheless relied on them in other ways —e.g., by withdrawing Solomon's nomination for the Pulitzer Prize and declining to accept a National Press Club award he had won.[112]

Having failed at their first attempt to fully deplatform and silence Solomon, the Defendants, sometime in early 2017, had the same package of documents transmitted via wire and/or mail to a reporter for the *Associated Press*, who confronted first Solomon and then Solomon's employer with accusations that Solomon was engaging in the aforementioned criminal activity.[113]

This transmittal constituted another act of wire or mail fraud and it carried out pursuant to the Action Plan, which was drafted at least in part by Defendants KARV, Frank and Handjani and others.[114] Specifically, the Action Plan called for the enterprise to "contact several world leading reporters and investigative journalists and supply them with materials and evidence" about Azima and his acquaintances such as Solomon "in order to be published."[115] Some of those false and disparaging stories claimed that Solomon was in the middle of hundreds of millions of dollars of fraudulent transactions.[116] The defendant's mental state as it pertains to whether they knowingly participated in a scheme or intended to defraud "may be, and most often is, inferred from the totality of the circumstances, including indirect and circumstantial evidence." *Feld Entertainment Inc.*, 873 F. Supp. 2d at 312 (quoting *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009)).

---

[112] FAC ¶¶13, 104, 191.
[113] FAC ¶¶105-106.
[114] FAC ¶75.
[115] FAC ¶99.
[116] FAC ¶99.

Indeed, on June 21, 2017, after the *Associated Press* reporter published a story based on the Defendants' transmittals, Solomon's employment with the *Wall Street Journal* was terminated as a direct result of the Defendants intentional campaign to silence and deplatform Solomon through fraudulent wire and/or wire transmissions.[117] Where a RICO plaintiff has shown an "intentional scheme to use fraudulently obtained" materials "to harass and harm plaintiffs in their business and especially to deprive" a plaintiff of employment, this Court has found this "certainly an allegation of an "active" scheme." *Federal Information Systems, Corp.*, 753 F. Supp. at 976.

After Solomon's termination, the Defendants continued their efforts to keep him silenced and deplatformed by disseminating the fraudulent information in a series of at least seven articles that they published or caused to be published over wires that portray Solomon in an undeserved negative light, based on the fraudulently obtained and fraudulently presented communications he had with Azima.[118]  Each article constituted another act of wire fraud.

        ii.    The procurement of the fraudulently used communications was facilitated by a series of at least six acts of wire fraud committed by Defendants Del Rosso, Vital, Gerrard, and Dechert

The transmittals that the Defendants used in their campaign to silence and deplatform Solomon were also fraudulently procured and fraudulently presented via wires specifically by Defendants Dechert, Gerrard, Del Rosso, Vital and their co-conspirators in furtherance of the enterprise's overarching purpose to silence any threats to its operation.[119]

As alleged, in 2016, Defendant Dechert, through Defendant Gerrard, oversaw and directed Defendant Del Rosso and by extension Vital to coordinate the illegal accessing of Azima's communication through fraudulent acts.[120] Defendants Vital and Del Rosso were compensated by

---

[117] FAC ¶¶13, 38, 106, 191.
[118] FAC ¶¶111, 192.
[119] FAC ¶¶13, 38, 106, 191.
[120] FAC ¶184.

Defendant Dechert and in turn retained a cyber firm to engage in online activity targeting Azima.[121] At the direction of Defendants Gerrard and Dechert, Defendant Del Rosso commissioned the cyber firm to lure Azima into providing his login data, so that Defendants and their co-conspirators could have persistent access to Azima's accounts and computers.[122] Such access to Azima was gained through phishing emails sent to Azima by the cyber firm for compensation by and at the direction of Defendant Del Rosso, who was being compensated and directed to engage as such by Defendant Gerrard.[123]

"Phishing" by definition, entails the intentional sending of a fraudulent solicitation over wires to gain access to sensitive data.[124]   At least five different individuals, including one that publicly markets his skills as including the creation of "undetectable phishing Payloads," used wires to fraudulently obtain access to Azima's accounts and computers, pursuant to Defendant Del Rosso's instructions.[125] As a result of the alleged phishing of Azima in 2016, which ultimately gave rise to the injuries Solomon suffered, Defendants Del Rosso, Vital, Gerrard, Dechert, and by extension their co-conspirators, knowingly and intentionally committed at least five acts of wire fraud under 18 U.S.C. § 1343.

Following the phishing activity, the cyber firm, at Defendant Del Rosso's instruction, on August 7, 2016, uploaded to a public location online at least two encrypted tranches of the stolen communications—one of which in its publicly visible heading, falsely accused Plaintiff Solomon of engaging "fraud".[126] This occurred weeks after a meeting took place between Defendant Gerrard

---

[121] FAC ¶81.
[122] FAC ¶84.
[123] FAC ¶¶81, 85.
[124] "Phishing," National Institute of Science and Technology, Computer Security Resource Center available at https://csrc.nist.gov/glossary/term/phishing (last visited May 17, 2023) ("A technique for attempting to acquire sensitive data, such as bank account numbers, through a fraudulent solicitation in email or on a web site, in which the perpetrator masquerades as a legitimate business or reputable person.")
[125] FAC ¶84.
[126] FAC ¶¶ 93, 94, 99.

and Azima, in which Azima notified Defendant Gerrard of his relationship with Solomon in response to a threat made by Defendant Gerrard.[127] Upon discovering Azima and Solomon's relationship, Defendants Dechert and Gerrard immediately instructed the Defendants Del Rosso and Vital (who in turn complied), to search the batch of documents that were illegally hacked and stolen from Azima by the Defendants and post online any documents that could be used to attack Solomon.[128]

As a foreseeable and intended result of the Defendants' false and misleading statements, the fraudulent scheme caused Solomon substantial damages and lost business opportunities.[129] Accordingly, as a result of the online posting of Azima's communication with Solomon under the false heading of "fraud" on or about August 7, 2016, Defendants Del Rosso, Vital, Gerrard, Dechert, and by extension their co-conspirators, knowingly and intentionally committed another act of wire fraud as defined by 18 U.S.C. § 1343.

<div style="padding-left:2em">

iii.   Defendants Forlit, Insight, SDC-Gadot, Hughes, Dechert and Gerrard engaged in cover-up activity constituting additional acts of wire fraud

</div>

This Court has found that defendants alleged to have known about  a scheme and to have participated in the cover-up can be named as having participated in the wire fraud. *Feld Entertainment Inc.*, 873 F. Supp. 2d at 312.

Subsequent to the initial posting of the fraudulently obtained communications, Defendant Gerrard worked with Defendant Forlit, through an intermediary, to "independently" locate and advise Dechert as to the location of those tranches so that Dechert would have plausible deniability of having commissioned the placement of the tranches online in the first place.[130] Defendant Forlit

---

[127] FAC ¶90.
[128] FAC ¶38.
[129] FAC ¶195.
[130] FAC ¶¶38, 78, 88.

received substantial compensation for this work through his entities Insight and SDC-Gadot.[131] Defendant Forlit prepared or directed others to prepare reports about the content of the illegally obtained materials for use by the enterprise,[132] and developed an intricate system using wires and mails to covertly disseminate them.[133] Defendant Forlit would later conduct several meetings with Defendants Gerrard, and Hughes and others at which he allegedly proposed the  false narrative about how Defendant Dechert came to locate and possess the fraudulently accessed communications between Solomon and Azima.[134] The FAC identifies several instances in which the false narrative designed by Defendant Forlit as part of the cover-up, was presented presumably via wire to US and UK courts.[135] Accordingly, Defendants Forlit, Insight, and SDC-Gadot, are adequately alleged to have participated in several acts of wire fraud.

Defendant Gerrard himself prepared, signed and transmitted by wire to Azima's UK counsel a false witness statement regarding the discovery of Azima's fraudulently obtained communications, but an even greater number of the perjurious filings were identified as having been made by Defendant Hughes.[136] Defendant Hughes is also identified as having participated in several of the meetings at which the false discovery story was formulated.[137] Additionally, the FAC alleges that in September 2016, Defendant Hughes threatened to file a lawsuit in the U.K. against Azima and provided Azima's counsel via wire some of the emails that Defendants Vital and Del Rosso had stolen from Azima.[138]

---

[131] FAC ¶¶8, 27, 28, 43, 80.
[132] FAC ¶¶89, 92.
[133] FAC ¶¶116-119.
[134] FAC ¶¶120-143.
[135] FAC ¶¶125, 129, 131-136, 190.
[136] FAC ¶¶125, 129, 131, 135.
[137] FAC ¶¶128-133, 144.
[138] FAC ¶123.

The FAC also describes a series of meetings, correspondence, and testimony revealing substantial relevant evidence that Defendants Dechert, Gerrard and Hughes destroyed, or permitted to be destroyed, during the pendency of litigation, which were part of a broader scheme to conceal the enterprise's illegal acts.[139] The RICO Conspirators' false statements, all presumably transmitted over U.S. wires, prevented Solomon, this Court, and the U.S. Court of Appeals for the D.C. Circuit from learning material information about the enterprise and its illegal activities,[140] and were also relied on by Solomon in his refraining from pursing legal recourse against the Defendants, which would have allowed him to rehabilitate his name in the publishing and journalism sector.[141]

Defendant Dechert's arguments endeavoring to hide behind its status as counsel and to cast aside these allegations as attempting to reach protected "litigation activities" are without merit.[142] Lawyers may be liable for operating or managing the enterprise when they participate in the central activities of the enterprise, including knowingly procuring false testimony. *Feld Entertainment Inc.*, 873 F. Supp. 2d at 327 (citing *Napoli*, 32 F.3d at 36 (enterprise was fraudulent litigation operated by attorneys who conducted the litigation, bribed witnesses and suborned perjury); *Handeen*, 112 F.3d at 1349–50 (noting "an underlying distinction between acting in an advisory professional capacity ... and acting as a direct participant in [an enterprise's] affairs"). Accordingly, the FAC adequately pleads that Defendant Hughes possessed the requisite knowledge and involvement in the wire fraud to satisfy the RICO predicate act requirement and reinforces the same regarding Defendants Dechert and Gerrard.

---

[139] FAC ¶¶147-152.
[140] FAC ¶152
[141] FAC ¶¶189, 195.
[142] Dechert Brief at 25, 28

          iv.    Plaintiff's supplemental filing of wire and mail communications and money laundering transactions reflect hundred of other instances of wire fraud.

In addition, the FAC includes hundreds of specific examples of mailings and wirings in furtherance of the enterprise's scheme.  Where "allegations are supported in supplemental papers filed by the parties with specific examples of alleged uses of the mails and wires in furtherance of th[e] scheme," this Court has found such examples to be sufficient to support a plaintiff's claim that "defendants committed the predicate acts of mail and wire fraud," even where the allegations in the Complaint were "not specific enough to meet Federal Rule of Civil Procedure 9(b)'s particularity requirement". *Dooley*, 803 F. Supp. at 441.

The Plaintiff incorporated by reference into the FAC an attached Exhibit B, which sets forth particular use of 173 wire and mail communications and describes which Defendant caused the communication to be mailed or wired, when the communication was made, and how it furthered the fraudulent scheme.[143]   Exhibit A in the FAC  sets forth 413 money laundering transactions.[144] All acts on both exhibits constitute additional acts of wire and/or mail fraud in furtherance of the enterprise's pattern of racketeering activity, which included the scheme to defraud and deplatform the Plaintiff and which in fact did, cognizably damage Solomon by causing him to lose his job, book deals and speaking engagements, thereby depriving him of money, property and business in the U.S.[145]

          b)  *The FAC adequately pleads obstruction of justice as a RICO predicate offense committed by the Defendants Dechert, Gerrard, Hughes, Forlit, Insight, SDC-Gadot, Del Rosso and Vital.*

---

[143] FAC ¶193, Ex. B.
[144] FAC ¶194, Ex. A.
[145] FAC ¶¶193, 194.

The obstruction of justice statute prohibits corruptly influencing, obstructing, or impeding, or endeavoring to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503. "There must be a nexus in time, causation or logic between the conduct and its effect on the proceeding: A defendant must know that his corrupt actions 'are likely to affect the ... proceeding.'" *Feld Entertainment Inc.*, 873 F. Supp. 2d at 319.

      i.   Plaintiff's allegations regarding coordinated perjury adequately plead obstruction of justice as a predicate RICO offense

Establishing defendants' organizational capacity in the coordination of a false testimony scheme and awareness that special procedures are needed to be used for everyone to come out "clean" is sufficient to establish knowledge of participating in a conspiracy and RICO enterprise predicated on obstruction of judgement. *United States v. Abbell*, 271 F.3d 1286, 1300 (11th Cir. 2001). Perjury before a foreign tribunal can serve as the factual basis for finding obstruction of justice as a civil RICO predicate offense. *Abbell*, 271 F.3d at 1301. This Circuit permits parties to also pursue obstruction of justice charges for misrepresentations in the course of civil discovery. In *Feld*, this Court found allegations of defendants providing knowingly false responses to interrogatories and knowingly false deposition testimony to conceal their illegal activity adequate for plaintiff's claim of obstruction of justice as a RICO predicate offense to survive a motion to dismiss. *Feld Entertainment Inc.*, 873 F. Supp. 2d at 319–20.

The alleged volume of perjurious testimony advanced by members of the enterprise is alarming, each instance of which sustains an independent act of obstructing justice.  The FAC identifies at least seven false filings and four witnesses perjuring themselves in court in furtherance of the enterprise's objectives.

In the summer of 2018, Defendants Hughes and Dechert each presented false statements in documents Dechert filed in DC District and Circuit Court respectively, regarding how the stolen

communications were located.[146] After describing further meetings in Cyprus and elsewhere among members of the enterprise, including Defendants Gerrard, Hughes and Forlit, the FAC identifies two more instances in which Defendant Hughes files a false sworn statement, this time in the UK proceeding, on November 6 and December 11, 2018.[147] In May and June of 2019, Defendants Gerrard, Hughes, and Forlit and others convened on several occasions at the London offices of Defendant Dechert in connection with the preparation of three witnesses statements— for Defendant Gerrard, Page and Majdi Halabi—all of which were signed and advanced as evidence in UK proceeding.[148] All of these false statements were also intended, at least in part, to also obstruct the parallel proceeding in this Court.[149]

In addition, the enterprise, at the direction of Defendants Gerrard and Forlit, coordinated a three-day meeting in Switzerland for the witnesses to rehearse the false narrative for the purpose of testifying in live court.[150] Indeed, in January 2020, at least four RAKIA witnesses—Page, Halabi, Defendant Gerrard, and Buchanan—delivered the coordinated and rehearsed perjurious testimony under oath in support of RAKIA's case against Azima.[151] Initially, the testimony was accepted by the UK Court, which ruled in favor of RAKIA.[152] However, at least two of the witnesses, Page and Halabi, have since recanted their testimony, admitting to having participated in the scheme to obstruct justice with Defendants Dechert, Gerrard, Hughes, Forlit, Insight, and SDC-Gadot.[153] Similarly, the English court itself has recently ruled that the story put forward about how the stolen data was obtained by the Defendants was a false story.[154]

---

[146] FAC ¶125.
[147] FAC ¶¶126-131.
[148] FAC ¶¶132-135.
[149] FAC. ¶¶128, 131, 132, 135.
[150] FAC ¶¶136-141.
[151] FAC ¶¶142-143.
[152] RAKIA v. Azima, [2020] EWHC 1327 (Ch), No. HC-2016-002798 (May 22, 2020).
[153] FAC ¶¶44-45, 134, 136, 142-143.
[154] FAC ¶144.

Defendant Del Rosso was also an important part of Dechert's false story of "innocent discovery" of Azima's stolen data.[155] Defendants Gerrard and Del Rosso exchanged a series of emails on August 15 and 16, 2016, in which Defendant Gerrard purported to "break the news" of the discovery of the hacked material on websites, even though he was aware of these websites at least a week earlier, in a clear attempt to lay a false "paper trail" of discovery.[156] In a witness statement, Defendant Del Rosso also hid his engagement of the cyber firm and denied any involvement in the hacking.[157]

As a direct result of his reliance on the false testimony and/or evidence that each of the Defendants either contributed to or knew about, Solomon remained unaware of the fraudulently concealed conduct of the Defendants that gave rise to his claims.[158] This Court has found that the defendants illegal acts in furtherance of the cover-up may satisfy the RICO predicate requirement. *Feld Entertainment Inc.*, 873 F. Supp. 2d at 312.

> ii.   FAC adequately plead destruction of evidence as an obstruction of justice predicate RICO offense

The act of destroying documents that are relevant to pending proceedings, may also qualify as predicate acts of obstructing justice under the civil RICO statute. *United States v. Lundwall*, 1 F. Supp. 2d 249, 251–52 (S.D.N.Y. 1998).

---

[155] FAC ¶145.
[156] FAC ¶145.
[157] FAC ¶146.
[158] FAC at ¶¶16, 39, 45, 146, 190, 203. Defendants Dechert and Gerrard attempt to cabin off efforts to conceal their illegal activity as "not cognizable as RICO predicates" citing to a Southern District of New York case. Dechert Memo at 26-27; Gerrard Memo 24-25. That case, *Democratic Nat'l Comm. v. Russian Fed'n*, addresses a very narrow fact pattern where the purpose of the alleged RICO enterprise was to impact the outcome of a single event—the US Presidential election—which occurred on a date certain—Tuesday, November 8, 2016—which the Court determined to give rise to a narrow exception to the long standing Supreme Court precedent that "'acts of concealment done in furtherance of the main criminal objectives of the conspiracy' are considered part of the conspiracy." *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 443–44 (S.D.N.Y. 2019) (quoting *Grunewald v. United States*, 353 U.S. 391, 405, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957)).

The enterprise obstructed the D.C. District Court Proceeding by destroying evidence and documents, and then concealing this conduct by making false statements to Azima and his counsel regarding their efforts to preserve and retain relevant materials, which were relied upon by Azima.[159]   Throughout the almost four years the D.C. District Court Proceeding was pending, Azima's counsel made at least five requests to Defendant Dechert and to the court intended to ensure the preservation of relevant evidence.[160] Defendants Dechert, Gerrard, and Hughes, through correspondence from the other Dechert attorneys, made affirmative, but false, assurances that relevant evidence was being reserved, despite knowing that evidence had already been destroyed and/or was in the process of being destroyed.[161] For example, just one week after Azima filed the D.C. District Court Proceeding in September 2016, Buchanan a non-Defendant co-conspirator brought his iPhone to an Apple store, where much of his webmail, including mail stored remotely in the "cloud," was allegedly deleted.[162] On October 22, 2016, Buchanan informed a Defendant Dechert attorney that his emails and other data had been deleted but that the emails and data could be restored if steps were taken immediately.[163] The attorney instructed Buchanan to restore only emails from August to September 2016, ensuring that earlier emails, which they knew would necessarily include emails and reports related to the enterprise's hacking of Azima would be permanently deleted, destroyed, and unrecoverable.[164] Buchanan's laptop also disappeared under mysterious circumstances, as he claimed in a sworn statement that the laptop was stolen in January 2017, just a few months after Azima's D.C. District Court Proceeding was filed.[165] At the time,

---

[159] FAC ¶¶147-149.
[160] FAC ¶147.
[161] FAC ¶147.
[162] FAC ¶147.
[163] FAC ¶147.
[164] FAC ¶147.
[165] FAC ¶148.

Defendant Dechert did not take steps to preserve his laptop or its data; as it was destroyed to prevent evidence stored on it from being produced to this Court.[166]

In July 2021, Defendant Dechert revealed that it had furnished Defendant Gerrard with at least fifteen different mobile devices between 2014 and 2020 – a period when Defendant Gerrard and others were actively involved in the enterprise's unlawful activities.[167] Defendant Dechert admitted that data and evidence from eight of those devices could not be retrieved and had not been preserved because the devices were "temporarily mislaid," "stolen," "reissued to another member of the firm," "returned to [the] Dechert IT team," or "lost."[168] Indeed, throughout his tenure with Defendant Dechert, Defendant Gerrard consistently and repeatedly replaced his devices – at least twenty-two times since he joined the law firm.[169]

Though Defendant Dechert was aware as early as 2016, it did not disclose that data from Buchanan's laptop or Defendant Gerrard's cell phones had been lost or destroyed at any point in the D.C. District Court Proceeding.[170] In fact, Defendant Dechert, with the knowledge and approval of Defendants Gerrard and Hughes, falsely assured Azima's U.S. legal team that all relevant documents had been preserved even though Defendants Gerrard and Hughes knew the evidence had already been destroyed.[171]  As intended by the Defendants, this conduct obstructed discovery in the D.C. District Court Proceeding and concealed their racketeering conduct from the victims, including Solomon.[172] Had the truth about the document destruction been known, Azima

---

[166] FAC ¶148.
[167] FAC ¶149.
[168] FAC ¶149.
[169] FAC ¶149.
[170] FAC ¶150.
[171] FAC ¶150.
[172] FAC ¶¶151, 152.

would have immediately sought judicial intervention, which would have alerted Solomon who would have done the same.[173]

> c)  The FAC adequately pleads Kidnapping, Extortion and Obstruction of Justice against Defendants Gerrard, Hughes and Dechert

A person violates the US federal kidnapping statute by travelling internationally in furtherance of the commission of a kidnapping, seizure, confinement, abduction or carrying away of another person who is held out for any unlawful purpose. 18 U.S.C. § 1201(a)(1) ("Whoever unlawfully *seizes, confines,* inveigles, decoys, *kidnaps, abducts*, *or carries away* and holds for ransom or reward *or otherwise* any person, . . . when—the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the *offender travels in interstate or foreign commerce* or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or *in furtherance of the commission of the offense*").[174]  The RICO predicate of kidnapping can be established based solely under the language of the federal kidnapping statute. *Murphy v. Farmer*, 176 F. Supp. 3d 1325, 1355 (N.D. Ga. 2016).

The FAC alleges that a pair of former RAKIA executives—Al Sadeq and Quzmar—were abducted and unlawfully detained in September 2014 in RAK on bogus charges of fraud against RAKIA and that, while in detention, Defendants Dechert, Gerrard and Hughes made threats to them and their families, which would be carried out unless they gave false testimony implicating,

---

[173] FAC ¶ 151.

[174] Defendant Dechert also argues that the Court should not consider these allegations because the alleged kidnapping and extortion occurred in another country. Dechert Brief 22-23. In the *RJR Nabisco, Inc. v. European Community* case that Dechert cites in support, however, the Supreme Court does not track its reasoning, ruling in that case "that the complaint does not allege impermissibly extraterritorial violations of §§ 1962(b) and (c)". *RJR Nabisco, Inc.*, 579 U.S. 325, 344 (2016).  In reaching this conclusion the Supreme Court notes that "it is hard to imagine how Congress could have more clearly indicated that it intended RICO to have (some) extraterritorial effect" and that RICO's "unique structure makes RICO the rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality." *RJR Nabisco, Inc.*, 579 U.S. at 340.

among others, Azima.[175]   Describing Al Sadeq's detention as an example, the FAC more specifically alleges that (a) Al Sadeq was forcibly taken from his home by RAK State Security Investigations personnel without being formally arrested in violation of UAE law; (b) Defendant Gerrard was behind his kidnapping and in charge of his detention; (c) Al Sadeq was interrogated in RAK by Defendant Gerrard, Defendant Hughes and other Dechert attorneys; and (d) Defendant Gerrard coerced him to falsely swear that Azima was an international arms dealer, was manipulating an aviation firm in RAK to use it as a gun-running vehicle and had embezzled money.[176]   Following several more months of being pressured by the Defendants, Al Sadeq eventually capitulated and signed statements confessing to his involvement in alleged fraud under duress.[177] Despite the false and fraudulent promises that were made to Al Sadeq, he remains incarcerated to this day.[178]   Accordingly, the FAC adequately pleads that Defendants Dechert, Gerrard and Hughes, committed two RICO predicate acts of kidnapping.

In the District of Columbia, a person commits extortion if she "obtains or attempts to obtain the property of another with the other's consent which was induced by wrongful threat of economic injury." D.C. Code Ann. § 22-3251 (West). This court has found extorsion adequately plead where plaintiffs specify instances of defendants threatening them with information to deprive them of interests of value. *Federal Information Systems, Corp.*, 753 F. Supp. at 976. Hardly a novel theory,[179] courts recognize legal rights as "a thing of value" under extortion laws.[180]   *See e.g., United States v. Loc. 560*, 550 F. Supp. 511, 518 (D.N.J. 1982) (D.N.J.1982; *Hunt v. Weatherbee*,

---

[175] FAC ¶¶40, 61.
[176] FAC ¶¶64, 67-68, 200.
[177] FAC ¶70.
[178] FAC ¶71.
[179] Dechert Brief at 23.
[180] FAC ¶201

626 F. Supp. 1097, 1101–02 (D. Mass. 1986) (defendants act of coercing plaintiff to withdraw a criminal complaint was chargeable as extortion).

The FAC alleges that Defendants Dechert, Hughes and Gerrard engaged in acts of extortion, by obtaining a false confession and false testimony from Al Sadeq, which came at the expense of his property, his person, and his liberty.[181] To the extent discovery may reveal how this false testimony has been used directly or indirectly to influence U.S. proceedings, its procurement by the Defendants is also actionable as an obstruction of justice under 18 U.S.C. § 1503.

Defendant Gerrard also pressured Al Sadeq to pay Defendant Dechert's legal fees owed to the firm by RAK.[182] Attorney Black of Defendant Dechert directed the taking of take all possessions from Al Sadeq's office as well as many from his home, such as papers relating to his business, clothing, jewelry belonging to his wife and children, all electronic items.[183] None of the items taken during these searches were ever returned.[184]

Defendant Dechert argues the allegations regarding the detention of Al Sadeq and Quzmar should be ignored because "[t]hese allegations are *entirely disconnected* from Plaintiff and his claims."[185] However, in later arguing that the Plaintiff failed to allege a pattern, Defendant Dechert unequivocally contradicts itself by arguing that "the alleged pressure to elicit false testimony from Al Sadeq was *still part of the same purported scheme*."[186]  This double talk simply reflects a struggle to confront the Plaintiff's legitimate allegations that Dechert engaged in the pattern of related illegal racketeering acts against multiple victims that gives rise to his RICO claims.

>    d)  *The Amended Complaint adequately pleads Money Laundering*

---

[181] FAC ¶¶185, 201, 204.
[182] FAC ¶68.
[183] FAC ¶66.
[184] FAC ¶66.
[185] Dechert Memo at 21 (emphasis added).
[186] Dechert Memo at 31 (emphasis added).

The Money Laundering Control Act ("MLCA") prohibits the use or movement through the United States of proceeds of certain unlawful activity with the intent to promote the unlawful activity. 18 U.S.C. § 1956(a)(2)(A). "The money laundering statute criminalizes behavior that masks the relationship between the individual and his illegally obtained proceeds." *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007); 18 U.S.C. § 1956. This Court has found allegations of defendants' payments to other defendants in exchange for and promoting illegal fraudulent activity to be sufficient to establish a MLCA violation as predicate act for a RICO claim against those defendants on a motion to dismiss. *Dooley*, 803 F. Supp. at 441.

As alleged, the Defendants engaged in repeated acts of money laundering in furtherance of and to promote the unlawful objectives and activities of the enterprise.[187] Members of the enterprise knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to themselves and other co-conspirators to promote unlawful activity including, 413 specific transactions described in Exhibit A, which was attached to the FAC and incorporated by reference.[188] The value of the transactions total in aggregate $29,266,723.75.[189]

Of the 413 listed transactions:

- 91 transactions totaling $3,841,642.05 were payments by RAK to Defendant KARV to promote unlawful enterprise activities related to Azima and others,
- 68 transactions totaling $9,363,334 were payments by entities owned by Stuart Page to Defendant Forlit's U.S. entities Insight and SDC-Gadot for hacking, sham litigation, coverup, and related services to promote unlawful enterprise activities, and
- 56 transactions totaling $1,224,141.39 were payments by Defendant Vital from Defendant Del Rosso's U.S. bank account (PNC Bank) to co-conspirators Cyber Defense and Analytics or CyberRoot for hacking, sham litigation, coverup, and related services to promote unlawful Enterprise activities.[190]

---

[187] FAC ¶188.
[188] FAC ¶188.
[189] FAC Ex. A.
[190] FAC Ex. A.

These money laundering transactions were in furtherance of the scheme to defraud and deplatform the perceived threats to the Defendants, the enterprise and their client, Sheikh Saud.[191] This scheme was intended to, and in fact did, cause cognizable damage to Solomon.[192]

Defendant Dechert argues that Plaintiff did not plead the elements of money laundering because the Complaint does not implicate Dechert in the transfer of proceeds of unlawful,[193] though the FAC alleges "Defendants Vital and Del Rosso were engaged and paid more than $1 million by Defendant Dechert in concert with RAKIA, directly or indirectly, for their work."[194]

### 3.  The FAC sufficiently pleads a pattern of racketeering activity

This Court adopts a "liberal interpretation of the pattern requirement**.**" *Bergen*, 648 F. Supp. at 591.  In analyzing the pattern elements, "the D.C. Circuit 'continues to endorse a case-by-case, fact-specific approach' that is 'fluid, flexible, and commonsensical, rather than rigid or formulaic.'" *Lu*, 45 F. Supp. 3d at 97. The element is satisfied if "[c]ommon sense dictates that the claim alleged . . .  is far from an ordinary business dispute." *Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials Corp.*, 887 F. Supp. 2d 9, 23 (D.D.C. 2012).

"Under RICO, a 'pattern' requires at least two or more acts of racketeering activity occurring within a ten-year period."  *Lu*, 45 F. Supp. 3d at 96; *Bergen*, 648 F. Supp. at 590; 18 U.S.C. § 1961(5), 1962(c). "Further, these acts must be related and must 'amount to or pose a threat of continued criminal activity.'"  *Companhia Brasileira Carbureto de Calcio-CBCC*, 887 F. Supp. 2d at 22 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)). As the Plaintiff claims both RICO and conspiracy offenses, he is also only

---

[191] FAC ¶194.
[192] FAC ¶194.
[193] Dechert Brief at 25.
[194] FAC ¶81.

required to allege one overt act in furtherance of the conspiracy for each Defendant. *Federal Information Systems, Corp.*, 753 F. Supp. at 976. However, as shown above, the FAC pleads more.

The Defendants effectively only challenge the continuity element of the pattern requirement, labeling what the Plaintiff alleges as constituting a "single scheme."[195]  While the Del Rosso Defendants challenge the Plaintiff's allegations of relatedness as insufficient, they "rely on the discussion by Dechert" to do so even though Dechert itself did not challenge relatedness.[196] "Continuity" in the RICO pattern context refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995) (*quoting H.J. Inc.*, 492 U.S. at 241). It is not necessary to prove that the alleged conduct remains ongoing, where the court finds that plaintiffs present evidence sufficient to support a claim of closed-ended continuity. *Lu*, 45 F. Supp. 3d at 97–98. In determining whether or not a closed-period pattern is established, courts consider several factors: "[T]he number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number

---

[195] Dechert Memo at 29-31; KARV Memo at 18-20; Gerrard Memo at 30-32; SDC Memo at 25-28.

[196] Del Rosso Memo at 31. The relatedness requirement is not a cumbersome one for a RICO plaintiff. *Lu*, 45 F. Supp. 3d at 97 (internal quotations omitted). As long as the predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events, this element is satisfied. *Lu*, 45 F. Supp. 3d at 97 (internal quotations omitted). "These criteria, moreover, have been generously construed. *Id.* The factors "d[o] not establish a rigid test," and should be used as a "flexible guide for analyzing RICO allegations on a case-by-case basis." *Feld Entertainment Inc.*, 873 F. Supp. 2d at 311 (citing *Western Associates Ltd. Partnership, ex rel. Ave. Associates Ltd. Partnership*, 235 F.3d at 634). In the case, *United States v. Benny*, the Northern District of California analyzed a series of hypotheticals to illustrate the logic of the relatedness requirement. *Benny*, 559 F. Supp. at 270.
- Relatedness requirement not met – "Hypo A: Jones murders his wife in New York, robs a bank in Kentucky, and sells one ounce of marijuana in Florida."
- Relatedness requirement satisfied – "Hypo B: Jones devises a plan to take control of a shopping center. Acting alone, he extorts money from three shopowners, murders a fourth shopowner and burns down a fifth shopowner's store. In addition, Jones rents an office from which he operates a security service and begins to operate several of the stores he has taken over."

of perpetrators, and the character of the unlawful activity." *Edmondson & Gallagher*, 48 F.3d at 1265.

As discussed above, the FAC pleads the following predicate violations and volume:

- At least five different acts of wire fraud, reflected by at least five individuals who, at the direction of and as compensated by the Defendants, lured Azima into providing access to his accounts through fraudulent phishing emails;
- At least ten additional acts of wire and/or mail fraud, from the Defendants' fraudulent, manipulated presentations of the communications that were illegally obtained, including the transmissions to the Bit Torrent site, the Wall Street Journal, Plaintiff Solomon's employer, the Associated Press Reporter and pay-to-play publications, which the Defendants intended to silence and deplatform Solomon, and in fact resulted in Solomon's termination and unemployability as a journalist;
- 586 additional acts of wire fraud committed by the Defendants, as specified on Exhibits A and B to the Amended Complaint
- Seven identified sworn legal filings/discovery documents served or produced by the Defendants in US and UK litigation containing material falsities that were known and expressly designed by the Defendants, with the intended purpose and resulting effect of covering up the enterprise's illegal acts by obstructing justice in proceedings before this Court and other courts;[197]
- Four witnesses, including Defendant Gerrard, knowingly delivering perjurious testimony in UK court, as coordinated by the Defendants with the intended purpose and resulting effect of covering up the enterprise's illegal acts by obstructing justice in UK and US proceedings;
- Spoliation of evidence on at least nine cell phones and one laptop computer that was relevant to an ongoing proceeding at the time of destruction, as coordinated by the Defendants with the intended purpose and resulting effect of covering up the enterprise's illegal acts by obstructing justice in UK and US proceedings;
- Kidnapping and extortion of two former RAKIA executives by Defendants Dechert, Gerrard, Hughes and others; and
- 413 acts of money laundering committed by the Defendants, as specified on Exhibit A to the Amended Complaint.

This likely does not reflect the totality of the Defendants' known, unknown and unknowable acts that qualify as racketeering activity, but they satisfy the RICO statute's

---

[197] Courts have found that "activities designed to prevent detection and prosecution of the organization's illegal activities [to be] part of a consistent pattern," for the purpose of RICO pattern analysis. See e.g., *United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991).

requirement.   As reflected by the chart below, the acts were carried out as a close-ended enterprise

with an extended timeline, common goals, consistent participants, and a number of victims[198]

| Act | Timing | Purposes | Participants | Victims |
|---|---|---|---|---|
| Wire Fraud - Gaining access to Azima's accounts | 2015-2016 | Use of materials in litigation against Azima as perceived threat to RAK, enterprise | All Defendants | Azima, Solomon, Massaad |
| Wire Fraud – Dissemination of manipulated, stolen communications | 2016-2020 | Deplatforming of Jay Solomon, as perceived threat to RAK, enterprise | All Defendants | Azima, Solomon, Massaad |
| Wire Fraud – Acts described in Exhibits A and B | 2014-2022 | Misc. | All Defendants | Azima, Solomon |
| Obstruction of Justice/Wire Fraud – false filings/productions in US and UK litigation proceedings | 2017-2020 | Concealing the illegal activities of the enterprise | All Defendants | Azima, Solomon |
| Obstruction of Justice – spoliation of evidence | 2014-2020 | Concealing the illegal activities of the enterprise | Dechert, Gerrard, Hughes | Azima, Solomon |
| Kidnapping and Extortion | 2014-2016 | Manufacturing evidence for use in litigation against Azima, as perceived threat to RAK | Dechert, Gerrard, Hughes | Azima, Al Sadeq, Quzmar, Massaad |
| Money Laundering | 2014-2022 | Financing the illegal activities of the enterprise | All Defendants | Azima, Solomon |

Defendants' arguments that the FAC merely pleads a single scheme targeted at Azima and

indirectly harming Plaintiff are nonsensical.[199]   While in fact multiple acts in furtherance of the

same scheme *can* constitute a pattern, that is clearly not the case here. *United States v. Daidone*,

471 F.3d 371, 374–75 (2d Cir. 2006). There is a diverse array of illegal acts that the Defendants

perform, and on top of that they perform each of those acts several times over.  The Defendants

---

[198] FAC ¶¶32, 36.
[199] Dechert Memo at 30-31; Gerrard Memo at 31-32; KARV Memo at 20; Del Rosso Memo at 30.

struggle with this dynamic, needing to argue simultaneously that the acts alleged are both too connected[200] and too disconnected[201] to support a RICO claim.[202]

Defendants Del Rosso and Vital argue that "RICO is not 'aimed at the isolated offender,' RICO targets 'those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes.'"[203]   That is not the case here,[204] and moreover the FAC also notes that many of the Defendants came to the enterprise with a history of unsavory conduct: Defendants Dechert and Gerrard were engaged by RAK, who has since distanced itself from their conduct, fresh off an engagement with ENRC, which successfully sued the law firm and its partner for reckless conduct against the client's interests;[205] Defendant Handjani is alleged to have a close relationship with the Iranian regime and was a close advisor to Sheikh Saud when he attempted to sell a hotel to Iran through a money laundering racket.[206]

### 4. The FAC establishes that the enterprise's pattern of RICO predicate act violations proximately caused Plaintiff's injury

The Defendants argue that the FAC does not allege an injury proximately caused by the enterprise's RICO violations.[207]   They are again wrong.   At the pleading stage, "nothing more is needed to confer standing" on a plaintiff than "general factual allegations of injury result from the defendant's conduct." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256, 114 S. Ct. 798,

---

[200] Dechert Memo at 31 ("the alleged pressure to elicit false testimony from Al Sadeq was *still part of the same purported scheme*.") (emphasis added)

[201] Dechert Memo at 21 (the allegations regarding the detention of Al Sadeq and Quzmar should be ignored because "[t]hese allegations are *entirely disconnected* from Plaintiff and his claims.") (emphasis added)

[202] See also Del Rosso Memo at 23 n.5

[203] Del Rosso Memo at 30 (quoting *Lu*, 45 F. Supp. 3d at 98).

[204] *Daidone*, 471 F.3d at 374–75.

[205] From 2011-2013, Defendants Dechert and Gerrard served as counsel leading an internal investigation for the Eurasian Natural Resources Corporation ("ENRC"), in which they were recently found by a UK court to have committed reckless and negligent breaches of duty by engaging in activities against the client's interests.  FAC ¶35. It is plausible if not probable, that discovery will reveal more evidence about the depths of illegal conduct involved in ENRC matter, including whether other named Defendants in this case were involved and whether the wrongful conduct of the Defendants involved in that case amounted to racketeering activity.

[206] FAC ¶¶52, 58.

[207] Dechert Memo at 33; KARV Memo at 22; Gerrard Memo at 32; Del Rosso Memo at 44

127 L. Ed. 2d 99 (1994) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).  In the District of Columbia, the proximate cause inquiry contains two similar but distinct elements: (a) that the defendants conduct was a 'substantial factor' in the sequence of events that led to the plaintiff's injuries; and (b) that the injuries were reasonably foreseeable as a natural consequence of the defendants' conduct. *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 85 (D.D.C. 2018).

In this matter, proximate causation is clear because Solomon's damages were brought about by the relentless efforts of the Defendants and were exactly what the Defendants intended and worked towards. Upon discovering Azima and Solomon's relationship, Defendants Dechert and Gerrard "immediately" instructed other Defendants to locate documents mentioning Solomon from the batch of communications that the Defendants fraudulently obtained from Azima, and "within weeks," an encrypted folder containing communications between Solomon and Azima was posted on the internet.[208] The Defendants decrypted the folder, and created the dossier of communications, which were fraudulently presented to convey a false narrative implicating Solomon in purported improper, unethical and/or fraudulent activities in which he did not engage.[209] The Defendants purposefully disclosed this dossier first to Solomon's employer, the *Wall Street Journal*'s Washington DC bureau, and then to other media outlets in an attempt to exert pressure on the employer to fire him.[210]

As an intended result of the Defendants' actions, Solomon was discredited and ultimately fired by the *Wall Street Journal*, thereby advancing the goals and objectives of the enterprise, which were to neutralize the threats against RAK and the enterprise and cover up the enterprise's

---

[208] FAC ¶38.
[209] FAC ¶¶38, 206.
[210] FAC ¶¶38, 101-108, 199.

illegal activities.[211]   After Solomon lost his job, the enterprise continued to cause him harm, by using the fraudulently obtained and fraudulently presented communications to news articles published that portrayed Solomon in a negative light, as to ensure his reputation would remain soiled, thereby prevent him from restoring his credibility, obtaining comparable employment and exercising the influence he had prior to being targeted by the enterprise.[212]   The Defendants also continued to engage in conduct to conceal their activities, which caused Solomon to be unable to take legal steps to restore his reputation.[213]

The Defendants claim that they are somehow absolved, because their alleged fraudulent statements were directed towards Azima, the *Wall Street Journal* (as Solomon's employer) and other media outlets, characterizing the *Wall Street Journal*'s decision to terminate the Plaintiff as some independent decision based on its discovery of truthful information,[214] knowing this only occurred as an intended result of their relentless acts to generate pressure for this very outcome.[215]

But the law logically recognizes that the technicality of who was targeted by the fraud is utterly irrelevant.   "[T]here is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it."  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008).  "[T]he plaintiff's loss must be a foreseeable result of someone's reliance on the misrepresentation."  *Bridge*, 553 U.S. at 656. This Court has found "meritless" assertions by defendants "that they did not cause any injury to Plaintiffs" by pointing instead to the role played by third party actors as the cause, where those

---

[211] FAC ¶¶15, 38, 42, 101-108, 187, 199, 206.
[212] FAC ¶¶15, 17, 42, 46, 77, 110-115.
[213] FAC ¶¶16, 39, 146-149, 195.
[214] Dechert Memo at 34; KARV Memo at 23; Gerrard Memo at 33
[215] FAC ¶¶17, 114

relevant actions by the third party are alleged to have resulted from the defendants' influence or conduct. *Companhia Brasileira Carbureto de Calcio-CBCC*, 887 F. Supp. 2d at 22.

"A scheme that injures D by making false statements through the mail to E is mail fraud, and actionable by D through RICO, if the injury is not derivative of someone else's." *Feld Entertainment Inc.*, 873 F. Supp. 2d at 312 (quoting *Bridge*, 553 U.S. at 645). Plaintiff need not prove direct reliance on defendant's fraudulent predicate act "when the plaintiff can demonstrate injury as a direct and contemporaneous result of fraud committed against a third party". *Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 223 (5th Cir. 2003). RICO does not require that "only injuries suffered by the immediate victim of a predicate act" may satisfy proximate cause, particularly when the injuries suffered by others are not "derivative of any losses suffered by" the immediate victims. *Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263 (4th Cir. 1994). This Court, after discovery, will be in a better position to consider "such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 264 (4th Cir. 1994).

Defendants try to create an artificial requirement for establishing proximate cause that the plaintiff must be the "intended target" of the RICO offense, citing *Meng v. Schwartz*.[216] 116 F. Supp. 2d 92, 96 (D.D.C. 2000). Hardly a case of broad application, and certainly not one that is relevant to the case at bar, *Meng* deals with a suit against a publicly traded company brought by its shareholders, based on an alleged scandal in which the company was believed to have been embroiled that included an alleged bribe by its CEO, the exposure of which presumable resulted in a drop in the company's share price. *Meng*, 116 F. Supp. 2d at 96. Citing a Second Circuit

---

[216] Dechert Memo at 33; Gerrard Memo at 33; Del Rosso Memo at 44

opinion regarding another shareholder action stemming from alleged illegal dealings by a CEO, which backfired, resulting in a drop in share price, the *Meng* court noted that the shareholders were not the "intended target" of the alleged enterprise, but rather the "intended [] benefi[ciaries]" of the alleged RICO violations. *Meng*, 116 F. Supp. 2d at 96 (quoting *In re Am. Exp. Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994)). "Thus, this Court agrees with the Second Circuit that, *in RICO cases such as this one*, a scandal severs the chain of legal causation." *Meng*, 116 F. Supp. 2d at 97 (emphasis added) ("this Court's decision is also well-grounded in social policy. Denying a RICO claim in this case would not shield the alleged wrongdoers from liability, nor would it prevent the shareholders from seeking other remedies. In both instances, a properly plead derivative action would provide both a penalty for the malfeasant and a remedy for the shareholders"). Another case the Defendants cite for the same proposition, *Weaver v. Bratt*, similarly turns on the fact that the plaintiff in that case stood to benefit from the alleged RICO violations. [217] *Weaver v. Bratt*, 421 F. Supp. 2d 25, 37 (D.D.C. 2006).

In the *Kelly v. United States* case that the Defendants cite for the proposition that there is no fraud "when the loss to the victim is only an incidental byproduct of the scheme", the Supreme Court shares an illustrative hypothetical that is indeed informative as to what is meant by "incidental byproduct." *Kelly v. United States*, 206 L. Ed. 2d 882, 140 S. Ct. 1565, 1573 n2 (2020). [218] "A e-mails B an invitation to a surprise party for their mutual friend C. B drives his car to the place named in the invitation, thus expending the cost of gasoline. But there is no party; the address is a vacant lot; B is the butt of a joke. Wire fraud? No. The victim's loss must be an objective of the deceitful scheme rather than a byproduct of it." *Id.* (citing *United States v. Walters*, 997 F.2d 1219, 1224 (7th Cir. 1993)). By contrast, the FAC, as set forth above alleges a

---

[217] Dechert Memo at 33; Gerrard Memo at 33; Del Rosso Memo at 44
[218] Dechert Memo at 33; Gerrard Memo at 33; KARV Memo at 25; Del Rosso Memo at 26

straightforward narrative of how the Defendants purposefully and proximately caused the Plaintiffs injuries, which are unique to him and not an incidental byproduct of anything done to or by anyone else.[219]

Lastly, the Defendants try to pin the Plaintiff's damages on the Plaintiff himself, introducing and asking the Court to take judicial notice of an article he published in 2018,[220] as he desperately sought to restore his reputation (which at the time unbeknownst to him, had been wrongly and maliciously destroyed by the Defendants) by trying to show remorse for any and all ways that he thought in hindsight he could have acted differently.  The Court should refuse to take judicial notice of this article, which was not referenced in or incorporated by the FAC, or adopt the Defendants' self-serving interpretation of it, as it needs to be understood in the context of the moment in which it was published, which can reasonably be achieved through discovery.

5.   Plaintiff alleged RICO Damages

The FAC makes perfectly clear that the Defendants engaged in a brutal campaign of wire and/or mail fraud, sending the fraudulently presented dossier of communications first to Plaintiffs employer – and when that did not work, next to the press, as to exert pressure on the employer to terminate Solomon, and all in the context of the Defendants' larger purpose, which was *to silence and deplatform Solomon*.[221] Demonstrating their ruthlessness, even after the Defendants succeed in deplatforming Solomon at the *Wall Street Journal* through their campaign of wire and/or mail fraud, they committed further acts of wire fraud by publishing articles geared towards keeping his reputation damaged.[222]

---

[219] FAC ¶¶38, 187.
[220] Dechert Memo at 1, n.1; KARV Memo at 26; Gerrard Memo at 5, n.1
[221] FAC at ¶¶24, 40, 108, 110, 182, 186, 189, 191-194, 263.
[222] FAC at ¶¶110-112

As alleged, the Plaintiff Solomon's job and reputation as a reporter, which he lost as a proximate result of the Defendants' pattern of racketeering as an enterprise, was integral to his ability to earn, his book publishing business and his identity, and the loss of his job and the tarnishing of his reputation has already caused him serious economic loss, and damage to business and property.[223]  Given the competitiveness of the journalism space and the high demand for his position, it is unlikely that Solomon will ever be able to land a similar post.[224]

Around the time he was fired, Solomon had just published his first book, *The Iran Wars*, for which he was given a $270,000 advance, and he was working with his agents to sell another one.[225] He was being positioned like many other major newspaper journalists to regularly publish books on global events and international affairs.[226]

But this opportunity disappeared after his firing.[227] His agents advised Solomon that he had been blacklisted by the publishing industry due to the negative press that was wrongfully sabotaging his reputation.[228] Just last year, Solomon wrote a book proposal about the Confederate Secretary of State, Judah P. Benjamin, which his agent could not sell, because he had been advised by publishers that they could no longer market Solomon given what had been reported about him on a continued basis, including by International Policy Digest through at least March 4, 2020.[229]

Moreover, Solomon was beginning to give regular speeches on international affairs in 2017 and appearing at major conferences.[230]  In 2018, Solomon signed with a speakers' bureau and was initially advised by the bureau that he could expect his speeches to income of approximately

---

[223] FAC ¶¶46, 206.
[224] FAC ¶206.
[225] FAC ¶113.
[226] FAC ¶113.
[227] FAC ¶114.
[228] FAC ¶114.
[229] FAC ¶114.
[230] FAC ¶115.

$50,000 a year which could last as long as two decades.[231] However, due to the Defendants' hack and smear campaign the opportunities and interest in Solomon's speeches did not materialize, thereby causing additional injuries.[232] Plaintiff also alleges concrete money damages in the form of attorney's fees.[233]

The Defendants argue that the FAC fails to allege the type of injury that is cognizable under RICO.  They argue that the Plaintiff's termination by his employer was some sort of significant intervening that somehow absolves them of their intentional efforts to fraudulently pursue that exact result.[234]  This is simply at odds with the law.

The Supreme Court has specifically rejected any requirement that RICO plaintiffs need plead any special racketeering or competitive injury beyond that injury resulting from the predicate acts.  *Bergen*, 648 F. Supp. 582 (citing *Sedima, S.P.R.L.*, 105 S. Ct. at 3285. "If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)." *Sedima, S.P.R.L.*, 473 U.S. at 495.  "[T]he statute requires no more than this. Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern."  *Sedima, S.P.R.L.*, 473 U.S. at 495; *see also Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 231 (E.D.N.Y. 1999) ("RICO is [] intended to remedy the range of economic costs of racketeering, including those economic costs racketeers inflict when they choose to achieve their aims . . . by fraud calculated to injure the person.")

---

[231] FAC ¶115.
[232] FAC ¶115.
[233] FAC ¶¶10, 208.
[234] SDC Memo at 30; Dechert Memo at 36; Gerrard Memo at 35

Next, Defendants broadly assert that "a RICO plaintiff is not entitled to recover for personal or emotional injuries,"[235] but the law in this area is not so clear. *Hargraves*, 140 F. Supp. 2d at 26. There is significant dispute as to the scope of compensable business or property injury. *Id.* For example, it may be possible for pecuniary losses associated with personal injury to be sufficiently related to "property" injury so as to permit recovery. *Id.*; *see also Nat'l Asbes.  National Asbestos Workers Medical Fund*, 74 F. Supp. 2d at 228 (finding injuries resulting from tobacco related illnesses compensable); *Guerrero v. Gates*, 110 F. Supp. 2d 1287, 1291–92 (C.D. Cal. 2000) (finding that pecuniary losses stemming from personal injuries are compensable under RICO); *Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997) (attorneys' fees incurred in objecting to fraudulent claims, if proven at trial, can qualify as an injury to business or property that was proximately caused by a predicate act of racketeering); *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 382 (S.D.N.Y. 2002) (legal fees).

In support of its argument that the Plaintiff's injuries do not qualify as being to "business or property", Defendants Del Rosso and Vital cite a pair of decision over custody disputes in which fathers sued, *inter alia,* their ex-wife for damaging the fathers' relationships with their children. *McMurtry v. Brasfield*, 654 F. Supp. 1222, 1224–25 (E.D. Va. 1987) (relocating across the county);[236] *Reynolds v. Condon*, 908 F. Supp. 1494, 1518 (N.D. Iowa 1995) (termination of parental rights).[237] The *McMurtry* court narrowly proclaimed this injury to be "clearly personal in nature" beyond the scope of RICO's redress for injury to "business or property." *McMurtry*, 654 F. Supp. at 1224–25. The *Reynolds* court actually distinguished the loss of parental rights from

---

[235] Dechert Memo at 36; KARV Memo at 24; Gerrard Memo at 36; SDC Memo at 30
[236] Del Rosso Memo at 42-43. The Del Rosso Defendants' reliance on the dicta in *Sedima, S.P.R.L.*, 473 U.S. 479 is equally unavailing, as the Supreme Court in that case ruled favorably to the RICO plaintiff overruling lower court decisions that the injury "must be somehow different in kind from the direct injury resulting from the predicate acts of racketeering activity." *Sedima, S.P.R.L.*, 473 U.S. at 484.
[237] Del Rosso Memo at 43; Gerrard Memo at 36; Dechert Memo at 37

loss of income, indicating that the latter may suffice as RICO injury to property. *Reynolds v. Condon*, 908 F. Supp. 1494, 1518 (N.D. Iowa 1995) ("plaintiff's assertions at oral arguments of loss of income as the result of his incarceration and potential harm to his business or employment opportunities because of his incarceration might also suffice to state a RICO injury").

This Court has recognized employment as a property interest. *Federal Information Systems, Corp.*, 753 F. Supp. at 976. Also "[m]oney, the Supreme Court has recognized . . ., is a form of property." *National Asbestos Workers Medical Fund*, 74 F. Supp. 2d 221 (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979)). "Victims of racketeering who have been deprived of their monetary resources as a direct result of racketeers' predicate acts should, under the most natural interpretation of the phrase "business or property," recover their pecuniary losses." *Id.*

Contrary to the Defendants assertions to the contrary,[238] this includes potential income lost as a result of a victim's employment being terminated. Some cases have recognized this in the context of a personal injury claim. *Hunt*, 626 F. Supp. at 1100–1101 (victim allowed to seek lost wages under RICO due to willful acts of discrimination and harassment which "forced her out of her job as a carpenter and disabled her from pursuing such work in the future");[239] *Rice v. Janovich*, 109 Wash. 2d 48, 742 P.2d 1230, 1237–38 (1987) (assault victim, who was a night watchman and janitor, allowed to seek lost wages under RICO).

Other courts have allowed recovery for lost wages outside the "personal injury" context. *See, e.g., Snead v. Hygrade Food Prod. Assocs.*, No. CIV. A. 98-2657, 1998 WL 910223, at *3

---

[238] Gerrard Memo at 35; Dechert Memo at 36; Del Rosso Memo at 43.

[239] In interpreting the scope of the "business or property" language of § 1964(c), it is appropriate to consider those decisions which have interpreted identical language from Section 4 of the Clayton Act, 15 U.S.C. § 15, since the Clayton Act served as the model for § 1964(c). In the antitrust context, federal courts have frequently concluded that "the loss of employment constitutes an injury to one's business or property." *Hunt v. Weatherbee*, 626 F. Supp. 1097, 1100–01 (D. Mass. 1986).

(E.D. Pa. Dec. 28, 1998) (claims for economic damages resulting from loss of employment allowed under RICO); *Rodonich v. House Wreckers Union, Loc. 95 of Laborers' Int'l Union of N. Am.*, 627 F. Supp. 176, 180 (S.D.N.Y. 1985) (lost wages claim allowed under RICO**)**; *Callan v. State Chem. Mfg. Co.*, 584 F. Supp. 619, 623 (E.D. Pa. 1984) (claim for lost income from plaintiffs' discharge allowed under RICO)

In *National Organization for Women, Inc*, where the plaintiff alleged that the defendant threatened an employee with "reprisals if she refused to quit her job at the clinic", the Supreme Court determined that "Nothing more is needed to confer standing on [the plaintiff] at the pleading stage." 510 U.S. at 256. In analyzing this case, the Eastern District of New York has found "no principled basis for allowing the business to recoup these costs while denying that same right to the injured employees, who also have sustained real pecuniary losses and therefore have been "injured in their property."" *National Asbestos Workers Medical Fund*, 74 F. Supp. 2d at 232.

In claiming that employment loss does not qualify as a cognizable RICO injury, Defendants cite to *Reynolds v. Condon*,[240] which quite to the contrary states that "plaintiff's assertions at oral arguments of *loss of income* as the result of his incarceration *and potential harm to his* business or *employment opportunities* because of his incarceration *might also suffice to state a RICO injury*". *Reynolds*, 908 F. Supp. At 1519 (emphasis added).

Other Defendants rely on a number of inapplicable cases which hold that a plaintiff may not sue under RICO where the plaintiff has been terminated for "blowing the whistle" on an employer's racketeering or for the plaintiff's failure to cooperate with that racketeering. *See e.g. Beck v. Prupis*, 529 U.S. 494, 505, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000);[241] *Dunleavy v.*

---

[240] Del Rosso Memo at 43; Gerrard Memo at 36; Dechert Memo at 37
[241] KARV Memo at 11,44; SDC Memo at 18; Gerrard Memo at 23; Del Rosso Memo at 25-26;

*Wayne Cnty. Comm'n*, No. 04-CV-74670-DT, 2006 WL 8431836, at *2 (E.D. Mich. May 11, 2006)[242].

As with the defendants in *Mruz v. Caring*, Inc., a case cited by Defendants Gerrard, Del Rosso and Vital,[243] the Defendants here do not embrace the substantial authority which distinguishes those cases from the situations where plaintiffs alleged that the conduct . . . which ultimately culminated in the discharge, is *itself* racketeering activity." *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 712 (D.N.J. 1998).  Another such case, *Anderson v. Ayling,* which is cited by Defendants Dechert and Gerrard,[244] turned on the presence of a "long chain of intervening causes" that simply is not present in the FAC. 396 F.3d 265, 270 (3d Cir. 2005).  In *Anderson*, the court notes that the decision maker did not rely on the defendant's statements, noting that one defendant's statement did not mention the plaintiffs at all, but rather that a non-party used the statements "as but one source" for a report that was relied on "in part" in imposing a "proper" emergency trusteeship. *Id.* at 270.  Importantly, the 3rd Circuit in dismissing affirm the lower court's dismissal, distinguished the *Anderson* case from those like the present, in which "a predicate act of racketeering . . .  directly caused a plaintiff to lose his job," which it said "could create civil RICO standing"). *Id.* at 269–270.

Finally, the Defendants wrongly claim that reputational damage does not qualify as a cognizable RICO harm.[245] This Court has found that where plaintiffs alleged that their business reputation and goodwill have been tarnished by release of information gained through illegal means; and that a potential contract was frustrated by the defendants, it can be inferred that the potential contract would have been advantageous and such allegations do amount to sufficient

---

[242] Del Rosso Memo at 43; Gerrard Memo at 36;
[243] Del Rosso Memo at 43; Gerrard Memo at 36
[244] Dechert Memo at 36; Gerrard Memo at 35
[245] Dechert Memo at 37; KARV Memo at 24; Gerrard Memo at 36; SDC Memo at 30; Del Rosso Memo at 43

harm to plaintiffs to give them standing to bring a civil RICO action. *Federal Information Systems, Corp.*, 753 F. Supp. at 977.  Losses to business or property caused by reputational attacks are recoverable provided they are not "general, forward looking, [or] speculative." *Reich v. Lopez*, 38 F. Supp. 3d 436, 449–51 (S.D.N.Y. 2014).

Courts "have persuasively concluded that reputational harm resulting in the loss of business opportunities is a cognizable RICO injury if the pecuniary losses from the missed opportunities are quantifiable and non-speculative." *Nygård v. Nygard v. Bacon*, No. 19 CIV. 1559 (LGS), 2021 WL 3721347, at *5 (S.D.N.Y. Aug. 20, 2021) (citing *Yien-Koo King v. Wang*, No. 14-CV-7694 (LJL), 2020 WL 6875403, at *25 (S.D.N.Y. Nov. 23, 2020)). In fact, one of the very cases that Defendants Del Rosso and Vital cite recognize that damage to professional reputation *is* compensable under RICO to the extent it can be quantified by the plaintiff. [246]  *Bakala v. Krupa*, No. 9:18-CV-2590-DCN-MGB, 2021 WL 3508585, at *6 (D.S.C. Aug. 10, 2021).

The KARV Defendants cite *Byrne v. Clinton*, for their erroneous proposition that "allegations of damage to [] reputation . . .  are not cognizable under RICO.  410 F. Supp. 3d 109, 117 n.6 (D.D.C. 2019), aff'd sub nom. *Byrne v. Brock*, 19-7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020).[247]  In the *Byrne* decision, this Court merely found that allegations of reputational harm were not adequately pled, noting "the Amended Complaint lacks any information plausibly alleging that Byrne did, in fact, suffer an injury to his reputation . . . [n]or is there any information as to how Byrne knows he is on a 'blacklist,'" *Id.* at 118.

By contrast, the FAC is replete with specific factual allegations as to how Solomon's reputation and voice were effective "canceled" by the Defendants campaign of wire and/or mail

---

[246] Del Rosso Memo at 42
[247] KARV Memo at 24

fraud that was designed and in fact succeeded in deplatforming and silencing him.[248] The series of press articles that were published by the enterprise, drawing from the same fraudulently obtained, fraudulently presented communications, similarly caused, continued and compounded significant damage to Solomon's economic opportunities, business interests, property interests and reputation from which he continues to suffer.[249] Solomon cannot replicate these opportunities in quantity and magnitude, even through other employment.[250] The continued manufactured press assault against Solomon's character interfered directly with concrete book publishing opportunities, speaking engagements and the significant income they would have generated.[251]

Lastly, the cases of speculative publishing claims, to which Defendants cite were of persons lacking in any relevant credentials either endeavoring to exploit or claiming they were exploited by politicians, are distinguishable from this case. See e.g.   *Browning v. Clinton*, 292 F.3d 235, 249 (D.C. Cir. 2002) (a Presidential mistress suing for acts taken to stop her from publishing about their affair); *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 514 (D.D.C. 2021) (an anti-vaccination organization suing a member of Congress from taking measures to stopping the spread of propaganda deemed harmful to public health).

By contrast, Solomon was a well-respected, award-winning journalist for America's largest newspaper by paid circulation, who was at the time of the attack nominated for Pulitzer and successfully selling what was to be his first of many books in his specialized field of experience.[252] His voice, his platform, his ability to publish and deliver information – that was his business – his words present and future, were his property.[253]   The moment, Azima, then one of the enterprise's

---

[248] FAC at ⁋⁋99,101-115.
[249] FAC ¶¶111-112, 207.
[250] FAC ¶207.
[251] FAC ¶¶113-115.
[252] FAC at ⁋⁋11, 104.
[253] See e.g., FAC at ⁋⁋17, 46, 110; *Trump v. O'Brien*, 403 N.J. Super. 281, 293–294, 958 A.2d 85, 93 (App. Div. 2008) ("professional journalist . . . defined as one who, for gain or livelihood, is engaged in gathering, preparing or editing

primary targets mentioned his name to Gerrard, the lawyers of Dechert saw an opportunity for their racketeering enterprise, proposing to their paranoid client of abundant wealth a new fee generating matter, which entailed a relentless assault of mail and/or wire fraud on this newly identified "threat", using materials that were obtains from prior acts of wire fraud.[254] With Defendants Dechert and Gerrard in the center, the enterprise launched their campaign—not just to seek his termination from his prestigious job, though that was the initial point of emphasis—but to silence and deplatform him, and eventually they succeeded.[255] With that, Solomon lost several legitimate, non-speculative and quantifiable streams of income.[256]

## B.  Plaintiff Adequately Alleges a Claim under the Computer Fraud and Abuse Act

The CFAA penalizes "[w]hoever intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." A "protected computer" is one that "is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(a)(2)(B). Defendants do not, and cannot, contest the availability of conspiracy liability under the CFAA. See § 18 U.S.C. § 1030(b) ("Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section."). Instead, Defendants attempt to dismiss Count II, generally asserting that the allegations of an agreement and common activities are insufficiently specific.  Here, by contrast, Plaintiff has provided numerous factual allegations describing the criminal enterprise, in which the defendants participated and the hacking scheme. As noted above, the FAC contains detailed allegations of the Defendants' participation in

---

of news for a newspaper, magazine, news agency, press association or wire service. . . We regard an author who obtains news in confidence for dissemination to the public through the medium of a published book as fitting within this definitional phrase").

[254] FAC at ¶¶32, 36, 48-51, 53, 59-61, 90, 93, 99, 105, 111.

[255] FAC at ¶¶99, 105, 110-112.

[256] FAC at ¶¶113-115.

cyberhacking of Azima's computer. Beginning in 2016 and continuing thereafter, the Defendants engaged in activities wherein unlawful and unauthorized access to Azima's email accounts was gained by using stolen credentials to access and obtain highly sensitive documents. The purpose of the hack was to obtain confidential communications and business documents for use in the subsequent media campaign to silence and deplatform the Plaintiff. [257] Defendants were a critical part of this common scheme from its early stages; without their participation, the hacking would have lacked any payoff. The FAC alleges that the Defendants received millions of dollars in payments from RAK in the months leading up to the hacking. The FAC details that the enterprise was part of a group of persons associated together in fact for the common purpose of marginalizing the perceived enemies, including the Plaintiff of Sheikh Saud of RAK. [258]   Over the years, the Defendants expanded the scope and nature of their activities to harm their targets and conceal their illegal activities, including the hacking of computers. [259]   The enterprise, through Defendants Dechert and Gerrard, used Defendants Del Rosso and Vital as their hacking coordinator to target the Plaintiff and others. [260]   In addition, Defendant Gerrard and other members of the enterprise had Defendant Fortlit orchestrate the hacking and theft of emails and then engage in a massive coverup of this conduct.   Defendant Fortlit used his exclusively owned and controlled businesses, Insight and SDC-Global, to receive and transfer millions of dollars to promote the enterprises unlawful hacking activity. [261]   The Defendants orchestrated a quick and concerted media campaign to go after Solomon using these stolen documents to harm Solomon. These specific allegations more than plausibly point to defendants' participation in an agreement to hack computers, in

---

[257] FAC at ¶¶99, 105, 110-112.
[258] FAC ¶182.
[259] FAC ¶12.
[260] FAC ¶184.
[261] FAC ¶¶26-28.

violation of the CFAA. Plaintiff submits that more thorough discovery will provide even more details about the extent of defendants' involvement in the conspiracy.

CFAA is a criminal statute; however, subsection (g) of the statute provides a civil cause of action to "any person who suffers damage or loss by reason of a violation" of the CFAA. 18 U.S.C. § 1030(g). *Lewis-Burke Assocs., LLC v. Widder*, 725 F. Supp. 2d 187, 191 (D.D.C. 2010). It was designed primarily to deter computer hacking. See *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 645 (4th Cir. 2009).   Under the statute, such a person may obtain compensatory damages and injunctive relief or other equitable relief, but only if the conduct leading to the violation of the CFAA involves one of the factors "set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." *Id.* The conduct relevant in this case is set forth in 18 U.S.C. § 1030(c)(4)(A)(i)(I), which states that the CFAA is violated when there is a "loss to 1 or more persons during any 1–year period ... aggregating at least $5,000 in value." Id...; 18 U.S.C. § 1030(c)(4)(A)(i)(I). Under the statute, loss is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11) (Emphasis added). Thus, a "private plaintiff must prove that the defendant violated one of the provisions of § 1030(a)(1)-(7), and that the violation involved one of the factors listed in § 1030(a)(5)(B)." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1131 (9th Cir. 2009).

Plaintiff alleges that Defendants violated subsection (a)(2) of the CFAA, which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] ... information from any protected computer." 18 U.S.C. § 1030(a)(2).  Under the statute, "exceeds authorized access" is defined as "to access a computer with authorization and

71

to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). Further, a "protected computer" means "a computer ... which is used in or affecting interstate or foreign commerce or communication ..." Id. at (e)(2)(B). Therefore, to bring an action successfully under 18 U.S.C. § 1030(g) based on a violation of 18 U.S.C. § 1030(a)(2), plaintiff must show that defendant:

> (1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that he (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate or foreign communication), and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value.

*Lewis-Burke Associates, LLC*, 725 F. Supp. 2d at 191.

Here, Plaintiff alleges that Defendants were not authorized to access Azima's computers by "phishing and spear-phishing emails."[262] Further, the Defendants specifically accessed communications that the Plaintiff sent or received.   The unauthorized access of this computer was done on a computer that did affect interstate and foreign commerce. Through these actions Tthe Defendants intentionally accessed a computer system without authorization and exceeded their authority to obtain information from a protected computer.

Plaintiff further alleges that he has suffered damages and loss a result of Defendants' actions.  Plaintiff alleges "the damages caused by the Defendants' unauthorized access of Azima's computer far exceeds $5,000 in value."[263]

The Defendants argue that Plaintiff's CFAA claims should be dismissed because the damage does not allege technological harms.[264] Loss is defined in the CFAA as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment,

---

[262] FAC ¶85.
[263] FAC ¶214.
[264] Dechert Memo at 39, Gerrard Memo at 38, KARV Memo at 28, SDC Memo at 32-33.

and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11) *Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, 622 F. Supp. 2d 1357, 1370 (S.D. Fla. 2009).   There are many examples of where courts have found damage as reasonable costs to a victim.   *See e.g. Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1196–97 (E.D. Wash. 2003) (CFAA case in which the court looked to the history of the Act and concluded that it could be applied to prevent a former employee from using wrongfully acquired trade secret information in order to compete with former employer); *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577 (1st Cir. 2001) (former employee's use of a "scraper program" to copy otherwise public information on the former employer's website likely exceeded the authorized access in violation of the CFAA); *George S. May Int'l Co. v. Hostetler*, No. 04 C 1606, 2004 WL 1197395 (N.D. Ill. May 28, 2004) (Kocoras, J.) (CFAA claim was properly stated where a former consultant accessed copyrighted materials while still an employee of the consulting firm to be used for his personal benefit); *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521, 525 (S.D.N.Y. 2004) (Cause of action under the CFAA was adequately plead where plaintiff alleged the integrity of their copyrighted data system was impaired by defendant's copying it); and *Book Wholesalers, Inc. v. Rooth*, No. 04 CV 2428 DMS (Southern District of California court found a CFAA cause of action after a former employee downloaded the former employer's database onto her personal computer).

Therefore, as is the case here, unauthorized access can be damage.   *HUB Grp., Inc. v. Clancy*, No. CIV.A. 05-2046, 2006 WL 208684, at *3 (E.D. Pa. Jan. 25, 2006), and this Court should find that there are enough details plead that Plaintiff has stated a claim for damages suffered as a result of the Defendants' illegal hacking and unauthorized access to Azima's computer.

Therefore this Court should sustain Count II of the FAC and deny Defendants' Motion to Dismiss this Count.

### C.     The FAC Adequately Pleads Defendants' Violations of the Wiretap Act

The Defendants argue that they should not be held liable for violating the Federal Wiretap Act Federal Wiretap Act", 18 U.S.C. § 2511(1) or D.C. Wiretap Act D.C. Wiretap Act", D.C. Code Ann. § 23-542(a) and 23-554 because there is no secondary liability for the actual "interception" of the email communications between Plaintiff and Azima for which they can be held liable.  But Plaintiff's claims for violating these statutes does not rely on secondary liability theory.  Rather, Plaintiff alleges that the Defendants are primarily liable for their "disclosures and use" of the intercepted email communications Count III, IV, Count V, and Count IV of the FAC. See also 18 U.S.C. § 2511(1)(c)-(d); D.C. Code Ann. § 23-542(a)(2)-(3).[265]

The Federal Wiretap Act prohibits the intentional (a) disclosure to any other person or (b) use of the contents of any wires, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection, 18 U.S.C. § 2511(1)(c) and (d).

Defendants all argue that the interception of the email communications needs to be contemporaneous citing to various Circuits which held that in order to violate the Federal Wiretap Act, 18 U.S.C. § 2511(1)(c) and (d), the "interception" of the communication needs to be "contemporaneous" with its transmission. Despite the Defendants' arguments, none of the Defendants have been able to cite to any case in the DC Circuit which supports the proposition that to show a violation of the statue the "interception" of the communication must be

---

[265] Plaintiff concedes that there may not be a violation of the D.C. Wiretap statute, as the interception was not aural, as defined by D.C. Code Ann. § 23-541(3) (West).  The Federal Wiretap statute does not require that the interception be aural.

"contemporaneous" with the communications transmission. And the reason they have not done so, is because such a case does not exist.

The timing and scope of the Defendants interceptions must still be investigated and discovered.   Indeed, there is nothing to suggest that said interceptions were not "contemporaneous".   As set forth, *supra*, and in the FAC, the FAC contains allegation after allegation with regards to Defendants' creation of an "Action Plan" which took the form of a hack and dump scheme, in which Azima's email and computer would be hacked and then dumped onto public locations accessible through the internet.[266] In order to effectuate the Action Plan, the Defendants hired ("procured") others to hack and gain access to Azima's computers and accounts through, *inter alia*, phishing and spear-phishing emails, which gave cover and *persistent access* to Azima's email accounts and computers and his communications with Solomon.[267] Moreover, the FAC set forth the roles each of the Defendants played in the Action Plan and ultimately the use and disclosure of the communications against Solomon in violation of the Federal Wiretap Act and the D.C Wiretap Act[268].

The FAC clearly sets forth enough allegations that some, if not all, of the interceptions of the communications could have indeed occurred contemporaneous with the transmission of the communication to others for their illicit use. Accordingly, although Plaintiff did not expressly state in the FAC that the interceptions of the communications were contemporaneous with their transmission, at this stage of the pleadings, it is not necessary for the FAC to include such an allegation and the allegations as are sufficient to permit an inference that the "interception" of the communications were contemporaneous. *See Council on Am.-Islamic Rels. Action Network, Inc.*

---

[266] FAC ¶¶ 77-79.
[267] FAC ¶¶ 84, 85 (emphasis added).
[268] FAC ¶¶ 18-31

*v. Gaubatz*, 891 F. Supp. 2d 13 (D.D.C. 2012). While the Defendants' argument that the interceptions were not contemporaneous, this may or may not turn out to have merit, but only after the parties have had an opportunity to develop the evidentiary record and at this stage of the proceedings, it is woefully premature for the Court to find otherwise. *Id.*

The Defendants also argue that the actual interception must have occurred within the United States, and specifically the District of Columbia.  Even assuming *arguendo*, that the "interception" was perpetrated outside of the United States, it is unquestionable that Azima was a U.S. citizen and resident of Missouri,[269] and it was his email and computer(s) that were hacked/phished were with him where he was resident.

The allegations in the FAC clearly assert that the "use" and "disclosure" by the Defendants of the communications which caused the damage to the Plaintiff were, *inter alia*, (a) perpetrated within the United States and within the District of Columbia, (b) when the Defendants targeted Plaintiff, who is a DC resident, with regards to his DC employer.

The FAC also alleges how the Defendants continued to target Plaintiff "to make sure his voice would be silenced by discrediting him and otherwise cause him harm to his business and properties."[270] by 'taking the information that they had stolen via the hacking and disseminating or causing to be disseminated this information in articles that they published or caused to be published on pay-to-play websites and other online public sources."[271]  The Plaintiff provides a list of seven articles, each of which was published in the sixth month period between October 11, 2019 and March 4, 2020,[272]  These articles which were published online, clearly touch the United

---

[269] Del Rosso Memo at Ex. B, ¶2.
[270] FAC at ¶110.
[271] *Id.*
[272] *Id.* at ¶111.

States and the District of Columbia, which also satisfies any requirement that the use or disclosure of any communications occur within the United States or the District of Columbia.

### D.    The FAC Alleges the Defendants Tortiously Interfered with Plaintiff's Business Relationships

Tortious interference with prospective business relationships has four elements: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995) (citing *Genetic Sys. Corp. v. Abbott Lab'ys*, 691 F. Supp. 407, 422–23 (D.D.C. 1988); *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284 (D.C. 1977).  The Defendants focus on the fact that the Plaintiff was an "at will employee" and therefore had no contractual relationship with the *Wall Street Journal*. However, the basis for Plaintiff's claims against the Defendants for interference in his business opportunities are not based on the Plaintiff being an employee of Dow Jones Industrial, the owner of the *Wall Street Journal*.  Rather, they rest on the Plaintiff's opportunities to continue to report and submit stories to the *Wall Street Journal* for publication as well as other opportunities with other publications, speaking engagements and book publishing all which relied on his reputation as a reliable investigative journalist.

First, Plaintiff has plead that had an economic relationship with the *Wall Street Journal*. Defendants do not dispute that Plaintiff was journalist who worked at the *Wall Street Journal* as a chief foreign affairs correspondent and that he had economic relationship with Dow Jones Industrial which owned and operated the *Wall Street Journal*[273] that he expected would continue.

---

[273] FAC ¶11

Second, Plaintiff has plead the Defendants' knowledge of his relationship with the *Wall Street Journal* and others. The FAC alleges that Defendants acted knowingly with the specific intent of harming Plaintiff and to "de-platform" him thereby interfering in his business relationships.[274] This is sufficient to state a cause of action for intentional interference because general allegations of knowledge are appropriate at the pleadings stage. *See Luna Distrib. LLC v. Stoli Grp. (USA), LLC*, No. SACV171552DOCJDEX, 2018 WL 5099277, at \*15 (C.D. Cal. July 10, 2018).

Finally, Plaintiff has established that this was an intentional disruption and had the intent to cause harm.  The FAC states that Defendants participated in a scheme for the express purposes of discrediting Plaintiff through the press and interfering in and disrupting Plaintiff's business relationships.[275]

The FAC further alleges that Plaintiff's business relationships have suffered material harm as a result of the scheme, and that the Plaintiff was forced to forego business opportunities due to the fallout from the cyberattack and lost goodwill due to Defendants' tortious conduct.[276] *See, e.g., Drouet v. Moulton*, 245 Cal. App. 2d 667, 671–73, 54 Cal. Rptr. 278, 281–82 (Ct. App. 1966) (recognizing that injury to reputation of the business and goodwill among other categories of damages may be predicated on tortious interference); *Pac. Mar. Freight, Inc. v. Foster*, No. 10-CV-0578-BTM-BLM, 2010 WL 3339432, at \*5 (S.D. Cal. Aug. 24, 2010) (same). One reason Plaintiff's business relationships have suffered is that the media assault was designed to misleadingly connect the Plaintiff to wrongdoing. Defendants argue that the FAC fails to set forth sufficient allegations of interference with business relationships because it does not identify

---

[274] FAC ¶12
[275] FAC ¶¶12-15
[276] FAC ¶¶14-15

Plaintiff's specific relationships that were harmed. That is simply not true. In the FAC, the Plaintiff alleges his relationship with the *Wall Street Journal* and others. Regardless, a general allegation that harm to Plaintiff's relationships with others is more than sufficient to plead a claim for tortious interference with prospective economic advantage. Plaintiffs are "not required to plead a specific economic relationship between itself and a third party" to assert a claim of tortious interference. *Grateful Dead Prods. v. Sagan*, No. C 06-07727 JW, 2008 WL 11389542, at *6 (N.D. Cal. Dec. 18, 2008) (denying motion to dismiss tortious interference claim were defendants "unlawfully made repeated negative public statements" about the plaintiff "to disrupt sales between [plaintiff] and its existing customers."). *In Redfearn v. Trader Joe's Co.*, 20 Cal. App. 5th 989, 230 Cal. Rptr. 3d 98, 112 (2018), the appellate court the reversed the dismissal of a tortious interference claim where defendant made "false statements" about the plaintiff accusing him of "unethical behavior . . . that would have a natural tendency to injure him in his trade or business." Likewise, Defendants' hacking and media assault on plaintiffs had the obvious and natural result of harming their relationships with those who could offer prestigious job opportunities, and other high value speaking and publishing opportunities. The FAC's allegations are thus plainly sufficient to state a valid claim for tortious interference with prospective economic advantage and therefore this Court should deny the Defendants' motion to dismiss this claim. *See Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1033–34 (N.D. Cal. 2018) (denying motion to dismiss claim for interference with prospective economic advantage).

### E.     The FAC Adequately Pleads a Civil Conspiracy Among the Defendants

Moreover, as an aider and abettor, the Defendants are vicariously liable for all of the underlying torts committed, including tortiously interfering with Plaintiff's business relationships with his employer and others.  In the District of Columbia, under the theory of civil conspiracy, aiders and abettors are liable for underlying torts when certain criteria are met.  *Lannan Found. v.*

*Gingold*, 300 F. Supp. 3d 1, 29–30 (D.D.C. 2017) *citing Chen v. Bell-Smith*, 768 F. Supp. 2d 121, 140–141 (D.D.C. 2011).  "These actors are liable when: (1) they assist 'the primary violator in performing a wrongful act that cause an injury', (2) they are 'generally aware of [their] role as part of an overall illegal or tortious activity at the time [they] provide the assistance', and (3) they 'knowingly and substantially assist[] in the principal violation'. *Id.*   The elements of civil conspiracy are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994); *see Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). While "there is no recognized independent tort action for civil conspiracy in the District of Columbia." "[C]ivil conspiracy depends on performance of some underlying tortious act." *Halberstam*, 705 F.2d at 479.

Here, as described *supra* and in the FAC, the Defendants actively engaged in coordinated activity to perform certain hacking efforts, including the recovery of the documents and communications that the Defendants used to cause the Plaintiff to, *inter alia*, lose his job and suffer the other damages as alleged.  These illicit activities have now been confirmed by Defendant's co-conspirator Page,[277] as he has admitted to brokering an arrangement in which Defendants Dechert and Gerrard retained Defendants Forlit, SDC-Gadot, and Insight to carry out the illegal hacking scheme.

The Defendants claim that because their alleged fraudulent statements, which collectively, directly and purposefully caused Plaintiff's injuries, were directed only towards Azima, the *Wall*

---

[277] FAC at ¶¶43-45, 120, 124-151, 155

*Street Journal* (as Solomon's employer) and other media outlets, the Defendants are somehow absolved of their RICO liability and therefore liability for civil conspiracy.[278] They would like this Court to characterize the *Wall Street Journal's* decision to terminate the Plaintiff as some independent decision based on its discovery of truthful information,[279] knowing full well that this information was packaged in a way it was presented and titled with the word "fraud" to cause harm and damage to Plaintiff and this only occurred as a result of their relentless and tortious efforts to generate pressure for this outcome, both by trying to fraudulently influence other media outlets after the initial disclosure to the *Wall Street Journal* did not achieve their intended outcome and then tortiously interfering with the Plaintiff's future business opportunities by further assaulting the Plaintiff's reputation even after he was fired, as to ensure that he would remain unemployed, deplatformed, silenced and effectively "blackballed".[280]

The technicality of who was targeted by the fraud is utterly irrelevant. "[T]here is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it." *Bridge*, 553 U.S. at 656. "[T]he plaintiff's loss must be a foreseeable result of someone's reliance on the misrepresentation." *Bridge*, 553 U.S. at 656. Here, the torts committed by the Defendants, in concert with each other, damaged the Plaintiff and therefore under the theory of civil conspiracy, each of these Defendants are liable.

### F.    Plaintiff is Entitled to Punitive Damages

In cases involving claims under both RICO and other causes of action, courts have permitted punitive damage awards. *Hargraves*, 140 F. Supp. 2d at 26–27. In the District of Columbia, an award of punitive damage is permissible when there is a valid basis for an award of

---

[278] Dechert Memo at 34; KARV Memo at 23; Gerrard Memo at 33
[279] Dechert Memo at 34; KARV Memo at 23; Gerrard Memo at 33
[280] FAC, ¶¶101-116

compensatory damages. *Jordan v. Medley*, 711 F.2d 211 (D.C. Cir. 1983); *Al-Kazemi v. Gen. Acceptance & Inv. Corp.*, 633 F. Supp. 540, 543–44 (D.D.C. 1986) (lowering, but permitting, a punitive damage award in addition to a RICO treble damage award). In the DC Circuit, punitive damages are appropriate if the defendant acted with gross fraud, wantonness, maliciousness, or willful disregard of the plaintiff's rights. *Rainbolt v. Johnson*, 669 F.2d 767, 769 (D.C. Cir. 1981).

In *Al-Kazemi*, a buyer of money certificates brought action in this Court for fraud and RICO violations against the issuer and its president. *Al-Kazemi*, 633 F. Supp. at 541. The Court found that since plaintiff had sustained actual damages, he could obtain punitive damages by showing that the defendants acted with "gross fraud, wantonness, maliciousness, or willful disregard" for the rights of others. *Al-Kazemi v. Gen. Acceptance & Inv. Corp.*, 633 F. Supp. 540, 543 (D.D.C. 1986) (citing *Rainbolt v. Johnson*, 669 F.2d 767, 769 (D.C. Cir. 1981); *Subscription Television of Greater Washington v. Kaufmann*, 606 F. Supp. 1540 (D.D.C. 1985)).  On the basis of the evidence presented, which included affidavits attesting to loss, the money certificate and communications with the issuer, the Court had "little difficulty" in concluding that defendants acted with gross fraud or with willful disregard for the rights of those who were taken in by the certificate scheme and awarded punitive damages of $50,000 on top of the treble damage award of $133,673.76 and attorney's fees and costs. *Al-Kazemi*, 633 F. Supp. at 543–44.

As alleged, the Defendants acted with malice and specific intent to target the Plaintiff by committing outrageous activity and gross fraud, in that they fraudulently obtained communications from Azima's email account, then fraudulently presented those communications to Solomon's employer and the media to get Solomon fired from his job and destroy his reputation, and then perpetrated an unthinkable coordinated fraud on several courts, including this Court, which

included false statements in filings and propounded discovery, pre-rehearsed coordinated perjury in live court proceedings and the destruction of evidence.[281]

In addition to the wantonness, maliciousness, or willful disregard shown to Plaintiff Solomon through the targeting of his employment and reputation, as a means of silencing the free press, the Defendants – particularly Defendants Dechert, Gerrard and Hughes – were incredulously malicious in their treatment of the two RAKIA executives, who they tortured in detention, seeking false confessions, at the expense of the executives' liberty and livelihood – as they remain incarcerated to this day.

As the Eight Circuit has pronounced, "an attorney's license is not an invitation to engage in racketeering, and a lawyer no less than anyone else is bound by generally applicable legislative enactments." *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997). The fact that a defendant has the good fortune to possess the title "attorney at law" is, standing alone, completely irrelevant to the analysis dictated by the Supreme Court." *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997).

Defendants Dechert, Gerrard and Hughes have disgraced the legal profession with their acts, behavior and callous disregard for the rights of others, and the integrity of the law. This is a case in which punitive damages should remain in consideration.

III.     **This Court has Personal Jurisdiction over Defendants Hughes, Gerrard, Del Rosso and Vital Management**

A.     **Personal Jurisdiction over Defendants Del Rosso and Vital is established via 18 U.S.C. § 1965(b)**

---

[281] FAC at ¶¶ 99-151

The Del Rosso Defendants argue that they are not subject to jurisdiction in the District of Columbia under the RICO statute, and even if they are, the Court should not exercise jurisdiction on the grounds of due process.[282]  They are wrong on both points.

The Federal Rules of Civil Procedure provide that "[s]erving a summons ... establishes personal jurisdiction over a defendant ... when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1). The RICO statute specifically provides that, if "the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof." 18 U.S.C. § 1965(b). The "ends of justice" require that plaintiffs may bring all members of a nationwide RICO conspiracy before a court in a single trial.  *Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc*., 788 F.2d 535, 539 (9th Cir. 1986) (*citing Sanders v. United States*, 373 U.S. 1, 17, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963)).

In this way, as their co-Defendant Hughes points out, "[t]he RICO statute provides for nationwide personal jurisdiction over *all domestic defendants*." *Nuevos Destinos, LLC v. Peck*, No. 15-CV-1846 (EGS), 2019 WL 78780, at *12 (D.D.C. Jan. 2, 2019) (emphasis added).

Moreover, courts have "uniformly held that '[w]hen the personal jurisdiction of a federal court is invoked based upon a federal statute providing for nationwide or worldwide service, the relevant inquiry is whether the respondent has had sufficient minimum contacts with the United States.'" *U.S. S.E.C. v. e-Smart Techs., Inc.*, 926 F. Supp. 2d 231, 236 (D.D.C. 2013).  The Del Rosso Defendants do not deny their contacts with the United States as a whole and "would have difficulty doing so," since they live in North Carolina, and thus their argument on personal jurisdiction cannot prevail. *Id.*

---

[282] Del Rosso Memo at 8-9.

In support of their argument that establishing personal jurisdiction over them under the RICO statute would not comport with the bounds of due process, the Del Rosso Defendants cite only to one footnote of one inapplicable case. *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 84, n.8 (D.D.C. 2004). In that case, the Court *granted* plaintiffs' motion for jurisdictional discovery over the one remaining out of state plaintiff after they were unable to show jurisdiction over any of the other defendants due to "among other things, the sovereign immunity issues involved." *Id.* For that reason, the Court warns the plaintiffs that it "does not take the 'ends of justice' to mean that when due process gets in the way of the application of one jurisdictional theory, the defendant should be haled in to court on a more lenient theory." *Id.*

In this case, by contrast, none of the other U.S.-based Defendants, all of whom are in some way based out-of-state, argue against the exercise of personal jurisdiction by this Court.[283]  There is no basis for withholding the exercise of jurisdiction against the Del Rosso Defendants on due process grounds.

B.   **Exercise of Personal Jurisdiction is Proper Over All Defendants Under DC's Long-Arm Statute**

The Plaintiff has plead sufficient facts to establish specific personal jurisdiction over all Defendants.  Indeed, Defendants Dechert, KARV, Frank, Handjani, SDC-Global and Insight, do not contest personal jurisdiction as being established in the District of Columbia by virtue of their alleged participation in the racketeering enterprise and conspiracy.[284]

All of those challenging the exercise of personal jurisdiction, either under one of the prongs of DC's long-arm statute – namely, D.C. Code Ann. § 13-423(a)(3) and (4) (West) – or by

---

[283] See generally, Dechert Memo, KARV Memo, SDC Memo,
[284] See generally, Dechert Memo, KARV Memo, SDC Memo,

extension of other Defendants' uncontested jurisdiction via the application of conspiracy jurisdiction.

According to DC's long-arm statute, a "District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; or  (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code Ann. § 13-423(a).

Where civil conspiracy is adequately plead, the Court may exercise jurisdiction over all defendants pursuant to the "conspiracy" theory of long-arm jurisdiction. *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 140 (D.D.C. 2004) (*citing Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)).  Under this doctrine, acts undertaken within the forum by one co-conspirator in furtherance of an alleged conspiracy may subject a non-resident co-conspirator to personal jurisdiction under the long-arm statute. *Id.* Conspiracy jurisdiction under this subsection presumes that "[p]ersons who enter the forum and engage in conspiratorial acts are deemed to 'transact business' there 'directly'; [and] coconspirators who never enter the forum are deemed to 'transact business' there 'by an agent.' " *Id.* at 141.  So long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over all members of the conspiracy. *Id.*

The FAC states a cause of action for civil conspiracy.[285]  Thus, even if the long-arm statute does not directly provide a basis for finding jurisdiction directly against each of the challenging

---

[285] See infra. at ___

Defendants, they still fall within the jurisdiction of the Court on a showing that as the FAC adequately pleads (a) a tortious injury in Washington, DC that was caused by the Defendants and (b) that at least one of the Defendants either (i) committed at least one overt act in furtherance of the conspiracy in Washington, DC under D.C. Code Ann. § 13-423(a)(3) or (ii) transacted sufficient business in Washington, DC under D.C. Code Ann. § 13-423(a)(4).[286]

Specifically, the Plaintiff alleges that the Defendants knowingly and purposefully sent via mail and/or wire to the Washington DC Bureau of the *Wall Street Journal* a compilation of stolen documents that were presented in a misleading and fraudulent way to wrongly convey the perception that the Plaintiff engaged in illegal acts, in which he did not in fact engage.[287]  Because the wires and/or mails were received in Washington, DC, they constitute a tortious injury in Washington, DC. *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 53 (D.D.C. 2018); *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 67 (D.D.C. 2021) (injury to reputation).

It is therefore enough for the Plaintiff to plead that only one of the Defendants either committed the requisite "overt act" or sufficiently transacted business in Washington, DC to establish this Court's personal jurisdiction over all of the Defendants.  There are several alternative ways this is achieved in the FAC's pleadings.

*First,* because the fraudulent wires and/or mails were purposefully sent into Washington, DC they constitute an act occurring in Washington, DC that therefore satisfies the specific jurisdiction prong D.C. Code Ann. § 13-423(a)(3) of the long arm statute.

*Second,* Defendant David Hughes is alleged to have committed wire fraud and obstructed justice in Washington, DC by virtue of his witness statement, which was filed in this Court in July

---

[286] Because most of the Defendants are not challenging personal jurisdiction, the Court has discretion and good reason to find on this fact alone that the personal jurisdiction in may exercise over those Defendants extends to the minority of Defendants who are challenging personal jurisdiction.
[287] FAC at ¶15

2018, which knowingly and falsely stated that a "public relations company" innocently found Azima's stolen data on the internet, when it was in fact the Defendants, including Hughes, who illegally procured the theft of the data.[288]   This alone allows this Court to exercise personal jurisdiction over Hughes under D.C. Code Ann. § 13-423(a)(3), as well as over all other Defendants, including Gerrard, Del Rosso and Vital via conspiracy jurisdiction. *Edmond v. U.S. Postal Serv. Gen. Couns.*, 949 F.2d 415, 425 (D.C. Cir. 1991) ("We do not at this stage attempt to address the limits on the use of conspiracy theory to establish personal jurisdiction. Whatever those limits, it is an abuse of discretion to deny jurisdictional discovery where the plaintiff has specifically alleged: (1) the existence of a conspiracy, (2) the nonresident's participation, and (3) an injury-causing act of the conspiracy within the forum's boundaries.")

Additionally, the FAC pleads that Defendant Hughes is a lawyer and former Dechert partner who served as a high-level deputy of Gerrard in the enterprise.[289]   Between September 2014 and June 2017, Hughes was a partner at Dechert, where he worked closely with Gerrard in organizing and structuring the enterprise, coordinating and carrying out its affairs, and directing and executing its illegal acts.[290]   Hughes has transacted business and engaged in conduct in the United States which gives rise in part to the damages that Plaintiff Jay Solomon suffered in Washington DC.[291] As detailed further below, Defendant Hughes engaged in conduct in the United States and directed toward the United States related to the scheme and directed at the United States proceedings.[292]   For the same reasons, Hughes has engaged in intentional, wrongful, illegal, and/or acts the effects of which Hughes knew and intended would be felt in the United States and

---

[288] FAC at ¶125.
[289] FAC at ¶23.
[290] FAC at ¶23.
[291] FAC at ¶5.
[292] FAC at ¶5.

Washington, DC.[293]  Also, as set forth more fully herein, Hughes' co-conspirators and agents have

engaged in intentional, wrongful, illegal, and/or acts in the United States and Washington DC. [294]

Hughes was aware of the effects in the United States and Washington DC of those acts.[295]

    *Third*, as to Defendant David Gerrard, the FAC pleads sufficient "plus factors" – i.e., that

he transacted sufficient business in Washington, DC—to establish this Court's exercise of personal

jurisdiction over him.  Specifically, the FAC alleges that Defendant Gerrard was one of the leaders

of the enterprise and Dechert, both as Gerrard's employer and in its own distinct way, played a

central role in the enterprise's affairs and criminal activity.[296] Gerrard joined Dechert in 2011,

retired from Dechert at the end of 2020 and as recent as April 4, 2022 was listed on Dechert's

website as a "Retired Partner".[297]

    Prior to his retirement, Gerrard served as Dechert's co-head of its White-Collar Practice,

which consists of over one hundred attorneys who primarily work out of Dechert's offices in

London, New York and Washington DC, and a member of Dechert's Policy Committee.[298]

Dechert's page for its White Collar Practice touts that "Clients seek out our white collar lawyers

in Washington, D.C., London, and other global hubs for good reason . . . Our global presence

enables us to represent clients both in single and multi-jurisdictional matters – criminal cases,

internal investigations, enforcement matters – worldwide."[299]  *See Blumenthal v. Drudge*, 992 F.

Supp. 44, 56–57 (D.D.C. 1998) (person engaged in political affairs in DC avails himself of the

forum). Regarding internal investigations, Dechert states that "Dechert has represented clients in

all phases of internal investigations, and we have extensive experience in the full range of matters

---

[293] FAC at ¶5.
[294] FAC at ¶5.
[295] FAC at ¶5.
[296] FAC at ¶¶19-21.
[297] FAC at ¶21.
[298] FAC at ¶21.
[299] FAC at ¶4.

that often parallel or derive from them. Our familiarity and frequent interactions with regulators and enforcement agencies enhance our ability to protect our clients' interests."[300]

Accordingly, Gerrard as a partner of Dechert and as a leader of Dechert's White Collar Practice availed himself and benefited from Dechert's global reach, particularly including its presence in Washington D.C., and including in the context of this specific matter.[301]  *See Guttenberg v. Emery*, 41 F. Supp. 3d 61, 68 (D.D.C. 2014) (an employee of a practice that renders services in D.C. "derives substantial revenue" from those services under D.C. Code Ann. § 13-423(a)(4)). Gerrard regularly communicated to and/from as well as was located in the District of Columbia including interfering directly or indirectly with Solomon's employment in Washington, DC.[302] *See Vasquez*, 302 F. Supp. 3d at 53 (finding the defendant's provision of legal services in connection with the plaintiffs in the District of Columbia makes it "plausible" the defendant has provided similar services in the past in this forum).  These plus factors allow this Court to exercise personal jurisdiction over Gerrard under D.C. Code Ann. § 13-423(a)(4), as well as over all other Defendants, including Hughes, Del Rosso and Vital via conspiracy jurisdiction.

*Finally*, the FAC alleges that Defendant Dechert employees nearly 100 lawyers, as well as related support staff, in its Washington DC office located at 1900 K Street NW.[303]   This alone allows this Court to exercise personal jurisdiction over Dechert,[304] and its former employees Gerrard and Hughes under D.C. Code Ann. § 13-423(a)(4),[305] as well as over all other Defendants, including Del Rosso and Vital both via conspiracy jurisdiction and by virtue of their transmission

---

[300] FAC at ¶4.
[301] FAC at ¶4.
[302] FAC at ¶4.
[303] FAC at ¶3.
[304] *IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 161 (D.D.C. 2010) ("the plus factors are satisfied by connections considerably less substantial than those it takes to establish general, all-purpose 'doing business'—or 'presence'—based jurisdiction.")
[305] *Guttenberg*, 41 F. Supp. 3d at 68.

of computer files over the Internet in connection with their contract with Dechert. *Blumenthal*, 992 at 55 ("If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.")

IV.   <u>**A More Definite Statement Is Not Required**</u>

Under Rule 12(e), "[a] party may move for a more definite statement of a pleading ... which is so vague or ambiguous that the party cannot reasonably prepare a response." FED. R. CIV. P. 12(E); *Swierkiewicz*, 534 U.S. at 514 (stating that "[i]f a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e)"); Rule 12(e) should not frustrate the "liberality" of the notice pleading requirement by requiring a plaintiff to amend a complaint that would be sufficient to survive a motion to dismiss. *Mitchell v. E-Z Way Towers, Inc.*, 269 F.2d 126, 130, 132 (5th Cir. 1959); *see also Rahman v. Johanns*, 501 F. Supp. 2d 8, 19 (D.D.C. 2007) (holding that a more definite statement was not necessary because the plaintiff had provided a sufficient description of factual allegations and those allegations were "readily understandable".

Given the liberal nature of the federal pleading requirements, courts are reluctant to compel a more definite statement pursuant to Rule 12(e) out of fear that such action will become a substitute for discovery. *Fraternal Ord. of Police Libr. of Cong. Lab. Comm. v. Libr. of Cong.*, 692 F. Supp. 2d 9, 19 (D.D.C. 2010) (citing *Hilska v. Jones*, 217 F.R.D. 16, 25 (D.D.C. 2003)); *see also Mitchell*, 269 F.2d at 132 (determining that the information sought was an issue for discovery rather than the pleadings).

The Plaintiff has already filed an amended complaint wherein he has detailed with even more particularity his allegations supporting each of his claims.  Moreover, even if the FAC is not

a model of clarity, it provides the Defendants with sufficient notice of the Plaintiff's RICO and other claims and the facts supporting them.

Finally, it should be noted Rule 12(e) motions are disfavored for their dilatory effect on the progress of litigation. *Covington v. City of New York*, No. 98 CIV. 1285 (MGC), 1999 WL 739910, at *9 (S.D.N.Y. Sept. 22, 1999). Requiring the Plaintiff in this case to again amend his complaint would delay the prompt resolution of this case. Indeed, it would effectively restart the litigation clock by allowing the Defendants to move to dismiss for a second time. *See In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006) (explaining that an amended complaint "supercedes" the original and "entitles a defendant to raise substantive arguments" in a new responsive pleading, even if those arguments were not raised in response to the original complaint); *Chase v. Peay*, 286 F. Supp. 2d 523, 531 (D. Md. 2003) (stating that an amended complaint "opens the door for defendants to raise new and previously unmentioned affirmative defenses" (quoting *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999))). Therefore, this Court should conclude that ordering the Plaintiff to further amend his complaint is unnecessary because the Plaintiff has complied with pleading standards and because discovery will elucidate any ambiguity regarding Plaintiff's claims.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, this Court should find that Plaintiff's First Amended Complaint sets forth on its face facts which, when proven at trial, demonstrate that the (i) Plaintiff's claims were timely filed and brought before this Court; and Defendants (ii) engaged in a racketeering in such that they conspired with each other to cause injury and damage to the Plaintiff, (iii) violated the Computer Fraud and Abuse Act thereby causing them to be both primarily and secondarily liable to the Plaintiff, (iv) violated the Federal Wiretap Act by disclosing

and using wire and/or electronic communications, and (v) committed the torts of tortious interference in Plaintiff's business relationships and civil conspiracy thereby entitling the Plaintiff to compensatory and punitive damages.

In addition, the Court should find that it has personal jurisdiction over Defendants Hughes, Gerrard, Del Rosso and Vital Management and that the Complaint sufficiently sets forth detailed facts such that Defendants Israel Insight Analysis and SDC-Gadot motion for a more definite statement should be denied.

Dated:  May 31, 2023                    Respectfully Submitted,

                                        HEIDEMAN NUDELMAN & KALIK P.C.

                                        By:     */s/ Noel J. Nudelman*
                                                */s/ Tracy Reichman Kalik*
                                                Richard D. Heideman (No. 377462)
                                                Noel J. Nudelman   (No. 449969)
                                                Tracy Reichman Kalik (No. 462055)
                                                Joseph H. Tipograph (No.997533)
                                                HEIDEMAN NUDELMAN & KALIK, PC
                                                5335 Wisconsin Avenue, NW; Suite 440
                                                Washington, DC  20015
                                                Telephone: 202.463.1818
                                                Facsimile: 202.463.2999